Vol 1 of 2

E

COURT OF CRIMINAL APPEALS NO. 02-0634

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

FROM

CIRCUIT COURT OF Montgomery COUNTY, ALABAMA

CIRCUIT COURT NO. CC-00-909

CIRCUIT JUDGE Truman Hobbs

Type of Conviction / Order Appealed From: Robbery I

Sentence Imposed: life

Defendant Indigent: ☒ YES ☐ NO

Kourtney Sovern Greenwood, Ali[?]

Kourtney Greenwood

**NAME OF APPELLANT**

Marco Kirkland    261-6200
(Appellant's Attorney)          (Telephone No.)
529 S. Perry St.
(Address)
Montgomery    AL    36104
(City)          (State)          (Zip Code)

V.

## STATE OF ALABAMA

(State represented by Attorney General)

NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

**NAME OF APPELLEE**

```
FILED
FEB 11 2003
CLERK
ALA COURT CRIMINAL APPEALS
```

(For Court of Criminal Appeals Use Only)

MAR 25 2003    SUBMITTED ON BRIEFS

AFFIRMED BY MEMORANDUM.
ALL THE JUDGES CONCUR.

JUN 6 2003

APPLICATION
FOR REHEARING

JUN 13 2003

APPLICATION FOR REHEARING
OVERRULED. NO OPINION
ALL THE JUDGES CONCUR.

PETITION FOR CERTIORARI
DENIED BY
ALABAMA SUPREME COURT

```
EXHIBIT
P
```

# Court of Criminal Appeals

State of Alabama

Judicial Building, 300 Dexter Avenue

**P. O. Box 301555**

**Montgomery, AL 36130-1555**

MAY 2 3 2003

H.W."BUCKY" McMILLAN
Presiding Judge
SUE BELL COBB
PAMELA W. BASCHAB
GREG SHAW
A. KELLI WISE
Judges

Lane W. Mann
Clerk
Wanda K. Ivey
Assistant Clerk
(334) 242-4590
Fax (334) 242-4689

## MEMORANDUM

CR-02-0634                    Montgomery Circuit Court CC-02-909

Kourtney Sovern Greenwood v. State

McMILLAN, Presiding Judge.

The appellant appeals from his conviction for robbery in the first degree, a violation of § 13A-8-41, Ala. Code 1975. He was sentenced to life imprisonment, ordered to pay $96 restitution, $25 to the Victims Compensation Fund, attorneys' fees, half of all money he earns in the penitentiary, and assessed court costs.

The appellant argues that the trial court erred in denying his motion for a judgment of acquittal because the State presented insufficient evidence to sustain his conviction. Specifically, he argues that the robbery victim's identification of him as the second robber was inconsistent and, therefore, constituted unreliable witness identification.

1

The record indicates that the appellant's motion for a judgment of acquittal at trial was based upon a claim that the State failed to present any evidence that the second man present with Jamar Brown was actually participating in the robbery. Because the appellant's argument on appeal in support of his motion for a judgment of acquittal is different from the argument he presented to the trial court, his argument was not preserved for appellate review. <u>Rogers v. State</u>, 819 So. 2d 643 (Ala. Crim. App. 2001) (A statement of specific grounds of objection waives all grounds not specified, and the trial court will not be put in error on grounds not assigned at trial.)

The judgment of the trial court is affirmed.

AFFIRMED.

Cobb, Baschab, Shaw, and Wise, JJ., concur.

2

## INDEX – CLERK'S RECORD

| | |
|---|---|
| CASE ACTION SUMMARY | 1-4 |
| INDICTMENT | 5-6 |
| NOTICE OF DISCOVERY | 7-8 |
| MOTION FOR CONSOLIDATION OF DEFT AND CASES | 9-10 |
| ORDER FOR CONSOLIDATION OF DEFT AND CASES | 11 |
| JURY STRIKE LIST | 12 |
| JURY VERDICT | 13 |
| PRIORS | 14-34 |
| CERTIFICATE OF APPEAL | 35 |
| TRANSCRIPT OF RECORD | 36 |
| AMENDED TRANSCRIPT OF RECORD | 37 |
| ORDER APPOINTING MACEO KIRKLAND ON APPEAL | 38 |
| DOCKETING STATEMENT | 39-40 |
| REPORTER'S TRANSCRIPT ORDER | 41 |
| EXHIBITS | 42-47 |
| CERTIFICATE OF COMPLETION | 48 |

```
                   ALABAMA JUDICIAL INFORMATION SYSTEM    CASE: CC 2002 000909.0
CRO372                     CASE ACTION SUMMARY                    RUN DATE: 07/24/2002
PER: DBH                  CIRCUIT   CRIMINAL
AGE:   1                                                          JUDGE: SMG
========================================================================
    HE CIRCUIT COURT OF MONTGOMERY
TATE  OF   ALABAMA            /      VS      GREENWOOD KOURTNEY SOVERN
                                             103 COURTLAND DRIVE
ASE: CC 2002 000909.00                       MONTGOMERY, AL  36105 0000

                          SEX: M  RACE: B  HT: 5 11  WT: 135   HR:       EYES:
OB: 12/11/1979                                       KOURTNEE GREENWOOD
SN: 903070232   ALIAS NAMES: COURTNEY GREENWOOD
========================================================================
                                CODE01: ROB1  LIT: ROBBERY 1ST    TYP: F #: 001
HARGE01: ROBBERY 1ST            AGENCY/OFFICER: 0030100
FFENSE DATE:
                                         DATE ARRESTED: 07/24/2002
ATE WAR/CAP ISS:                         DATE   FILED: 07/24/2002
ATE    INDICTED: 07/19/2002              DATE  HEARING:
ATE    RELEASED:                            SURETIES:
OND    AMOUNT:      $30,000.00
                                         TIME: 0000
ATE 1:          DESC:                    TIME: 0830 A
ATE 2: 08/01/2002  DESC: ARRG                            /

RACKING NOS: GJ 2002 070232 00  /        TYPE: A                    TYPE:

   DEF/ATY: Hartley                                          00000 DC9 ✓
                            00000
                                                            O 28
PROSECUTOR:
========================================================================
                                                    GRAND JURY: 232
TH CSE: GJ200207023200 CHK/TICKET NO: UNKNOWN
ORT REPORTER: ---------- SID NO:      001357047          OPER: DBH
   STATUS: JAIL              DEMAND:
========================================================================
DATE        ACTIONS, JUDGEMENTS, AND NOTES
```

| DATE | ACTIONS, JUDGEMENTS, AND NOTES |
|---|---|
| 8-1-02 | W. Durant for Arraignment W. Hartley appointed |
| | DEFENDANT ARRAIGNED IN OPEN COURT, PLEADS NOT GUILTY. YO set 9-5-02 @ 8:30 SMG |
| 9-5-02 | ∆ denied YO - not eligible, set for trial SMG |
| 9/23/02 | Notice of Discovery |
| 10-18-02 | Motion by State to Consolidate with 02-905 - Jamar Brown granted. ∆ present for pretrial SMG |

ACR0369  A L A B A M A   J U D I C I A L   I N F O R M A T I O N   C E N T E R

CASE ACTION SUMMARY
CONTINUATION

CASE: CC 2002 000909.00
JUDGE ID:  SMG

_TATE OF ALABAMA                    VS    GREENWOOD KOURTNEY SOVERN

| DATE | ACTION, JUDGMENTS, CASE NOTES |
|---|---|
| 10-30-02 | **MISTRIAL GRANTED** after a Jury was sworn in and some Testimony taken  SMG |
| | Circuit Judge |
| 12-11-02 | **JUDGEMENT IS HEREBY ENTERED IN ACCORDANCE WITH THE VERDICT OF THE JURY.** guilty of Robbery! Sentencing 12-30-02 |
| | SMG |
| | Circuit Judge |

| State of Alabama Unified Judicial System | CASE ACTION SUMMARY CONTINUATION | Case Number CC 02- 0909 |
|---|---|---|
| Form C-7    Rev 2/79 | | |

Style: _Kourney Teach_

Page Number _____ of _____ Pages

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|---|---|

**12-30-02**

Defendant & attorney appeared for sentencing. Court asked if he/she had anything to say why sentence should not now be pronounced and Defendant had his/her say.

HOA Enhancements Applicable (Yes)/No
Defendant Admits _____ State Proves _2_ priors

**IT IS ORDERED:**

Sentenced to _Life_ yrs./split to serve _____ yrs.
_____ reverse split postpone _____ Review _____
Concurrent _____    Consecutive _____

Suspended YES/(NO) Supervised/P.O/Court Probation _____ Level II
_____ years   End of Split Sentence _____ years
_____ DOC to give 60 day notice prior to E.O.S.

ENHANCEMENTS    $1000/2000 Enhancement Fine
_____ Remit portion completion of SAP
_____ Driver License suspended/revoked 6 mo/_____
_____ $100 DFS fee _____ $100 Head Injury
_____ years School _____ years Public Housing
_____ years Sale under 18

Boot Camp___ SAP___ Review upon completion-YES ___ GED___
Work Release___Community Service _____hrs. Trash Pickup _____hr
**OTHER:**

Restitution $_96.00_____Co-Defendant(s)_____
Jointly and Severally liable   Crime Victim $25.00/($50.00)_____
Court Costs _✓_ Attorney Fees $150.00/_✓_ Fine $_____
Payment $_____Mo/Week Begin_____/02 or 1/2 monies earned _✓_

Defendant advised right to appeal yes/no unless reserve issue or withdraw plea; Defendant to be given credit for time served.
Appeal Bond set $_____

SWG
SALLY GREENHAW
CIRCUIT JUDGE

_Oral Notice of appeal given_ (SWG)

ACRO369  A L A B A M A    J U D I C I A L    I N F O R M A T I O N    C E N T E R

CASE ACTION SUMMARY
CONTINUATION

CASE: CC 2002 000909.00
JUDGE ID: SMG

STATE OF ALABAMA                    VS    GREENWOOD KOURTNEY SOVERN

| DATE | ACTION, JUDGMENTS, CASE NOTES |
|------|------------------------------|
| 1-3-03 | Certificate of Appeal to Court Of Criminal Appls, AG, DA, attorney (w/forms) and Court reporters (should not have been done until sentencing was put in computer Issued In Error) ne |
| 1-8-03 | Corrected Certificate Of Appeal to Court Of Criminal Appls, AG, DA, attorney (w/forms) & Court reporters |
| 1-29-03 | forms filed |
| 2-6-03 | forms filed |

5

Oc 02 909

GJ NO. _____ 0232

**THE STATE OF ALABAMA**

Kourtney SoveYn Greenwood
B/M HT:5'11 WT:135 DOB:12/11/79

103 Courtland Dr.

SID. NO. _____ 01357047   ARREST DATE _____

FOR

Robbery 1

SMG

Oc-dup

Presented in open Court by the Foreperson of
the Montgomery County Grand Jury in the pres-
ence of _____ 14 _____ other members of
the Grand Jury and filed this _____ 14th _____ day of
_____ July _____, 02.

_____
Clerk of the Circuit Court of Montgomery County

**WITNESSES**

N.T. Buce
Wk:MPD

Larry Copeland, Jr.
3380-F McGehee Rd

**A TRUE BILL**

_____
Foreperson of Grand Jury

No Prosecutor

**BAIL IN THIS CASE IS FIXED AT**

$ 30,000

_____
Judge of Circuit Court of Montgomery County

CC NO. _____

Perkins

SEPP. 901

# THE STATE OF ALABAMA

## MONTGOMERY COUNTY

Circuit Court of Montgomery County, _____ JULY _____ Term, A.D. __2002__

The Grand Jury of said County charge that, before the finding of this indictment,

```
KOURTNEY SOVERN GREENWOOD, alias
KOURTNEE S. GREENWOOD, alias
KOURTNEE SOVENS GREENWOOD, alias
COURTNEY S. GREENWOOD, alias
K.S. GREENWOOD, alias
KOURTNEY S. GREENWOOD, alias
KOURTNEE SOVERN GREENWOOD, alias
KOURTNEE SOVENSKY GREENWOOD, alias
COURTNEY SOVENSKY GREENWOOD, alias
COURNEY GREENWOOD,
```

whose name is otherwise unknown to the Grand Jury, did, in the course of committing a theft of lawful currency and/or coinage of the United States of America, of some value, a better description of which is unknown to the Grand Jury, use force against the person of the owner or any person present, Larry Copeland, Jr., with intent to overcome his physical resistance or physical power of resistance, or threaten the imminent use of force against the person of the owner or any person present, Larry Copeland, Jr., with intent to compel acquiescence to the taking of or escaping with the property, while the said Kourtney Sovern Greenwood, alias was armed with a deadly weapon or dangerous instrument, a gun, a better description of which is unknown to the Grand Jury, in violation of Section 13A-8-41 of the Code of Alabama,

against the peace and dignity of the State of Alabama.

_Eleanor I. Brooks_
District Attorney, Fifteenth Judicial Circuit of Alabama

**IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
MONTGOMERY COUNTY, ALABAMA**

| | |
|---|---|
| STATE OF ALABAMA )<br>    Plaintiff, )<br>              )<br>v.             )<br>*Kourtney S. Greenwood* )<br>    Defendant )<br>             ) | CC No. *02-909* -SMG |

## NOTICE OF DISCOVERY

COMES NOW the State of Alabama by and through its District Attorney for the Fifteenth Judicial Circuit, Eleanor I. Brooks, and gives notice of discovery to the defendant, notice of intent to use prior convictions, notice of intent to invoke sentencing enhancements, notice of intent to offer proof by a certificate of analysis, and motion for discovery by the State:

(    ) 1.    Pursuant to Rule 16.1, A.R.Cr.P., and as otherwise required by law, all available discovery has been provided or made available to the Defendant. Arrangements to inspect physical evidence may be made by contacting the undersigned.

The State of Alabama has furnished a copy of the discovery by sequentially Bates numbered pages from 000001 thru 0000 *102*. (Pages *3, 100* have not been provided as they are either work product and/or NCIC, which cannot be provided pursuant to state law, unless ordered by the Court). The State of Alabama considers this discovery material to have been received in its entirety by Defense Counsel unless promptly notified in writing of any discrepancies.

( ✓ ) 2.    The State of Alabama intends to use at trial any and all prior convictions, crimes, wrongs, or acts of the Defendant permitted by Rules 404(b) and 609 of the Alabama Rules of Evidence, and as otherwise allowed by law. The State of Alabama is presently aware of, and intends to use, the following:

*Robbery I — 94-1286 SMG*

*POM I — 99-0463*

_____

_____

_____

_____

( ✓ ) 3.    The State of Alabama intends to invoke all sentencing enhancements required or permitted by law, including the Habitual Felony Offender Act, pursuant to §13A-59-9, <u>Code of Alabama</u>, 1975, based on any applicable felony convictions known or any which may subsequently be discovered and/or disclosed.  And, if applicable, the following:

( ✓ )  Enhancement for use of firearm or deadly weapon.  Minimum term of imprisonment of 20 years.
( __ )  Five Year enhancement for Sale of Drugs within three (3) miles of a school, §13A-12-250.
( __ )  Five Year Enhancement for Sale of Drugs within three (3) miles of housing project, §13A-12-281.
( __ )  $1,000.00 Fine, §13A-12-281.
( __ )  $2,000.00 Fine, §13A-12-281.
( __ )  Suspension of Driver's License, §13A-12-290.
( __ )  Five Year Enhancement for Possession of Firearm, §13A-12-231(13).

( __ )  4.    Pursuant to §§ 12-21-300 through 303, <u>Code of Alabama</u>, 1975, written notice is hereby given of the State's intent to offer proof by a certificate of analysis in lieu of direct testimony.  The certificate of analysis is from the Alabama Department of Forensic Sciences and a copy is included in the discovery material.

( ✓ )  5.    Pursuant to Rules 16.2 and 16.4(c), A.R.Cr.P., and as otherwise required by law, the Defendant is to provide the State of Alabama, within seven (7) days, a copy of all discovery to which it is entitled.

Respectfully submitted this 20th day of _September_ , 2002.

ELEANOR I. BROOKS
DISTRICT ATTORNEY

By:    _Vernetta R. Perkins_
Vernetta R. Perkins (PER067)
Deputy District Attorney

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served upon the Attorney for the Defendant, _Wiley Hartley_ by hand delivery or by placing same in the appropriate Courthouse Box, or by posting in the United States mail, postage prepaid and properly addressed, on the 20th day of _September_ , 2002.

ELEANOR I. BROOKS
DISTRICT ATTORNEY

By:    _Vernetta R. Perkins_
Vernetta R. Perkins (PER067)
Deputy District Attorney

9

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
MONTGOMERY, ALABAMA

| | | |
|---|---|---|
| STATE OF ALABAMA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | |
| | ) | |
| KOURTNEY S. GREENWOOD, | ) | CC No. 02-0909-SMG |
| JAMAR BROWN, | ) | CC No. 02-0905-SMG |
| Defendants, | ) | |

## MOTION FOR CONSOLIDATION OF DEFENDANTS AND CASES

**COMES NOW** the State of Alabama, by and through its District Attorney for the Fifteenth Judicial Circuit, Eleanor I. Brooks, and, pursuant to Rule 13.3 of the Alabama Rules of Criminal Procedure, moves this Honorable Court to consolidate the above-styled cases for trial on the ground that each of the above-named Defendants has been charged in separate indictments alleging participation in offenses that are the same act or transaction, or are a part of a common conspiracy, scheme, or plan, or are otherwise so closely connected that it would be difficult to separate the proof of one from proof of the other.

Therefore, the State of Alabama moves for consolidation and requests a hearing on this Motion, to be set not later than seven (7) days prior to trial.

Respectfully submitted this 18th day of October, 2002.

ELEANOR I. BROOKS
DISTRICT ATTORNEY

By: _Vernetta Perkins_

Vernetta Perkins
Deputy District Attorney

10

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Motion was served upon the

Honorable Wiley Hartley, and Winston Durant, by hand delivery or by placing a

copy thereof in the United States mail, postage prepaid and properly addressed

on this 18th day of October, 2002.

ELEANOR I. BROOKS
DISTRICT ATTORNEY

By: _____

Vernetta Perkins
Deputy District Attorney

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
MONTGOMERY COUNTY, ALABAMA

STATE OF ALABAMA,                    )
        Plaintiff,                   )
                                     )
                                     )
                                     )
KOURTNEY S. GREENWOOD,               )      CC No. 02-0909-SMG
JAMAR BROWN,                         )      CC No. 02-0905-SMG
        Defendants,                  )

## ORDER FOR CONSOLIDATION OF DEFENDANTS AND CASES

Upon consideration of the Motion for Consolidation of defendants and

Cases, and for good cause, it is hereby ORDERED that the above-styled cases are

consolidated.

Done this ___1st___ day of __October__, 2002.

_____
CIRCUIT JUDGE

Hon. Wiley Hartley, Defense Attorney
Hon. Winston Durant, Defense Attorney
Hon. Vernetta Perkins, Deputy District Attorney

JUDGE: ~~Kenny~~ Greenwood
COURT REPORTER: Newman
PANELS 15 — 20
DATE: 10 - 29 - 0 2

CASE 02 909 _____    CHARGE: _____

_____ State _____    VS Courtney Greenwood

ATTY: _____    ATTY: _____

| | PLANTIFF | DEFENDANT | | | |
|---|---|---|---|---|---|
| 1 | 309 | 313 | | | |
| 2 | 435 | 350 | | | |
| 3 | 441 | 382 | | | |
| 4 | 371 | 416 | | | |
| 5 | 374 | 327 | | | |
| 6 | 439 | 356 | | | |
| 7 | 411 | 451 | | | |
| 8 | | | | | |
| 9 | | | | | |
| 10 | | | | | |
| 11 | | | | | |
| 12 | | | | | |
| 13 | | | | | |
| 14 | | | | | |
| 15 | | | | | |

```
********************
No. Jur.    No. Stk.
********************
   12          0
   14          1
   16          2
   18          3
   20          4
   22          5
   24          6
  (26)         7
   28          8
   30          9
   32         10
   34         11
   36         12
   38         13
   40         14
   42         15

********************
```

13

State of Alabama
Unified Judicial System

**JURY VERDICT**

Case Number
CC-02-909 GR

Form C-50    Rev 6/88

# IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

Plaintiff: State of Alabama          v.          Defendant:    KOURTNEY    GREENWOOD

We the Jury find the Defendant GUILTY of Robbery

in   the First Degree as charged in the indictment.

OR

_____   We the Jury find the Defendant NOT GUILTY.

12-11-02

JUDGEMENT IS HEREBY ENTERED
IN ACCORDANCE WITH THE
VERDICT OF THE JURY.

*Sally Greenhaw*

Circuit Judge

*Jennifer Wyatt*

Name of Foreperson (please print)

*Jen Wyatt*

Signature of Foreperson

Date filed  12-11-02

RECEIVED

12-16-02

CIRCUIT COURT CLERK

CIRCUIT CRIMINAL                    CASE: CC 94 001286

E CIRCUIT  COURT OF MONTGOMERY  COUNTY                    JUDGE: JDP

OF  ALABAMA                VS          GREENWOOD KOURTNEE SOVERN
                                       530 N. Union Street
: CC 94 001286 00                      MONTGOMERY        AL  00000-0000

JB: 12/11/79  RACE: B  SEX:  M  HT:  506  WT: 125  HR:        EYE:
SN: 000000000   ALIAS NAMES:

CHARGE1: ROBBERY 1ST              CODE1: ROB1 LIT: ROBBERY 1ST    TYPE: F
CHARGE2:                          CODE2: 0000                     TYPE: F
CHARGE3:                          CODE3: 0000                     TYPE: F
MORE?:        OFFENSE DATE: __/__/__   AGENCY/OFFICER:

DATE WAR/CAP ISS: __/__/__        DATE ARRESTED: __/__/__
DATE  INDICTED: 05/26/94          DATE   FILED: 05/31/94
DATE  RELEASED: __/__/__          DATE  HEARING: __/__/__
  BOND AMOUNT:      $5,000.00          SURETIES: INDIV

DATE 1:            DESC: 0000     TIME: 0000              179810
DATE 2: 06/08/94   DESC: ARRG     TIME: 0900 A            — NOT IN DOC

DEF/ATY:  CARTE, TEDDI LANE        TYPE: A                        TYPE:
PROSECUTOR: MCNEILL, JAMES RANDALL

JTH CSE: 0000000000    CHK/TICKET NO:              GRAND JURY: 45
COURT REPORTER          SID NO: 000000000
DEF STATUS: BOND    JURY DEMAND:                   OPID: PAB

DATE        ACTIONS, JUDGMENTS, CASE NOTES

                                                   Sept. 27 ✓

6/8/94 | WIA filed
6/8/94 | App for YOA filed
7-6-94 | Attorney's YOA Application Report of Reference
9-27-94 | Motion to Set for Sentencing — Def wrong file from DA
          ✓
9-27-94 |

          The defendant comes before the Court, with attorney of record. The Court on the record, fully explained to Defen-
          dant all Constitutional rights. The court is convinced that Defendant comprehends & understands
          all Constitutional rights. Exhibit A is signed by Defendant and the recor... ... ... between
          the Ju... ... Defend... to Defendant fully read complete under...
          to all of the matters that a guilty plea effects and the consequences tha...
          the Court accepts the guilty plea and finds the defendant guilty and enters a judgment of guilt

          Sentencing date is: Oct. 11, 1994 at 8:00 a.m.

                                       Circuit Judge

10-11-94 | Reset for 10-13-94

                                       RECEIVED
                                       1-2-03
                                       ...QUAT OLER

| | | Case Number |
|---|---|---|
| State of Alabama Unified Judicial System | **CASE ACTION SUMMARY** CONTINUATION | CC 94-1286 |
| Form C-7  Rev. 2/79 | | ID    YR    Number |

15

tyle: _____    Page Number _____ of _____ Pages

State                     v.        KOURTNEE SOVERN GREENWOOD

DATE                                ACTIONS, JUDGMENTS, CASE NOTES

October 13, 1994

The Defendant appears in Court with his attorney of record for
sentencing. ~~The Court, having asked the Defendant if he had~~
anything to say as to why the sentence of law should not now be
~~pronounced upon him, and having had his say, the Court sentences~~
the Defendant to fifteen (15) years in the penitentiary.

The Defendant is to successfully complete up to 180 days
~~Disciplinary Rehabilitation Program pursuant to the Act 88-163.~~
When program is successfully completed, Defendant is to be
returned to the Court for review. ~~Upon motion of the State with~~
concurrence of the Defendant, the Court retains jurisdiction and
~~reconsideration of this sentence and of Y.O.A. if and or when the~~
Defendant successfully completes the 180 Day Disciplinary
~~Rehabilitation Program.~~

~~October 13, 1994~~
Court orders the Defendant to pay attorney's fees of $150.00,
court costs, and $50.00 to the Victims Compensation Fund.
~~Restitution is to be set at a restitution hearing. These court~~
~~ordered payments are to be collected by the Department of~~
~~Corrections from any funds to which the Defendant becomes~~
~~entitled while in the penitentiary, whether such funds are to his~~
~~credit in a welfare fund, inmate fund or in any other source~~
whatsoever. An amount equal to one-half of the gross amount of
~~such funds shall be collected by the Department of Corrections~~
~~and shall~~ be forwarded to the Circuit Clerk of this Court monthly
~~to be disbursed by the Clerk according to law.~~

                                        JOSEPH D. PHELPS, CIRCUIT JUDGE

11-29-94  Probation Office to see if Def. can be sent
          to Frank Lee, resit for 12-6-94.



| State of Alabama Unified Judicial System | **CASE ACTION SUMMARY** | Case Number |
|---|---|---|
| Form C-7  Rev. 2/79 | **CONTINUATION** | CC 94 1286. <br> ID   YR    Number |

Style: _Kaufman Greenwood_    Page Number _____ of _____ Pages

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|---|---|
| 3/13/95 | Defendant with attorney appeared for Review and reconsideration of sentence.  Sentence is ORDERED amended as follows: |
| | 1.  15 years split, to serve 2 years at Frank Lee Juvenile Facility with credit for time served. |
| | 2.  Defendant shall be enrolled in a full time regular school curriculum at Frank Lee Juvenile Facility. |
| | 3.  Court reserves jurisdiction for YOA determination. |
| | 4.  Defendant will be placed on 3 years supervised probation following release from that facility. |
| | SALLY GREENHAW, CIRCUIT JUDGE |

State of Alabama
Supreme Court
Dept. of Court Mgmt.

Form SC-C-711-77

## CASE ACTION SUMMARY
### CONTINUATION

Case Number

CC 94-128
IO   YR   Number

Kaurtnee Greenwood                    Page Number ____

| DATE | ACTIONS |
|------|---------|
| 10-3-96 | Δ's probation reinstated. Payment of court ordered monies to begin in December at $20.00/month. Review set for 3-6-97, 8:15 for increase, pay, ect. SM |

18

| State of Alabama Unified Judicial System | CASE ACTION SUMMARY CONTINUATION | Case Number 94-1286 |
|---|---|---|

Style: Kartha Maxwell

Page Number _____ of _____ Pages

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|---|---|
| 3-6-97 | △ FTA for Review. Reset review 4-24-97. sme |
| 4-24-97 | △ FTA for Review. F & C. sme |

19

| State of Alabama<br>Supreme Court<br>Dept. of Court Mgmt. | CASE ACTION SUMMARY<br>CONTINUATION | Case Number<br>CC 94-1286 |
|---|---|---|

_Kountree Greenwood_    Page Number _____

| DATE | ACTIONS |
|---|---|
| 2-6-97 | Delinquency report filed by P.O. Officer and based on testimony of P.O. Officer _Moore_ Defendant declared delinquent and **ARREST ORDERED** for:<br>✓ 1. Failure to report<br>✓ 2. Failure to pay court order monies<br>✓ 3. Failure to pay supervision fees<br>4. Arrested on new charges<br>5. Failure to avoid injurious habits<br>6.<br>7.<br>8.        SMG |
| 2-10-97 | Capias Issued |
| 7-03-97 | Capias executed; file sent to Judge. |

Supreme Court
Dept. of Court Mgmt.

Form SC-C-7 11-77

**CASE ACTION SUMMARY**
CONTINUATION

Case N. **20**

CC 99 - 12
ID    YR    Number

*Kountree, Greenwood*

Page Number _____

| DATE | ACTIONS |
|------|---------|
| 7-25-97 | Delinquency report filed by P.O. Officer and based on testimony of P.O. Officer Defendant declared delinquent and ARREST ORDERED for: |

~~1.Failure to report~~
~~2.Failure to pay court order monies~~
~~3.Failure to pay supervision fees~~
~~4.Arrested on new charges~~
~~5.Failure to avoid injurious habits~~
6.
~~7. FTA~~
8.

Defendant appeared with attorney and was orally
informed of the delinquency charges and also provided
with a written statement of the charges, the disclosure
of the evidence, the opportunity to be heard, to
present witnesses and documentary evidence, to confront
and cross-examine witnesses. Defendant ADMITTED
charges, or Defendant DENIED _____ charges and a
revocation hearing is set for 7-31-99

JUDGE SALLY GREENHAW

| State of Alabama Unified Judicial System | CASE ACTION SUMMARY | Case Number |
|---|---|---|
| rm C-7    Rev  2/79 | CONTINUATION | 94-1286 |

Style: Kourtnee Greenwood

Page Number _____ of _____ Pages

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|---|---|
| 7-31-97 | Defendant appeared with Wiley Hartley for a revocation hearing.  Probation Officer Moore testified that Defendant was placed on probation 10/3/96 and told to report monthly.  She stated he had failed to report to the probation office from March 1997 through August, 1997  even after several home visits were done in an attempt to bring Defendant back under supervision.  Defendant denied the charges and testified he was not told to report.  Officer Moore presented to the Court the instructions for probation signed by the Defendant on the date he was placed on probation stating he understood the conditions of probation.  Upon consideration of the evidence presented by the State and testimony of Probation Officer Moore finds Defendant  did violate the conditions of his probation for failure to report.  Wherefore, it is ORDERED that Defendant's probation and split sentence be  revoked and his 15  year sentence be invoked for  failure to report to the probation officer.  *SMG*  SALLY GREENHAW  CIRCUIT JUDGE |
| 8-19-97 | Motion to Reconsider Revocation of Probation |
| 9-2-97 | Motion to reconsider probation revocation re set 9-4-97 at 8:15  *Sally Greenhaw* |
| 9-4-97 | Motion to Reconsider probation Revocation was heard this date and testimony taken. Defendant continues to deny he was told to report. It is Ordered that Defendant's probation and split sentence be revoked and his 15 year sentence be invoked for failure to report. To be reviewed prior to E.O.S. — place hold.  *SMG* |

| State of Alabama Unified Judicial System | **CASE ACTION SUMMARY** CONTINUATION | Case Number |
|---|---|---|
| Form C-7     Rev 2/79 | | 94-1286 |

Style: Kourtnee Greenwood          Page Number _____ of _____ Pages

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|---|---|
| 9-16-97 | Defendant and counsel appeared for Review with the State and Officer Moore present. Defendant testified he would obey the Orders of the Court and Probation Officer if given one more opportunity on probation. Ordered: 1.) Defendant shall comply with all Court Orders and instruction from Probation Officer Moore. 2.) Failure to comply + Defendant probation shall be revoked. 3.) Sentence suspended and placed on supervised probation the first portion of which will be served on Level I Monitor. 4.) Supervised probation extended 2 years.     Sally Greenlaw |
| 1-23-98 | Probation Release to DOC |

State of Alabama
Supreme Court
Dept. of Court Mgmt.

Form SC-C-7 11-77

**CASE ACTION SUMMARY**
**CONTINUATION**

Case Number **23**

CC **94-1286**
ID    YR    Number

_Kourtnee Greenwood_                    Page Number _____

| DATE | ACTIONS |
|------|---------|
| 11-24-97 | Delinquency report filed by P.O. Officer and based on testimony of P.O. Officer _Moncrief_ Defendant declared delinquent and ARREST ORDERED for: |
| | 1. Failure to report |
| | 2. Failure to pay court order monies |
| | 3. Failure to pay supervision fees |
| | X 4. Arrested on new charges _menacing_ |
| | 5. Failure to avoid injurious habits |
| | 6 |
| | 7. |
| | 8. (A in City Jail) place a hold SMG |
| | Defendant appeared with attorney and was orally informed of the delinquency charges and also provided with a written statement of the charges, the disclosure of the evidence, the opportunity to be heard, to present witnesses and documentary evidence, to confront and cross-examine witnesses. Defendant ADMITTED _____ charges, or Defendant DENIED _____ charges and a revocation hearing is set for _____. |
| | |
| | |
| | JUDGE SALLY GREENHAW |
| 12-2-97 | Copias Issued |
| 3-07-98 | Copias executed; file sent to Judge. |
| 3-16-98 | Probation reinstated (P.O. Moore). SMG |
| | |
| | |
| | |
| | |
| | |
| | |

```
JOSE ???        ALABAMA JUDICIAL INFORMATION SYSTEM        CASE: CC 99 000453.00
OPER: REF                    CASE ACTION SUMMARY
PAGE: ?                     CIRCUIT  CRIMINAL                   RUN DATE: 03/10/99
        THE CIRCUIT COURT OF MONTGOMERY                              JUDGE: SG?
```

STATE OF ALABAMA                        VS        GREENWOOD COURTNEY
                                                  552 N UNION CIRCLE
CASE: CC 99 000453.00
                                                  MONTGOMERY, AL  36104 0000

DOB: 12/13/79        SEX: M  RACE: B  HT: 5 06  WT: 140    HR: BLK EYES: BRO
SSN: 417680527  ALIAS NAMES:

CHARGE1: POSS MARIJUANA 1ST        CODE1: VAPF LIT: POSS MARIJUANA TYP: F
MORE?:        OFFENSE DATE: 10/27/98  AGENCY/OFFICER: MPD    LOTFON

DATE WAR/CAP ISS:                      DATE ARRESTED: 10/27/98
DATE   INDICTED: 03/05/99            DATE   FILED: 03/09/99
DATE   RELEASED: 11/09/98            DATE   HEARING:
        BOND AMOUNT:    $1,000.00        SURETIES: BIG LADY'S

DATE 1:              DESC:              TIME: 0000
DATE 2: 03/18/99  DESC: ATTY            TIME: 1000 A

DEF/ATTY: HARTLEY, JOHN W, JR        TYPE: A
PROSECUTOR: DUKES, STEPHEN MARK

OTH CSE: 9800626400    CHK/TICKET NO:              GRAND JURY: 238
COURT REPORTER:                  SID NO:
DEF STATUS: BOND              DEMAND:                  OPER: REF

*[handwritten in right margin: Bail Bonds Eff. / Rapid Bail Bonds / TYPE: / May 3 / July 12 ✓]*

| TRANS DATE | ACTIONS, JUDGEMENTS, AND NOTES | OPE |
|---|---|---|
| 03/10/1999 | FILED THIS DATE: 03/09/99 | REF |
| 03/10/1999 | CHARGE AT FILING OF: POSS MARIJUANA 1ST | REF |
| 03/10/1999 | DEFENDANT INDICTED ON: 03/05/99 | REF |
| 03/10/1999 | BOND SET FOR:    $1000.00 | REF |
| 03/10/1999 | DEFENDANT ARRESTED ON: 10/27/98 | REF |
| 03/10/1999 | ATTORNEY FOR DEFENDANT: HARTLEY, JOHN W, JR | REF |
| 03/10/1999 | OFFENSE DATE OF: 10/27/98 | REF |
| 03/10/1999 | DEFENDANT RELEASED ON: 11/09/98 | REF |
| 03/10/1999 | SET FOR: ATTY APPOINTMENT ON 03/18/99 AT 1000A | REF |
| 4-7-99 | *Notice Of Discovery To Deft. etc* | |
| 5-24-99 | *Δ appeared* | |
| 5-25-99 | *Δ appeared, set for YOA 6-3-99* | |
| 5-28-99 | *Bondsman Process Issued to Big Lady's* | |
| 6-3-99 | | |

The Court having examined the defendant and
considered the report of investigation of the
defendant as required by Ala. Code §15-19-1
(1975) it is ORDERED that the defendant's
request to be tried as a youthful offender
is *Conditionally denied*    Ⓝ

*SmG*

SALLY GREENHAW, CIRCUIT JUDGE

6-21-99  *Bondsman's Process Served (Big Lady)*

*[stamp: RECEIVED  1-2-03  CIRCUIT COURT CLERK]*

**25**

| State of Alabama Unified Judicial System | CASE ACTION SUMMARY CONTINUATION | Case Number CC 99 - 453 GR |
|---|---|---|
| 1 C-7    Rev 2/79 | | |

Style: State v Kourtney Greenwood          Page Number ____ of ____ Pages

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|---|---|
| 7-8-99 | Δ FTA pretrial |
| 7-12-99 | DEFENDANT FTA FOR Trial W & F ISSUE W.Q.A. _Judy Greenlaw_ |
| 7-15-99 | Capias Issued |
| 8-9-99 | Capias executed; file to the Judge (8-10) |
| 8-12-99 | Δ appeared F + C set aside— SMG |

| State of Alabama<br>Unified Judicial System | **CASE ACTION SUMMARY**<br>CONTINUATION | Case Number |
|---|---|---|
| C-7        Rev 2/79 | | CC-9-469  GR |

Style: STATE OF ALABAMA  VS.
_Courtney Greenwood_    Page Number _____ of _____ Pages

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|---|---|
| / /199_ | |
| 5/12/99 | |
| / /199_ | |
| / /199_ | |
| 5/12/99 | |

Y. O. A.    GRANTED / DENIED

State's Motion/Nolle Prosse Count(s) _Count II_ Granted _SMG_

State's Motion To Dismiss Count(s) _____ Granted

State's Motion To Amend Count _____ to
_____ Granted

The Defendant is before the Court and is represented.
The Court on record fully explained all Constitutional
rights. The Court is convinced that Defendant comes
into court voluntarily and understands all his rights.
Exhibit A is signed by Defendant and counsel and the
record affirmatively shows colloquy between the Judge
and Defendant and that Defendant fully and completely
understands he is waiving his Constitutional rights and
other effects of a guilty plea and the consequences
thereof and the sentence that could be imposed.  Upon
the conclusion of said colloquy the Court accepts the
guilty plea and finds Defendant guilty and enters a
judgment of guilt to the charge of _P.O.M 1st_ _SMG_
_Count I_ _pros_

Notice of HOA/Drug/Weapon Enhancements given

P.S.I. ORDERED / WAIVED

Sentencing date is _8-16-99_ 1599 at 8:00 a.m.
_SMG_
SALLY GREENHAW, CIRCUIT JUDGE

**27**

| State of Alabama<br>Unified Judicial System | CASE ACTION SUMMARY<br>CONTINUATION | Case Number<br>C99-453 GR |
|---|---|---|

F   C-7   Rev 2/79

Style:
State v _Rountree Tr_____   Page Number _____ of _____ Pages

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|---|---|
| 8/16/99 | Defendant & attorney appeared for sentencing. Court asked if he/she had anything to say why sentence should not now be pronounced and Defendant having his/her say, it is ORDERED: |

HOA Enhancements Applicable  Yes/No
Defendant Admits_____ State Proves _____ Priors

Sentenced to _10_ yrs./split to serve _3_ yrs.
__✓__ reverse split postpone _up_ review _Aug 14, 2000_
Concurrent _____ Consecutive _____

SUSPENDED ⟨YES/NO⟩ SUPERVISED/COURT PROBATION
_3_ years LEVEL II __✓__ Monitor_____
                    _first 30 Day_
ENHANCEMENTS - Weapons_____years
     Drug -_____years School/Public Housing
                    years Sale under 18
__$1000/2000__ Fine
     __✓__ Remit portion completion SAP
     __✓__ Driver License suspended 6 mo.

GED____BootCamp_____/SAP__X__/Chain Gang_____
Work Release____Frank Lee____/Employment_____
Community Service____hrs.at_____/PO Select
Review upon completion - Yes_____

Other - _____

Restitution  $_____ Fine $_____
Crime Victim $25.00/$50.00/$_____ Ct.Costs ✓
Attorneys Fees $150.00/Attorney/GAL Fees _____
Payment $_50_ (Mo/Wk Begin _10/1_/99 OR
1/2 monies earned___ Review _____

Defendant advised rt. appeal, credit time served
     Appeal Bd. set $_____ JUDGE SALLY GREENHAW

SE ACTION SUMMA..
CONTINUATION

CC 99 - 453

Rountree Greenwood

Page Number _____

| ATE | ACTIONS |
|---|---|

2-27-99  Delinquency report filed by P.O. Officer and  based on
testimony of   P.O. Officer       Defendant declared
delinquent and ARREST ORDERED for:

       1. Failure to report
       2. Failure to pay court order monies
       3. Failure to pay supervision fees
       4. Arrested on new charges
       5. Failure to avoid injurious habits
  ✓  6. ✓ ✓ Complete S.A.P.
       7.
       8.

W. Hartley

Defendant appeared with attorney and was orally
informed of the delinquency charges and also provided
with a written statement of the charges, the disclosure
of the evidence , the opportunity to be heard, to
present witnesses and documentary evidence, to confront
and cross-examine witnesses.   Defendant ADMITTED
charges, or Defendant DENIED ✓ charges and a
revocation hearing is set for 1-10-00 .

SMG

1-10-00  Revocation Continued to 1-20-00
at 7:30 Am

SMG

1-20-00  Continued to 1-24-00

SMG

1-24-00  Δ appeared; Mr Davis from CAPs
FTA.  On recommendation of P.O.
and no objection from the
State Δ is Ordered on Work
Release beginning 1-25-00 from
7am-6pm M-F. D shall remain
delinquent pending hearing on
2-14-00 @ 8am  SMG

COURT RECORD (White)

**29**

| State of Alabama | | Case Number |
|---|---|---|
| Unified Judicial System | **CASE ACTION SUMMARY** CONTINUATION | cc 99 - 453 GR |
| Form C-7    Rev 2/79 | | |

State v _Kourtney Greenwood_          Page Number ____ of ____ Pages

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|---|---|
| 2-14-00 | Defendant Greenwood appeared with Wiley Hartley and was orally informed of the delinquency charge for failing to successfully complete a substance abuse program. He was provided with a written statement of the charge, the disclosure of the evidence, the opportunity to be heard, to present witnesses, documentary evidence, and to confront and cross examine witnesses. |
| | Defendant requested a hearing, the parties were sworn in and P. O. McCarty testified Defendant was instructed on all rules and regulations of probation. McCarthy stated, by letter to her, Defendant was terminated from CAP for failure to attend the program. Witness Steve Davis from CAP testified Def. had been given several opportunities to enroll or re-enroll and had failed to do so. He also stated he did not know if CAP would be willing to reconsider him for the program again. |
| | Defendant testified he had been in Jackson Hospital on 12/13/99 and shortly thereafter his infant son had been put in the hospital. He further testified he had no positive drug screens, but he could not pay for the screens and they would not allow him to enter CAP nor would they consider re-enrolling him in the program. Defendant stated he also had an offer for a second job at Captain D's if he were allowed to be released. |
| | Ms. LaVon Howard (Defendant's fiance) testified both the baby and Defendant had been in the hospital but that her Mother would be supervising Defendant at Captain D's if he were released. |
| | Defendant shall remain in delinquent status pending further hearing on 2/22/00 at 8:00 am. SMG |
| | SALLY GREENHAW, CIRCUIT JUDGE |
| 2-22-00 | Defendant appeared with counsel for further hearing on the revocation matter. It is ORDERED: |
| | 1. Defendant's probation is reinstated, the first 90 days on Level 2. |
| | 2. Defendant shall enroll in CAP or an alternative program which Ms. McCarty is to approve. |
| | 3. This is Defendant's last opportunity to comply. SMG |
| | SALLY GREENHAW, CIRCUIT JUDGE |

30

| State of Alabama Unified Judicial System | CASE ACTION SUMMARY | Case Number |
|---|---|---|
| Form C-7    Rev 2/79 | CONTINUATION | CC 99-45 3 |

Style: _State v. Kourtnee Greenwood_

Page Number _____ of _____ Pages

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|---|---|
| 3-27-0 | Delinquency report filed by P.O. Officer and based on testimony of P.O. Officer _Hill_ Defendant declared delinquent and ARREST ORDERED for: |
| | ✓ 1. Failure to report |
| | ___ 2. Failure to pay court order monies |
| | ___ 3. Failure to pay supervision fees |
| | ___ 4. Arrested on new charges |
| | ___ 5. Failure to avoid injurious habits |
| | ___ 6 |
| | ___ 7. |
| | ___ 8 |
| | (Meredith Newman)    S.M.G. |
| 3-28-00 | Capias Issued |
| 9-00 | Capias vacated, file to the Judge |

**31**

| State of Alabama Unified Judicial System | CASE ACTION SUMMARY | Case Number |
|---|---|---|
| Form C-7    Rev 2/79 | CONTINUATION | CC 00 - 453 GR |

Style:
State v _Kourtnee Greenwood_        Page Number _____ of _____ Pages

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|---|---|
| 7/17/00 | Defendant Greenwood appeared with Wiley Hartley and was orally informed of the delinquency charge for failure to report. The Court also finds the Defendant has a new Assault 1 charge, has paid nothing on his COMs and did not enroll in CAP. Defendant was provided with a written statement of the charges, the disclosure of the evidence, the opportunity to be heard, to present witnesses, documentary evidence, and to confront and cross examine witnesses. Defendant requested a hearing, the parties were sworn in and P. O. Mills testified Defendant was instructed on all rules and regulations of probation on 2/22/00 when he was placed on Level II probation. Mills stated Defendant has not reported since he was placed on probation, has failed to make any payments toward his COMs, was arrested on a new charge of Assault 1 and failed to enroll in CAP. P. O. Mills recommends Defendant's probation be revoked and his sentence imposed. Defendant testified he didn't report because he had a conflict with P. O. Mills. Upon consideration of the evidence presented by the State, and testimony of P. O. Mills the Court finds Defendant did violate the conditions of his probation for failure to report. Wherefore, it is ORDERED that Defendant's probation is revoked and his split sentence is imposed for failure to report. It is further ORDERED Defendant complete a SAP while at DOC. Defendant advised of his right to appeal. |
| | _Sally Greenhaw_ SALLY GREENHAW, CIRCUIT JUDGE |
| 8-31-00 | Oral Motion to Reconsider Probation is denied, Defendant has had constant problems while on probation. SMG |
| 9/13/00 | (Letter) Defendant's Motion for Review |
| 9-13-00 | Order Denying Review |
| 11/13/00 | Motion to Compel Disclosure Motion to Produce |

| State of Alabama Unified Judicial System | CASE ACTION SUMMARY CONTINUATION | Case Number |
|---|---|---|
| Form C-7      Rev 2/79 | | CC 99-453 |

Style: State v/s Courtney Greenwood

Page Number _____ of _____ Pages

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|---|---|
| 6/14/01 | Motion of Reconsideration, Modification, Amend / alter term of Imprisonment |
| 7-16-01 | Motion to Review Sentence |
| 8/15/01 | Motion for Reconsideration of Probation + Notice of Completion of SAP. |

**33**

| State of Alabama<br>Unified Judicial System | **CASE ACTION SUMMARY**<br>CONTINUATION | Case Number<br>CC 99-453 GR |
|---|---|---|

Form C-7    Rev 2/79

Style: State v _Kountree Greenwood_    Page Number _____ of _____ Pages

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|---|---|
| 9-10-01 | Defendant appeared with Wiley Hartley for DOC sentence review. The Court is mindful that Defendant has had a history of chemical addictions and ~~Defendant is advised~~ that this is his **FINAL CHANCE** to comply with the Court's ~~Orders. The matters having been considered it is ORDERED:~~ 1. That Defendant's sentence is suspended and his supervised probation is reinstated and he shall be placed on Level I monitor probation for the first 90 days Defendant is to report to Probation Officer McCarty upon ~~release from MCDF.~~ 2. That Defendant shall pay $40.00 per month toward ~~his COMs beginning 11-1-01.~~<br><br>SMG<br><br>~~SALLY GREENHAW, CIRCUIT JUDGE~~ |
| 9-12-01 | Probation Release to DOC |
| 8-1-02 | Δ declared delinquent for having been arrested on new charge of Robbery (02-909). Δ shall remain in delinquent status pending outcome of new charge<br>SMG |

**34**

STATE OF ALABAMA
MONTGOMERY COUNTY

    I, Melissa Rittenour, Clerk of the Circuit
Court of Montgomery County, hereby certify
that the within is a true and correct copy of
the _Case Action Summary_
on file in said office.

    Witness my hand and the seal of said
Court is hereto affixed, this the _30th_
day of _Dec_ ,20 _02_

_Melissa Rittenour_
             Clerk Circuit Court

35

```
ACR371              LABAMA JUDICIAL DATA CENTE
          NOTICE OF APPEAL TO THE ALABAMA COURT OF CRIMINAL APPEALS
                      BY THE TRIAL COURT CLERK
            IN THE CIRCUIT COURT  OF MONTGOMERY COUNTY
STATE OF ALABAMA VS GREENWOOD KOURTNEY SOVERN JUDGE: SARAH M. GREENHAW
--------------------------------------------------------------------------
| APPEAL DATE: 12/30/2002                                                 |
|------------------------------------------------------------------------|
| INDIGENCY STATUS:                                                       |
|    GRANTED INDIGENCY STATUS AT TRIAL COURT:     __X__ YES  _____ NO     |
|    APP. TRIAL COUNSEL PERMITTED TO W/D ON APPEAL:N/A _____ YES  _____ NO|
|    INDIGENT STATUS REVOKED ON APPEAL:           _____ YES  __X__ NO     |
|    INDIGENT STATUS GRANTED ON APPEAL:           __X__ YES  _____ NO     |
|                                                                        |
| DEATH PENALTY: NO                                                      |
|                                                                        |
| APPEAL TYPE: STATE CONVICTION                                          |
|------------------------------------------------------------------------|
| THIS IS AN APPEAL FROM A CONVICTION.                                   |
|                                                                        |
| DATE OF CONVICTION: 12/11/2002        DATE OF SENTENCE: 12/30/2002     |
|                                                                        |
| YOUTHFUL OFFENDER STATUS: DENIED                                       |
|                                                                        |
| CO/CASE NUMBER: 03/CC 2002 000909.00                                  |
| CODE: ROB1   CONVICTION: ROBBERY 1ST      ACTION: CONVICTED           |
|                                           STATUTE: 13A-008-041        |
| SENTENCE:   CONF: 00 YRS 00 MOS 000 DAYS                              |
| SENTENCE:   PROB: 00 YRS 00 MOS 000 DAYS    LIFE: YES  LIFEWO: NO     |
|------------------------------------------------------------------------|
| POST-JUDGMENT MOTIONS FILED:  DT FILED    DT DENIED    CON BY AGREE    |
| ___ MOTION FOR NEW TRIAL      _____    _____    _____     |
| ___ MOTION FOR JUDG. OF ACQUIT _____   _____    _____     |
| ___ MOTION TO W/D GUILTY PLEA _____    _____    _____     |
| ___ MOTION FOR ATTY TO W/DRAW _____    _____    _____     |
| ___ OTHER _____   _____                                |
|------------------------------------------------------------------------|
| COURT REPORTER(S):                  NEWMAN MEREDITH                    |
| ADDRESS:                            C/O HON. SALLY GREENHAW            |
|                                     MONTGOMERY    , AL 36102           |
|                                                                        |
| APPELLATE COUNSEL #1:               HARTLEY JOHN W JR                  |
| ADDRESS:                            312 SCOTT ST.                      |
|                                                                        |
|                                     MONTGOMERY    , AL 36104           |
| PHONE NUMBER:                       205-269-9157                       |
| APPELLATE COUNSEL #2:               _____     |
| ADDRESS:                            _____     |
|                                     _____     |
|                                     _____     |
| PHONE NUMBER:                       _____     |
| APPELLANT (PRO SE):                 GREENWOOD KOURTNEY SOVERN          |
| ADDRESS:                            103 COURTLAND DRIVE                |
|                                     MONTGOMERY    , AL 361050000       |
| AIS #:                                                                |
|                                                                        |
| APPELLEE (IF CITY APPEAL):          _____     |
| ADDRESS:                            _____     |
|                                     _____     |
--------------------------------------------------------------------------
```

I CERTIFY THAT THE INFORMATION PROVIDED                    OPERATOR: DEC
ABOVE IS ACCURATE TO THE BEST OF MY              PREPARED: 01/08/2003
KNOWLEDGE AND I HAVE SERVED A COPY OF
THIS NOTICE OF APPEAL ON ALL PARTIES TO      _____
THIS ACTION ON THIS 1TH DAY OF _January, 2003_      CIRCUIT COURT CLERK

```
ACR359                  ALABAMA JUDICIAL DATA CENTER
                             MONTGOMERY COUNTY
                           TRANSCRIPT OF RECORD
                            CONVICTION REPORT
                                           CC 2002 000909.00 01
                                           SARAH M. GREENHAW
------------------------------------------------------------------
| CIRCUIT COURT OF MONTGOMERY COUNTY         COURT ORI: 003045 J  |
|----------------------------------------------------------------|
| STATE OF ALABAMA       VS.                 DC NO: GJ 2002 070232.00 |
| GREENWOOD KOURTNEY SOVERN ALIAS: COURTNEY GREENG J:  232        |
| 103 COURTLAND DRIVE       ALIAS: KOURTNEE GREEN                 |
| MONTGOMERY AL 36105                         SID:   001357047    |
|                                             AIS:                |
|----------------------------------------------------------------|
|                                                      EYE:       |
| DOB: 12/11/1979  SEX: M  HT: 5 11  WT: 135  HAIR:              |
| RACE: ( )W (X)B ( )O  COMPLEXION: _____  AGE: ____ FEATURES: ____ |
|----------------------------------------------------------------|
| DATE OFFENSE: 00/00/0000  ARREST DATE: 07/24/2002  ARREST ORI: 0030100 |
|----------------------------------------------------------------|
|                                 CT CL COURT ACTION      CA DATE |
| CHARGES @ CONV    CITES                                         |
| ROBBERY 1ST       13A-008-041   01 A  CONVICTED        12/11/2002 |
|                                 00                     00/00/0000 |
|                                 00                     00/00/0000 |
|----------------------------------------------------------------|
| JUDGE: SARAH M. GREENHAW          PROSECUTOR:                   |
|----------------------------------------------------------------|
| PROBATION APPLIED   GRANTED DATE  REARRESTED DATE  REVOKED DATE |
| ( )Y( )N           ( )Y( )N _____ ( )Y( )N _____ ( )Y( )N _____ |
|----------------------------------------------------------------|
| 15-18-8, CODE OF ALA 1975  IMPOSED  SUSPENDED  TOTAL  JAIL CREDIT |
| ( )Y (X)N  CONFINEMENT:  00 00 000  00 00 000  00 00 000  00 00 160 |
|            PROBATION :  00 00 000             00 00 000         |
| DATE SENTENCED: 12/30/2002     SENTENCE BEGINS: 00/00/0000      |
|----------------------------------------------------------------|
| PROVISIONS              COSTS/RESTITUTION       DUE     ORDERED |
|                                                                |
|  PENITENTIARY          RESTITUTION          $96.00     $96.00  |
|  LIFE                  ATTORNEY FEE        $150.00    $150.00  |
|                        CRIME VICTIMS        $50.00     $50.00  |
|                        COST                $375.00    $375.00  |
|                        FINE                  $0.00      $0.00  |
|                        MUNICIPAL FEES        $0.00      $0.00  |
|                        DRUG FEES             $0.00      $0.00  |
|                        ADDTL DEFENDANT       $0.00      $0.00  |
|                        DA FEES               $0.00      $0.00  |
|                        COLLECTION ACCT       $0.00      $0.00  |
|                        JAIL FEES             $0.00      $0.00  |
|                                                                |
|                        TOTAL              $671.00    $671.00  |
|----------------------------------------------------------------|
| APPEAL DATE      SUSPENDED     AFFIRMED       REARREST          |
|                                                                |
|  (X)Y( )N 12/30/2002 ( )Y( )N _____  ( )Y( )N _____  ( )Y( )N _____ |
|----------------------------------------------------------------|
| REMARKS:                   THIS IS TO CERTIFY THAT THE         |
|                            ABOVE INFORMATION WAS EXTRACTED     |
|                            FROM OFFICIAL COURT RECORDS         |
|                            AND IS TRUE AND CORRECT.            |
|                                                                |
|                                                                |
|                                                                |
|                                                                |
|                            _____        |
|                            MELISSA RITTENOUR(CC)               |
|                                                                |
|                            01/08/2003                          |
|                                                                |
------------------------------------------------------------------

OPERATOR: DEC
PREPARED: 01/08/2003
```

ACR359
```
                    ALABAMA JUDICIAL DATA CENTER
                         MONTGOMERY COUNTY
                         TRANSCRIPT OF RECORD
                         CONVICTION REPORT
```

## AMENDED

```
                              CC 2002 000909.00 01
                              SARAH M. GREENHAW
```
--------------------------------------------------------------------
| CIRCUIT COURT OF MONTGOMERY COUNTY          COURT ORI: 003045 J  |
|------------------------------------------------------------------|
| STATE OF ALABAMA      VS.              DC NO: GJ 2002 070232.00   |
| GREENWOOD KOURTNEY SOVERN ALIAS: COURTNEY GREENG J:  232         |
| 103 COURTLAND DRIVE       ALIAS: KOURTNEE GREEN                  |
| MONTGOMERY AL  36105                    SID:   001357047         |
|                                         AIS:                    |
|------------------------------------------------------------------|
| DOB: 12/11/1979   SEX: M   HT: 5 11   WT: 135  HAIR:    EYE:     |
| RACE: ( )W (X)B ( )O   COMPLEXION: _____  AGE: ____ FEATURES: _____ |
|------------------------------------------------------------------|
| DATE OFFENSE: 00/00/0000  ARREST DATE: 07/24/2002  ARREST ORI: 0030100 |
|------------------------------------------------------------------|
| CHARGES @ CONV      CITES       CT CL COURT ACTION      CA DATE  |
| ROBBERY 1ST        13A-008-041  01 A  CONVICTED        12/11/2002 |
|                                 00                     00/00/0000 |
|                                 00                     00/00/0000 |
|------------------------------------------------------------------|
| JUDGE: SARAH M. GREENHAW          PROSECUTOR:                   |
|------------------------------------------------------------------|
| PROBATION APPLIED   GRANTED  DATE    REARRESTED DATE  REVOKED  DATE |
| ( )Y( )N _____  ( )Y( )N _____   ( )Y( )N _____  ( )Y( )N _____ |
|------------------------------------------------------------------|
| 15-18-8, CODE OF ALA 1975   IMPOSED   SUSPENDED   TOTAL   JAIL CREDIT |
|  ( )Y (X)N  CONFINEMENT: 00 00 000  00 00 000  00 00 000  00 00 160 |
|             PROBATION  : 00 00 000              00 00 000        |
| DATE SENTENCED: 12/30/2002    SENTENCE BEGINS: 12/30/2002       |
|------------------------------------------------------------------|
| PROVISIONS              COSTS/RESTITUTION       DUE      ORDERED |
|                                                                  |
|   PENITENTIARY         RESTITUTION           $96.00      $96.00 |
|   LIFE                 ATTORNEY FEE         $150.00     $150.00 |
|   HABITUAL OFDR        CRIME VICTIMS         $50.00      $50.00 |
|                        COST                 $375.00     $375.00 |
|                        FINE                   $0.00       $0.00 |
|                        MUNICIPAL FEES         $0.00       $0.00 |
|                        DRUG FEES              $0.00       $0.00 |
|                        ADDTL DEFENDANT        $0.00       $0.00 |
|                        DA FEES                $0.00       $0.00 |
|                        COLLECTION ACCT        $0.00       $0.00 |
|                        JAIL FEES              $0.00       $0.00 |
|                                                                  |
|                        TOTAL               $671.00     $671.00 |
|------------------------------------------------------------------|
| APPEAL DATE       SUSPENDED      AFFIRMED         REARREST       |
|                                                                  |
| (X)Y( )N 12/30/2002 ( )Y( )N _____  ( )Y( )N _____  ( )Y( )N _____ |
|------------------------------------------------------------------|
| REMARKS:                        THIS IS TO CERTIFY THAT THE     |
|                                 ABOVE INFORMATION WAS EXTRACTED  |
|                                 FROM OFFICIAL COURT RECORDS      |
|                                 AND IS TRUE AND CORRECT.         |
| (AMENDED)                                                        |
| SENTENCE BEGIN DATE IS 12/30/02.                                |
| ALL OTHER ASPECTS FROM THE PREVIOUS TRANSCRIPT ARE TO REMAIN THE SAME. |
|                                                                  |
|                                 _____  |
|                                 MELISSA RITTENOUR(CC)           |
|                                                                  |
|                                 01/17/2003                      |
|                                                                  |
--------------------------------------------------------------------
OPERATOR: DBH
PREPARED: 01/17/2003
```

IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

STATE OF ALABAMA,            *

     Plaintiff,            *

v.                           *        CASE NO. CC-02-909 TMH

KOURTNEY GREENWOOD,          *

     Defendant.            *

**ORDER**

    The Court having found Defendant to be indigent, it is ORDERED

that the Honorable John W. Hartley  is given leave to withdraw and

the Honorable Maceo Kirkland is appointed to represent Defendant in

the above referenced matters on appeal.

    DONE this the 4th day of February, 2003.

                              TRUMAN M. HOBBS, JR.
                              CIRCUIT JUDGE

Pc:

John W. Hartley, Esq.
Maceo Kirkland, Esq.
District Attorney
Court of Criminal Appeals
Office of the Attorney General

RECEIVED
2-4-03

**39**

| State of Alabama<br>Unified Judicial System<br>Form ARAP- 26 (front)    8/91 | COURT OF CRIMINAL APPEALS<br>DOCKETING STATEMENT | Criminal Appeal Number<br>CR. 02-0634 |
|---|---|---|

## A. GENERAL INFORMATION:

☑ CIRCUIT COURT  ☐ DISTRICT COURT  ☐ JUVENILE COURT OF _Montgomery_____ COUNTY

_Kourtney Greenwood_____, Appellant

V.  ☑ STATE OF ALABAMA  ☐ MUNICIPALITY OF _____

| Case Number<br>CC-02-909 | Date of Complaint or Indictment<br>7/19/02 | Date of Judgment/Sentence/Order<br>12/30/02 |
|---|---|---|
| Number of Days of Trial/Hearing<br>one                Days | Date of Notice of Appeal<br>Oral: 12/30/02 | Written: |

Indigent Status Requested:  ☑ Yes ☐ No          Indigent Status Granted:  ☑ Yes ☐ No

## B. REPRESENTATION:

Is Attorney Appointed or Retained?  ☑ Appointed ☐ Retained.    If no attorney, will appellant represent self?  ☐ Yes ☐ No

| Appellant's Attorney (Appellant if pro se) *(Attach additional pages if necessary)*<br>Maceo O. Kirkland | Telephone Number<br>(334) 261-6200 |
|---|---|

| Address<br>529 S. Perry St. Ste 14A | City<br>Montgomery | State<br>AL | Zip Code<br>36104 |
|---|---|---|---|

## C. CODEFENDANTS: List each CODEFENDANT and the codefendant's case number.

| Codefendant    Jamar Brown | Case Number    CC-02-0905 |
|---|---|
| Codefendant | Case Number |
| Codefendant | Case Number |

## D. TYPE OF APPEAL: Please check the applicable block.

1 ☑ State Conviction  4 ☐ Pretrial Order  7 ☐ Juvenile Transfer Order  10 ☐ Other (Specify)
2 ☐ Post-Conviction Remedy  5 ☐ Contempt Adjudication  8 ☐ Juvenile Delinquency  _____
3 ☐ Probation Revocation  6 ☐ Municipal Conviction  9 ☐ Habeas Corpus Petition  _____

## E. UNDERLYING CONVICTION/CHARGE: Regardless of the type of appeal checked in Section D, please check the box beside each offense category for which the appellant has been convicted or charged as it relates to this appeal. Also include the applicable section of the Code of Alabama for State convictions.

1 ☐ Capital Offense - § _____  6 ☐ Trafficking in Drugs - § _____  11 ☐ Fraudulent Practices - § _____
2 ☐ Homicide - § _____  7 ☐ Theft - § _____  12 ☐ Offense Against Family - § _____
3 ☐ Assault - § _____  8 ☐ Damage or Intrusion  13 ☐ Traffic - DUI - § _____
4 ☐ Kidnapping/Unlawful         to Property - § _____  14 ☐ Traffic - Other - § _____
    Imprisonment - § _____  9 ☐ Escape - § _____  15 ☑ Miscellaneous (Specify):
5 ☐ Drug Possession - § _____  10 ☐ Weapons/Firearms - § _____  _Robbery I_ - § 13A-8-41

## F. DEATH PENALTY:

Does this appeal involve a case where the death penalty has been imposed?  ☐ Yes ☑ No

## G. TRANSCRIPT:

1. Will the record on appeal have a reporter's transcript?  ☑ Yes ☐ No
2. If the answer to question "1" is "Yes," state the date the Reporter's Transcript Order was filed. _2/6/03_
                                                                                                        (Date)
3. If the answer to question "1" is "No":
    (a)  Will a stipulation of facts be filed with the circuit clerk?  ☐ Yes ☐ No
    (b)  Will the parties stipulate that only questions of law are involved and will the trial court certify the questions?  ☐ Yes ☐ No

NOTE: If the appeal is from the district or juvenile court and the answer to question "1" is "No," then a positive
       response is required for question 3(a) or 3(b).

Form ARAP- 26 (back)    8/91    COURT OF CRIMINAL APPEALS DOCKETING STATEMENT

**H. POST-JUDGMENT MOTIONS:** List all post-judgment motions by date of filing, type, and date of disposition (whether by trial court order or by the provisions of Rules 20.3 and 24.4 (ARCrP)):

| DATE OF FILING | | | TYPE OF POST-JUDGMENT MOTION | DATE OF DISPOSITION | | |
|---|---|---|---|---|---|---|
| Month | Day | Year | | Month | Day | Year |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

**I. NATURE OF THE CASE:** Without argument, briefly summarize the facts of the case.

The appellant was arrested and indicted, and convicted of robbing someone with a Firearm.

**J. ISSUE(S) ON APPEAL:** Briefly state the anticipated issues that will be presented on appeal. *(Attach additional pages if necessary.)*

Unknown at this time.

**K. SIGNATURE:**

2/6/03
Date

Maceo O. Kirkland
Signature of Attorney/Party Filing this Form

| State of Alabama<br>Unified Judicial System<br><br>Form ARAP- 1C          8/91 | **REPORTER'S TRANSCRIPT ORDER -- CRIMINAL**<br>See Rules 10(c) and 11(b) of the<br>Alabama Rules of Appellate Procedure (A.R. App.P.) | Criminal Appeal Number<br><br>CR - 02- 0634 |

**TO BE COMPLETED BY COUNSEL FOR THE APPELLANT OR BY THE APPELLANT IF NOT REPRESENTED AND FILED WITH THE WRITTEN NOTICE OF APPEAL OR FILED WITHIN 7 DAYS AFTER ORAL NOTICE OF APPEAL IS GIVEN.**

☑CIRCUIT COURT  ☐DISTRICT COURT  ☐JUVENILE COURT OF ___Montgomery___ COUNTY

___Kourtney Greenwood___ , Appellant

V.  ☑ STATE OF ALABAMA  ☐MUNICIPALITY OF _____

| Case Number<br>CC-02-909 | Date of Judgment/Sentence/Order<br>12/30/02 |
| Date of Notice of Appeal<br>Oral: 12/30/02       Written: | Indigent Status Granted:<br>☑Yes   ☐No |

**PART 1. TO BE SIGNED IF THE APPEAL WILL NOT HAVE A COURT REPORTER'S TRANSCRIPT:**
I CERTIFY THAT NO REPORTER'S TRANSCRIPT IS EXPECTED AND THAT THE RECORD ON APPEAL SHALL CONSIST OF THE CLERK'S RECORD ONLY  IF THE APPEAL IS FROM DISTRICT COURT OR JUVENILE COURT, I ALSO CERTIFY (1) THAT A STIPULATION OF FACTS WILL BE INCLUDED IN THE CLERK'S RECORD AND THAT THE APPELLANT WAIVES HIS RIGHT TO A JURY TRIAL IF SO ENTITLED; OR (2) THAT THE PARTIES HAVE STIPULATED THAT ONLY QUESTIONS OF LAW ARE INVOLVED AND THAT THE QUESTIONS WILL BE CERTIFIED BY THE JUVENILE/DISTRICT COURT FOR INCLUSION IN THE CLERK'S RECORD (SEE RULE 28(A)(1), ALABAMA RULES OF JUVENILE PROCEDURE, AND §12-12-72, *CODE OF ALABAMA 1975*).

| Signature | Date | Print or Type Name |

**PART 2. DESIGNATION OF PROCEEDINGS TO BE TRANSCRIBED.** Request is hereby made to the court reporter(s) indicated below for a transcript of the following proceedings in the above referenced case (see Rule 10(c)(2), Alabama Rules of Appellate Procedure (A.R.App.P.)):

MARK PROCEEDINGS REQUESTED:                                    COURT REPORTER(S)

A. ☑TRIAL PROCEEDINGS - Although this designation will include the judgment and sentence    ___Meredith Newman___
proceedings, a transcript of the organization of the jury and arguments of counsel must
be designated separately                                           _____

B. ☐ORGANIZATION OF THE JURY - This designation will include voir dire examination and    _____
challenges for cause  Note that in noncapital cases the voir dire of the jury will not be
recorded unless the trial judge so directs. (See Rule 19 4, ARCrP.)                        _____

C. ☑ARGUMENTS OF COUNSEL - Note that in noncapital cases the arguments of counsel will    _____
not be recorded unless the trial judge so directs. (See Rule 19 4, ARCrP.)                _____

**IN ADDITION TO ANY PROCEEDINGS DESIGNATED ABOVE, SPECIAL REQUEST IS HEREBY MADE TO INCLUDE THE FOLLOWING PROCEEDINGS IN THE REPORTER'S TRANSCRIPT PORTION OF THE RECORD ON APPEAL. (ATTACH ADDITIONAL PAGES IF NECESSARY):**

ADDITIONAL PROCEEDINGS REQUESTED          DATE          COURT REPORTER(S)

D. _____

E. _____

F. _____

G. _____

**IMPORTANT NOTICE:** The court reporter who reported the proceedings for which a transcript is requested must be identified on this form to be effective. Additionally, it is important to note that the appellant may not be permitted to raise any issue on appeal relating to any proceedings in the case that are not specifically designated on this form for inclusion in the reporter's transcript. A general designation such as "all proceedings" is not sufficient. (See Rule 10(c)(2), A.R.App.P.)

**PART 3. MUST BE SIGNED IF THE APPEAL WILL HAVE A COURT REPORTER'S TRANSCRIPT:**
I CERTIFY THAT I HAVE DISTRIBUTED THIS FORM AS SET OUT BELOW  I ALSO CERTIFY (1) THAT I HAVE MADE SATISFACTORY FINANCIAL ARRANGEMENTS WITH EACH COURT REPORTER LISTED ABOVE FOR PREPARING HIS OR HER PORTION OF THE REPORTER'S TRANSCRIPT HEREIN REQUESTED; OR (2) THAT THE APPELLANT PROCEEDED AT TRIAL AS AN INDIGENT AND THAT THAT STATUS HAS NOT BEEN REVOKED; OR, (3) THAT THE APPELLANT HAS BEEN GIVEN PERMISSION TO PROCEED ON APPEAL IN FORMA PAUPERIS.

| Maceo O. Kirkland | 2/6/03 | Maceo O. Kirkland |
| Signature | Date | Print or Type Name |

**DISTRIBUTION:  Original filed with Clerk of Trial Court and copies mailed to:  (1)** Clerk of the Court of Criminal Appeals,  **(2)** the District Attorney, **(3)** the attorney general or the municipal prosecutor in lieu of the District Attorney and the Attorney General if the appeal is from a municipal conviction, and **(4)** to each Court Reporter who reported proceedings designated for inclusion in the reporter's transcript.

42

E X H I B I T S

STATE'S EXHIBITS:

    EXHIBIT NO. 1 -- PHOTO LINE-UP



DEFENDANT'S EXHIBITS:

    EXHIBIT NO. 1 -- PHOTOGRAPH OF DEFENDANT

    EXHIBIT NO. 2 -- PHOTOGRAPH OF DEFENDANT

43

STATE'S EXHIBIT

3

AL003010000202016A

6

AL003010000199682A

2

AL003010000198444A

5

AL003010000001983A

1

AL003010000548559A

4

AL003010000129113A

Signature: _____

**Montgomery Police Department Photo Line-up**

I have identified picture # 5 as the suspect on 2/18/02 (Date)

Montgomery Police Department Case # _____

44



45

DEFENDANT'S
EXHIBIT

1

46



Kourtnee 22 yrs

↑

Kourtneeje 2 yrs

DEFENDANT'S
EXHIBIT

2

| State of Alabama<br>Unified Judicial System | CERTIFICATE OF COMPLETION AND<br>TRANSMITTAL OF RECORD ON<br>APPEAL BY TRIAL CLERK | Appellate Case Number<br>CC-02-909 |
|---|---|---|
| Form ARAP-14          Rev. 11/91 | | |

| TO: THE CLERK OF<br>THE COURT OF CRIMINAL APPEALS OF ALABAMA | DATE OF<br>NOTICE OF APPEAL:  12-30-02 |
|---|---|
| APPELLANT  Kanthey Greenwood | |
| v.   STATE OF ALABAMA | |

I certify that I have this date completed and transmitted herewith to the appellate court the record on appeal by assembling in (a single volume of _____ pages) (_____ volumes of 200 pages each and one volume of _____ pages) the clerk's record and the reporter's transcript and that one copy each of the record on appeal has been served on the defendant and the Attorney General of the State of Alabama for the preparation of briefs.

I certify that a copy of this certificate has this date been served on counsel for each party to the appeal.

DATED this __7th__ day of __Feb__, __03__

_____
Circuit Clerk

1               IN THE CIRCUIT COURT

2                     OF

3        MONTGOMERY COUNTY, ALABAMA

4

5     STATE OF ALABAMA,

6         Plaintiff,

7     vs.             CASE NO:  CC-02-0909

8     KOURTNEY GREENWOOD,

9         Defendant.

10

11

12

13            * * * * * * * * * *

14

15           PROCEEDINGS in the above-styled

16   cause before the Honorable Sally M. Greenhaw,

17   Presiding Judge, in Courtroom 3-C, Montgomery

18   County Circuit Court, 251 South Lawrence Street,

19   Montgomery, Alabama, commencing on Tuesday,

20   December 10, 2002.

21

22           * * * * * * * * * *

23

24

25       Meridith D. Newman,
          Official Court Reporter

1                                  APPEARANCES

2

3

4        FOR THE STATE:

5        Ms. Vernetta Perkins
         Montgomery County Deputy District
6          Attorney
         251 South Lawrence Street
7        Montgomery, Alabama  36102

8

9

         FOR THE DEFENDANT:
10
         Mr. John Wiley Hartley
11       Attorney at Law
         312 Scott Street
12       Montgomery, Alabama  36102

13

14                   * * * * * * * * * * *

15

16

17

18

19

20

21

22

23

24

25

```
 1                          I N D E X

 2

 3     VOIR DIRE . . . . . . . . . . . . . .      8

 4     OPENING STATEMENTS  . . . . . . . . .     24

 5     STATE'S WITNESSES:

 6     LARRY COPELAND, JR.
             DIRECT BY MS. PERKINS . . . . . .    33
 7           CROSS BY MR. HARTLEY . . . . . . .    65

 8     DETECTIVE N. T. BUCE
             DIRECT BY MS. PERKINS . . . . . .    78
 9           CROSS BY MR. HARTLEY . . . . . . .    85
        TESTIMONY OUTSIDE THE PRESENCE OF THE JURY:
10           DIRECT BY MS. PERKINS . . . . . .    92
             CROSS BY MR. HARTLEY . . . . . . .    95
11
       STATE REST  . . . . . . . . . . . .       97
12

13     DEFENDANT'S WITNESSES:

14     KIMBERLY GREENWOOD
             DIRECT BY MR. HARTLEY  . . . . . . 100
15           CROSS BY MS. PERKINS . . . . . . . 103
             REDIRECT BY MR. HARTLEY  . . . . . 108
16
       DEVEN GREENWOOD
17           DIRECT BY MR. HARTLEY  . . . . . . 110
             CROSS BY MS. PERKINS . . . . . . . 113
18
       LAVAN HOWARD
19           DIRECT BY MR. HARTLEY  . . . . . . 119
             CROSS BY MS. PERKINS . . . . . . . 127
20           REDIRECT BY MR. HARTLEY  . . . . . 134
             RECROSS BY MS. PERKINS . . . . . . 136
21
       KOURTNEY GREENWOOD
22           DIRECT BY MR. HARTLEY  . . . . . . 138
             CROSS BY MS. PERKINS . . . . . . . 143
23           REDIRECT BY MR. HARTLEY  . . . . . 145

24     DEFENDANT REST  . . . . . . . . . . . . 146

25     REBUTTAL WITNESSES:
```

4

HAROLD FRANKLIN
        DIRECT BY MS. PERKINS . . . . . . . . 147
        CROSS BY MR. HARTLEY . . . . . . . . 149
        REDIRECT BY MS. PERKINS . . . . . . . 153

STATE REST . . . . . . . . . . . . . . 154

CLOSING STATEMENTS . . . . . . . . . . 155

JURY CHARGE . . . . . . . . . . . . . 188

VERDICT . . . . . . . . . . . . . . . 213

E X H I B I T S

STATE'S EXHIBITS:

        EXHIBIT NO. 1 -- PHOTO LINE-UP

DEFENDANT'S EXHIBITS:

        EXHIBIT NO. 1 -- PHOTOGRAPH OF DEFENDANT

        EXHIBIT NO. 2 -- PHOTOGRAPH OF DEFENDANT

1          **MS. PERKINS:** I think there's

2   several issues we need to take up.

3          **THE COURT:** Well, we --

4          **MS. PERKINS:** Mr. Hartley just

5   informed me of what he expects his defense to be.

6   From my understanding, Judge, Mr. -- Mr. Brown, the

7   co-defendant, is going to take the stand. It is

8   going to be his testimony that Mr. Greenwood was

9   not with him at the time and he does not even know

10  Mr. Greenwood. There are several witness -- well,

11  first thing -- first thing is first. When he does

12  do that, that opens the door to me establishing

13  that he does know --

14         **THE COURT:** Yeah, okay.

15         **MS. PERKINS:** -- does know -- does

16  know. And that -- that -- the way that he's known

17  him -- my prior motion -- I don't know if you

18  remember in the prior trial. I made a motion in

19  limine. And I'm understanding the Court's position

20  will probably --

21         **THE COURT:** What was your motion?

22         **MS. PERKINS:** Okay. The case agent

23  in this case, the way they developed Mr. Greenwood

24  as a suspect is because they were investigating a

25  prior robbery that the two of them had done

1    together and the victim in that prior case --

2                    THE COURT:  I'm not letting you get

3    into the robbery.

4                    MS. PERKINS:  Yes, ma'am.  In my

5    case in chief, however, Judge, if he opens the door

6    to it --

7                    THE COURT:  Then we'll take it up at

8    that time.  But right now, you cannot get into that

9    at all.

10                    MS. PERKINS:  Yes, I understand

11    that.

12                    MR. HARTLEY:  Judge, if the State --

13    here's what I expect to do.  First of all, I don't

14    think that it would be allowable for them to go

15    into some investigation.  But I'm -- I think now

16    I'm just going to ask this young man, the

17    co-defendant, if he committed the crime alone.  I'm

18    not going to ask him if he knows him or not.

19                    MS. PERKINS:  Well, I have the right

20    to ask him on cross --

21                    THE COURT:  Well, she'll have to

22    wait and see what -- you know --

23                    MR. HARTLEY:  I don't think they can

24    open the door and then make the case for --

25                    THE COURT:  Let's just wait and see

1    how it goes.

2                    MR. HARTLEY:  Okay.

3                    MS. PERKINS:  Judge, I -- because --

4    due to what Mr. Hartley has informed me of this

5    morning, I am issuing subpoenas for these people --

6    because, of course, I wasn't aware -- so we're in

7    the process of getting our investigators to get

8    those people.  If after this point, we do need to

9    call those rebuttal witnesses, I may be asking for

10   a continuance so we can get them here.

11                   THE COURT:  Well, you can -- we're

12   getting started and see where they are.

13                   MS. PERKINS:  Yes, ma'am.

14                   MR. HARTLEY:  And we object, Judge,

15   because we're supposed to have prior notice of any

16   404B evidence.

17                   MS. PERKINS:  And we've given you

18   prior notice as well as prior to trial.  And as to

19   Mr. Hartley --

20                   THE COURT:  You know, I don't know

21   of any requirement that either side has to tell the

22   other side who they're calling for witnesses.

23                   MR. HARTLEY:  It is in 404B, Judge.

24                   THE COURT:  But --

25                   MR. HARTLEY:  It's a clause in 404B.

1      **THE COURT:**  So who's doing the 404B?

2      **MR. HARTLEY:**  She's claiming she's

3  going to be using 404B --

4      **MS. PERKINS:**  -- in rebuttal.

5      **THE COURT:**  In rebuttal.  But, I

6  mean, you don't have to tell her who your witnesses

7  are.

8      **MR. HARTLEY:**  Well, we probably

9  shouldn't have.

10      **THE COURT:**  Let's just go ahead with

11  it.

12      **MS. PERKINS:**  And I have case law to

13  the contrary that says we can do that.

14          (In the presence of the venire.)

15      **THE COURT:**  Good morning.  I've met

16  some of you.  But for those of you who I have not

17  met, I'm Judge Sally Greenhaw.  And we're about to

18  start a case.  It's a criminal case, and it's the

19  State of Alabama versus Kourtney Greenwood.

20  Mr. Greenwood is charged with robbery in the first

21  degree of Larry Copeland, which is alleged to have

22  occurred on August the 9th of this year on

23  Moorecroft Drive.

24      And I'm mentioning that to you, because I'm

25  going to ask you shortly if you know or if you've

1   heard anything about the case.  But before I do

2   that, I'm going to introduce you to everyone seated

3   at counsel table.  And the State today is

4   represented by Vernetta Perkins and Richard White.

5   And seated with them is Larry Copeland.  And down

6   at this end is Mr. Kourtney Greenwood and his

7   attorney, John Wiley Hartley.

8        And I know some of you have been through this

9   before.  But I'm going to have you introduce

10   yourselves to us.  When I call your name, if you

11   would stand, if you're employed, tell us where

12   you're employed.  And if you're married, where your

13   spouse is employed.  If you're fortunate enough to

14   be retired, the occupation from which you're

15   retired.  And if you're not working or in school,

16   we need to know that as well.  And if I

17   mispronounce anyone's name, please let me know.

18                    (Roll call was taken.)

19                    THE COURT:  I'm going to be asking

20   some questions, and then I'm sure the attorneys

21   will have some follow-ups.  When I refer to family

22   members, I'm referring to someone in your immediate

23   family, your spouse, children, grandchildren,

24   parents, grandparents, brothers, sisters, or if

25   there's a particular close friend that you think it

1    would be helpful for the attorneys to have that

2    information, you can also share that with us.

3        I had introduced you to everyone seated at

4    counsel table, and I'm going to ask the same

5    question about each of them, but not repeat it each

6    time.  What I need to know is if you know any of

7    them -- and this applies to witnesses as well -- or

8    related to them by blood or marriage.  And I'll

9    start again, the State today is represented by

10   Vernetta Perkins and Richard White.  Anyone here

11   know them?  (No response.)

            THE COURT:  And seated with them is

12

13   Larry Copeland?

            PROSPECTIVE JUROR:  Juror raises

14

15   hand.

            THE COURT:  Okay.  You know

16

17   Mr. Copeland?  And if you need to respond, stand,

18   give your name and any details that may be helpful.

19   And if you state and -- and how do you know him and

20   give your name.

            PROSPECTIVE JUROR:  My name is

21

22   Aretha Pettaway.  He used to shampoo my hair.

            THE COURT:  Okay.  So do you see him

23

24   just in that area or --

            PROSPECTIVE JUROR:  I see him out.

25

1    And whenever I see him, we talk so --

2                    THE COURT:  Well, do you see him, I

3    guess, on a fairly regular basis?

4                    PROSPECTIVE JUROR:  No.

5                    THE COURT:  Okay.  You don't.  And

6    I'm going to ask this to everyone anyway.

7         Have you or anyone else here heard anything or

8    know anything about this case?

9                    PROSPECTIVE JUROR:  No, ma'am.

10                    THE COURT:  Your contact with him,

11    would that cause you any problem serving as a

12    juror?

13                    PROSPECTIVE JUROR:  I think so.

14                    THE COURT:  Okay.  We'll talk with

15    you later in private.

16         And down at this end is Kourtney Greenwood and

17    his --

18                    MS. PERKINS:  Judge, there's someone

19    else.

20                    THE COURT:  Okay.  I'm sorry.

21                    PROSPECTIVE JUROR:  I'm not

22    positive, but I believe I sold some equipment to

23    the prosecutor here at one time.  So I'm not

24    sure --

25                    THE COURT:  I don't think so.  He's

1    just started working, so, probably -- unless you

2    were fast.  He's been here two or three weeks, but

3    maybe you'll have contact with him.

4         Down at this end is Kourtney Greenwood and his

5    attorney, John Wiley Hartley?  Some -- okay?

6              PROSPECTIVE JUROR:  Wiley Hartley is

7    my attorney.

8              THE COURT:  Okay.  And would you

9    state your name?

10             PROSPECTIVE JUROR:  Cynthia Webster.

11             THE COURT:  And is he presently your

12   attorney or has he represented you in the past?

13             PROSPECTIVE JUROR:  He's represented

14   me in the past.

15             THE COURT:  How long ago was it?

16             MR. HARTLEY:  Several times, Judge,

17   over this year.

18             PROSPECTIVE JUROR:  You were the

19   Judge.

20             THE COURT:  Okay.  So, has it been a

21   continuing representation over the years?

22             PROSPECTIVE JUROR:  Yes.

23             THE COURT:  And --

24             PROSPECTIVE JUROR:  And personal

25   friend and family friend.

1          THE COURT:  Okay.  Thank you.

2     And anyone else?

3               (No response.)

4          THE COURT:  I'm going to call -- not

5     all of these people may testify, but their names

6     may be mentioned.  And if you're not sure if you

7     know someone, the attorneys can help us out with

8     maybe where they work or where they live.

9     Lavan Howard?

10               (No response.)

11          THE COURT:  Deven -- Devean or

12     Devon Greenwood?

13               (No response.)

14          THE COURT:  Kimberly Greenwood?

15               (No response.)

16          THE COURT:  Harold Franklin?

17               (No response.)

18          THE COURT:  Kristy Arnett?

19               (No response.)

20          THE COURT:  Lavar Williams?

21               (No response.)

22          THE COURT:  And Jamar Brown?

23               (No response.)

24          THE COURT:  Okay.  Does anyone here

25     have any interest whatsoever in the conviction or

1    the acquittal of the defendant?   Or has anyone made

2    any promises that he or she will convict or acquit?

3                    (No response.)

4                    THE COURT:   Does anyone here have a

5    fixed opinion as to the guilt or innocence of the

6    defendant, which would bias your verdict?

7                    (No response.)

8                    THE COURT:   Any time you had rather

9    not answer a question in front of the rest of the

10   panel, we can talk to you in private.   And there

11   are probably a couple of you already we're going to

12   need to talk to you individually.   But I do need to

13   know if anyone here or in your immediate family has

14   ever been charged with or convicted of an offense

15   such as robbery -- any type of robbery or if anyone

16   here or anyone in your family has ever been a

17   victim of a robbery?   Does anyone on the front

18   row -- let's do it by rows -- want to answer it at

19   this time?

20                    (No response.)

21                    THE COURT:   Okay.   The second row, I

22   see a hand -- some hands.   Okay.

23                    PROSPECTIVE JUROR:   Yeah, Gerald

24   Roth.

25                    THE COURT:   And were you the victim

1    or someone in your family?

2                    PROSPECTIVE JUROR:  I was, yes.

3            THE COURT:  And how long ago was it?

4            PROSPECTIVE JUROR:  '94.

5            THE COURT:  Okay.  Was anyone

6    arrested?

7            PROSPECTIVE JUROR:  Oh, no, this was

8    a foreign country.  They had no police.

9            THE COURT:  Okay.  And what I need

10   to know is if you've had any experiences like that,

11   we just need to know if it's going to have any

12   impact on your sitting on this jury, would that

13   incident --

14           PROSPECTIVE JUROR:  No.

15           THE COURT:  Okay.  Thank you.

16   Another hand?

17           PROSPECTIVE JUROR:  Walter Pugh.  A

18   house, years ago.  And I've got three or four

19   brothers and sisters and they've had things stolen

20   out of cars and stuff like that.

21           THE COURT:  Okay.  Thank you.

22      Okay.  Anybody else on that row?

23               (No response.)

24           THE COURT:  What about the next row?

25   Okay.  I see a hand.

1    PROSPECTIVE JUROR:  I was a victim

2  at work --

3    THE COURT:  Okay.

4    PROSPECTIVE JUROR:  -- last year.

5    THE COURT:  And where were you

6  working?

7    PROSPECTIVE JUROR:  At Extended

8  Stay.

9    THE COURT:  Okay.  And was anyone

10  arrested for that?

11    PROSPECTIVE JUROR:  No.

12    THE COURT:  And you're

13  Ms. Stallings?

14    PROSPECTIVE JUROR:  Yes, I am.

15    THE COURT:  Okay.  Thank you.

16    Anyone else on that row?

17    (No response.)

18    THE COURT:  I see a hand on the next

19  row.  Any -- there's so many rows, I -- the fourth

20  row?

21    PROSPECTIVE JUROR:  Yes, ma'am.

22  I -- my son was robbed maybe about two years ago or

23  so.  And the person was convicted for it.

24    THE COURT:  Okay.

25    PROSPECTIVE JUROR:  That's about two

1   years ago, I believe, maybe a little longer, but

2   around two years or so.

3                    THE COURT:  And you're Mr. Whiting.

4                    PROSPECTIVE JUROR:  Mr. Whiting,

5   yes.

6                    THE COURT:  Okay.

7                    PROSPECTIVE JUROR:  Cynthia Webster.

8   I was the victim.  I was robbed, and they were

9   convicted.

10                   THE COURT:  Okay.  And how long ago

11  was that?

12                   PROSPECTIVE JUROR:  A year ago.

13                   THE COURT:  A year ago?  I didn't

14  hear --

15                   PROSPECTIVE JUROR:  (Prospective

16  juror nods.)

17                   THE COURT:  Okay.

18                   PROSPECTIVE JUROR:  Judy Debutte.

19  We had an employee steal money, and he was

20  convicted though.

21                   THE COURT:  Okay.  I see a hand on

22  the back row.

23                   PROSPECTIVE JUROR:  Jennifer White.

24  In '94, my mom and I were broke in at home.

25                   THE COURT:  Okay.

1   PROSPECTIVE JUROR:  My name is
2   John Williamson.  My parents were burglarized
3   within the past year at their home.  And he was
4   arrested.  I believe he was convicted.
5   THE COURT:  Anyone --
6   (No response.)
7   THE COURT:  Let me ask all of you
8   who responded if -- would those incidents, if
9   anyone that would make a difference in you serving
10  on the jury, I need to let you tell us at this
11  time.  Would anyone -- would that incident have any
12  affect on any of you from serving on this jury?
13  (No response.)
14  THE COURT:  Okay.  Sometimes for
15  personal reasons, moral reasons, or religious
16  reasons, a person does not think he or she can sit
17  in judgment on their fellow man.  Is there anyone
18  here who would not be able to serve on the jury
19  because of such a belief?
20  (No response.)
21  THE COURT:  Okay.  And does the
22  State -- are you going --
23  MS. PERKINS:  Just briefly.
24  Good morning everybody.  I see y'all all
25  wrapped up from the rain.  My name is

1    Vernetta Perkins again.  I represent the State of

2    Alabama in this case.  I'm the prosecutor.  And I

3    just want to ask you a couple of questions.

4         First of all, how many of you watch court TV

5    shows:  Law and Order, Alley McBeal, The Practice,

6    all that stuff -- all of the above?

7                        (Prospective jurors raise their

8                        hands.)

9         MS. PERKINS:  I can't believe

10   there's actually people in here that did not raise

11   your hand.  Usually everybody raises their hand.

12   How many of you all know that the law on those

13   television shows that you see is maybe different

14   than the law here in the State of Alabama?

15                        (Jurors raise their hands.)

16        MS. PERKINS:  Okay.  A few of the

17   people that don't watch the shows should be raising

18   your hand to that one.  How many of you will be

19   able to follow the law that the Judge is going to

20   instruct you that applies in this case, rather than

21   what you saw on Law and Order last night -- was it

22   last night?  What's today?  Today is Tuesday -- no,

23   that you'll see tomorrow night.  I watch Law and

24   Order too.

25                        (Prospective jurors raise their

1      hands.)

2             MS. PERKINS:   Okay.   There may be --

3      I don't -- I didn't hear if the Judge asked this or

4      not.   There may be some evidence that you all have

5      to look at in this case.   How many of you all --

6      does anybody have a problem seeing to where if an

7      exhibit is handed to you, you wouldn't be able to

8      look at it?

9             (No response.)

10             MS. PERKINS:   That's it, Judge.

11             THE COURT:   Mr. Hartley?

12             MR. HARTLEY:   Just one question, and

13     I think it's been asked to you at one point

14     already.   The Judge has sort of qualified y'all on

15     who have been victims of crime yourself or related

16     to someone who has been a victim of crime.   And she

17     asked whether or not, even if that's happened,

18     whether you could sit on this jury.   I want to

19     phrase that same question a little differently and

20     pose this hypothetical.   That, if, in this case,

21     the evidence were real close on the issue of guilt

22     or real close on the issue of innocence, or, you

23     know, to whether it was almost fifty, fifty type

24     thing.   I want to ask you to kind of search your

25     own soul and search your own mind and ask this

1   question.  Could my experience possibly affect my

2   verdict one way or the other if I had to make a

3   very close call in this case?  If you have -- if

4   the fact that you've been a victim of a crime or if

5   there is any reason that we haven't hit on yet that

6   might affect your verdict in this case some way,

7   either for the State or for the defense, we ask you

8   to stay in here after the Judge releases you -- the

9   whole group to go to the jury room, you have a

10  right to stay in here and have sort of a more

11  private conversation -- it's not totally private,

12  because we'll still be here -- but you can disclose

13  or brief the Court on any matter that might affect

14  your verdict.  So I want to pose it to you that way

15  and ask you to stay if you think there's something

16  that needs to be known about your personal

17  situation that might affect this case.  Thank you.

18              THE COURT:  Let me ask just one last

19  question to the Stovalls.  I'm sure, if you were

20  both selected, you could each make your own

21  independent decision; is that correct, and not be

22  influenced by the other?

23              PROSPECTIVE JUROR:  Yes.

24              PROSPECTIVE JUROR:  Yes.

25              THE COURT:  Let me see the attorneys

1    just a moment.

2                    (Bench conference was held.)

3                    **MR. HARTLEY:**  I move to strike.

4                    **THE COURT:**  Do y'all want to keep

5    them in here and talk to them?

6                    **MS. PERKINS:**  No.  We can go ahead

7    and strike both of them.

8                    (In the hearing of the venire.)

9                    **THE COURT:**  We, hopefully -- it will

10   probably take us about fifteen minutes.  I'll

11   just -- we'll, hopefully, let you know before 11:30

12   who's on the jury.  If anyone does need to stay in

13   here, I'd ask you to remain.  The rest of you are

14   released until 11:30, and we'll get -- let you know

15   in the jury assembly about 11:30 who's on the jury.

16                   (Out of presence of the jury.)

17                   (In the presence of Ms. Pettaway.)

18                   **THE COURT:**  Ms. Pettaway, if you'll

19   just come up here, I think we can take care of you.

20   You had indicated that it would cause you some

21   problem if you were selected for this jury.

22                   **PROSPECTIVE JUROR:**  I think it

23   would.

24                   **THE COURT:**  And we're just going to

25   go ahead and excuse you.

1    PROSPECTIVE JUROR:  Okay.

2    THE COURT:  And if you'll check with

3    the administrator's office, to see if you're needed

4    the rest of the day or where.

5    PROSPECTIVE JUROR:  Okay.

6    THE COURT:  Okay.

7    PROSPECTIVE JUROR:  I just --

8    THE COURT:  Wait just a minute.  Not

9    you.  Not you.

10    (In the presence of Ms. Skipper.)

11    THE COURT:  Did you need to ask us

12    something?

13    PROSPECTIVE JUROR:  No.  I just --

14    when we were talking about robbery, I guess, I just

15    was -- my car was broken into one time.  And -- but

16    that didn't occur to me until I heard some other

17    people --

18    THE COURT:  Well, it's -- probably

19    because it's not technically a robbery.  But, you

20    know, you were a victim of an offense.  And would

21    that have any impact on your sitting on this jury?

22    PROSPECTIVE JUROR:  I don't think

23    so.

24    THE COURT:  And you're Ms. Skipper?

25    PROSPECTIVE JUROR:  Correct.

1       THE COURT:  Okay.  Thank you for

2  letting -- do y'all want to ask her anything?

3       MS. PERKINS:  No.

4       THE COURT:  Okay.  Thank you.

5       (Out of the presence of

6       Ms. Skipper.)

7       (Striking of the jurors.)

8       MS. PERKINS:  Judge, can I have a

9  moment to review for a possibly Batson challenge?

10       THE COURT:  Yes.

11       MS. PERKINS:  Judge, I don't have a

12  challenge.

13       THE COURT:  Thank you.

14       MR. DARNIELLE:  Bring them in?

15       THE COURT:  Yeah -- let me be

16  sure -- let's be sure we all have the same ones.  I

17  forgot.  309, 310, 323, 330, 366, 388, 392, 397,

18  419, alternate 436, 442, 448, and 500.  Okay.

19       (In the presence of the jury.)

20       THE COURT:  And if you'll come

21  around and go to one of the end of the rows and

22  remain standing.  Okay.  Before we start, I'm going

23  to swear you in for this particular case.  So if

24  all of you will raise your right hands?

25       (Jurors sworn.)

1          THE COURT: You can be seated.

2   Before we start, I'm going to briefly explain to

3   you the procedures that we'll be following and the

4   duties of the Court and the duties of the jury.

5   Some of you may have been involved in court

6   proceedings before. But for those of you who have

7   not, hopefully, it will be helpful.

8          First of all, as trial judge, it's my duty to

9   ensure the orderly conduct of the trial, rule on

10  questions of law as they may arise from time to

11  time. And, at the end of the case, instruct you on

12  the law that applies. Now, you as the jury, you

13  are the sole and exclusive judges of the facts.

14  It's your duty to listen to the evidence and from

15  it determine the true facts and then apply the law

16  as given to you by the Court to the facts as you

17  find them to arrive at your verdict.

18         Now, the procedure that we'll follow is, first

19  of all, counsel for the State will make an opening

20  statement, and then counsel for defendant will

21  respond. At this time, each of the attorneys is

22  confined to a statement of what they expect the

23  evidence to show. Now, these statements, they're

24  not evidence. They're simply given to familiarize

25  you with the case. Following opening statements,

1    then there will be testimony from witnesses on the
2    stand and may also be some exhibits or documents.
3    During the course of the trial, the attorneys will
4    object from time to time.  That's their job.  And
5    it's up to the Court to rule on those objections.
6    But you should not concern yourself with any of the
7    reasons for my rulings, as they're controlled and
8    required by law.  You're also not to speculate as
9    to any possible answers to questions which are not
10   required to be answered.  In addition, the
11   overruling of an objection is not intended to
12   indicate the weight to be given such evidence.
13   Following the close of the evidence, then the
14   attorneys will address you again and make closing
15   arguments, and they'll discuss the evidence that's
16   been presented and all reasonable inferences to
17   help guide you to your verdict.
18        Now, we'll be taking breaks, and it may depend
19   on where we are with a witness.  But if anyone does
20   need to take a break, just raise your hand and get
21   my attention and we can do so.  I do want to
22   caution you at this time not to discuss the case
23   with anyone.  That includes a fellow juror.  In
24   fact, you're not even to consider the matter until
25   you've heard all of the evidence.

1    Are you ready with opening?

2                    **MS. PERKINS:**  Yes, Judge.

3       May it please the Court, counsel?

4       Members of the jury, back on April 18th of

5    2002, the victim in this case, Mr. Larry Copeland,

6    was walking down the street.  He was walking down

7    Raintree Street, which is over off of Virginia Loop

8    Road.  It's about 11:15, 11:30 at night, he was

9    walking with a young friend of his.  He was going

10   over to a friend's house -- a girlfriend.  He was

11   going to visit -- just going around the block.  He

12   was coming from his father's house, which was right

13   around the corner.

14       As Mr. Copeland is walking down that street, a

15   man named Jamar Brown and this defendant seated

16   right here walked up to him.  They called out to

17   him.  They were behind him.  They called out to

18   him.  And they asked him a question about some

19   apartments that were right across the street.

20   Asked him if there was an entrance to those

21   apartments right there.  This appeared to be an odd

22   question to Mr. Copeland.  He was, like, you know,

23   Yeah, you can go in right there.  But he had to

24   slow down to get their attention and answer the

25   question.  And as he slowed down, this defendant

1    and Jamar Brown approached him.  Jamar Brown pulled

2    out a gun and stuck it to his head.  This defendant

3    grabbed that little boy that was standing there,

4    and they took property from him.  They took his

5    wallet.  They took money from him.  And they took

6    his identification.

7        And, members of the jury, that's what this

8    case is about.  This is a robbery case.  This is

9    about using force in the act of committing a theft.

10   Mr. Copeland is going to take the stand, and he's

11   going to tell you about the events of that day.

12   He's going to tell you about those two men that

13   walked up to him.  He's going to tell you that

14   where this occurred was right near lights.  There's

15   a street light on that street.  He got a good look

16   at both of the individuals who robbed him.  He got

17   a good look at Jamar Brown, the one who put that

18   gun to his head.  And he got a good look at the

19   other one.  And he's going to tell you that that

20   second person was this defendant seated right here.

21       He talked to the police about this case.  The

22   police developed suspects.  And he identified

23   Jamar Brown and this defendant right here in a

24   photo lineup.  That's the beginning and the end of

25   it.  There's some other things that are going to

1    come out during in the course of this case, and

2    we're going to allow -- that's -- that's the

3    victim's version of the story.  That's what he's

4    going to tell you that happened on that day.

5        Members of the jury, we want you to keep an

6    open mind and listen to all of the facts in this

7    case.  We want you to listen closely to the State's

8    case and listen closely at the defense case.

9    Issues that you're going to have to consider in

10   this case are going to be identity.  And you're

11   going to have to determine the credibility of

12   witnesses in this case.  And we want you to think

13   close about the credibility of witnesses in this

14   case.  Who's telling the truth?  Who's not?  And

15   who has motive to not tell the truth?  Thank you.

16                    **THE COURT:**  Mr. Hartley?

17                    **MR. HARTLEY:**  Thank you, Your Honor.

18   Thank you, counsel.

19       Members of the jury, I have a -- I think I'll

20   call it an abbreviated opening statement in this

21   case.  I appreciate what Ms. Perkins has told you,

22   but I believe that she has a weak case to present

23   today.  I'm going to just address what she has said

24   about what Mr. Copeland will testify about.  And

25   I'm going to tell you that there's something

suspicious about Mr. Copeland's testimony.

And it will work its way to this case this way. I believe his testimony will be that he and this person were out relatively late. I think it was almost midnight or sometime between ten and midnight when this allegedly occurred. And the location is somewhere out there by -- near the apartments out there -- I'm trying to think of the name of that street that they're on, but I can't recall at the moment. But, anyway, Mr. Copeland gave a statement to the police on April the 10th of 2002, trying to give a specific statement to the police to help them in the investigation so that they could, you know, resolve this matter and do something and to solve this alleged robbery. He never told the police what that person's name was that was with him. Identified him as a thirteen-year-old male and just calls him my friend. If he is his friend and is sort of close enough with him to be wandering around out there -- and, by the way, Mr. Copeland is twenty-eight years old and this other person is supposed to be about thirteen. And, as you heard from the District Attorney, this person was supposedly part of the victim of the robbery, according to Mr. Copeland's

1   claim and -- that Kourtney Greenwood was out there

2   committing the robbery.  And he's such a

3   brilliant -- I mean, such a good observer.  He saw

4   a good view of Jamar Brown and got a -- who was

5   holding a gun in his face.  And, at the same time,

6   they will identify a second person, who was some

7   distance away, but not with a gun pointed in his

8   face, who he claims is Kourtney Greenwood.  But he

9   can't even tell you the name of his friend that was

10  out there.  There's something suspicious about this

11  whole thing.

12       But let me tell you what else is wrong with

13  this matter.  On April the 18th of this year, he

14  tried to do a -- an identification in a

15  photographic lineup of whom the third -- I mean,

16  the second subject was supposed to be, not

17  Jamar Brown, not the person who had a gun pointed

18  in his face, but this person who is over to the

19  side doing something else.  And he was down at the

20  police station looking at some pictures.  And he

21  said, Yeah, I can tell you what he looked like.

22  This man -- the second person had twists in his

23  hair.  The identifying characteristic were twists

24  in his hair.  We're going to have several forms of

25  evidence that will show that that is a way he

1    has -- he has never worn his hair like that in his

2    life, wasn't wearing his hair like that at the

3    time.   And if that is the outstanding

4    characteristic that he identified him by, then he's

5    dead wrong.   That's what -- the State -- that's

6    what's going -- basically, undermined any theory

7    the State has that they've got proof beyond a

8    reasonable doubt that Kourtney Greenwood was

9    involved in this case.

10        So, you're going to find -- and not only --

11    and the District Attorney asked you to listen to

12    the defense side of the case closely.   Well, I

13    appreciate that.   Because that -- sometimes we say

14    things like that.   And we want you to listen to her

15    side of the case or their side of the case.   And I

16    want you to listen to our side of the case.   But I

17    want you to listen to what we just suggested to

18    you, that his identification is weak at best and,

19    in fact, it is in error.   And I think that you'll

20    find that Mr. Copeland's testimony comes out

21    doubtful and suspicious at best.

22        And, for that reason and many other reasons,

23    we'll argue to you at the close of this case, we

24    submit that this is a case where Mr. Greenwood

25    should be found not guilty.   There is a presumption

1  of innocence, which rises to the level of evidence

2  in this case.  I ask you to keep that presumption

3  of innocence in mind and don't make any judgment

4  about guilt or innocence until you've heard all the

5  evidence and until you've heard the jury charge,

6  when the Judge will give you perimeter of the law

7  that you're supposed to follow -- not just suppose

8  to follow, you're under oath to follow.  And I'll

9  ask you to follow that oath and apply the

10  presumption of innocence and the burden that the

11  State has to prove anybody guilty beyond a

12  reasonable doubt and find Kourtney Greenwood not

13  guilty.  Thank you.

14              THE COURT:  Are you ready with your

15  first witness?

16              MS. PERKINS:  Yes, Judge.  State of

17  Alabama calls Larry Copeland, Jr.

18              THE COURT:  And if you'll raise your

19  right hand?

20              LARRY COPELAND, JR.

21      The witness, having first been duly sworn or

22  affirmed to speak the truth, the whole truth, and

23  nothing but the truth, testified as follows:

24              DIRECT EXAMINATION

25  BY MR. PERKINS:

Q.    Let me pull this microphone up to you so everybody can hear you.  Okay?

A.    Okay.

Q.    Tell us your name.

A.    Larry Copeland, Jr.

Q.    Larry, where are you from?

A.    Montgomery, Alabama.

Q.    Have you lived here all of your life?

A.    Not all my life.  I mean, basically, but not all my life.

Q.    Okay.  But you are living here now?

A.    Yes.

Q.    Okay.  How old are you?

A.    I'm not twenty-eight.  I'm twenty-nine.

Q.    Twenty-nine?

A.    Twenty-nine, yeah.

Q.    Did you just recently turn twenty-nine, why you're saying it like that?

A.    Um, July 12th.

Q.    All right.  I want to take you back to April 18th of 2002.  Okay?

A.    Okay.

Q.    Were you in Montgomery on that day?

A.    Yes, ma'am.

Q.    Do you remember that day?

1        A.    I remember clearly.

2        Q.    Okay.  Something significant happened to

3    you that night; is that right?

4        A.    Yes, it did.

5        Q.    Where were you immediately before this

6    incident happened?

7        A.    Immediately, I had went by my dad's

8    house, you know, to see if he was at home and see

9    if I could check on my son or whatever.  And then I

10    came back to my cousin's house, which is on -- off

11    Virginia Loop Road right around Raintree Drive, and

12    I proceeded to walk.

13        Q.    Okay.  Where were -- you said you

14    proceeded to walk?

15        A.    Uh-huh.  I wasn't driving, so I walked.

16        Q.    Okay.  Are these -- all these streets

17    you're talking about, they're -- are they --

18        A.    They're in the same neighborhood.

19    They're right connected and everything.

20        Q.    Okay.  So it's literally like you're

21    walking around the block?

22        A.    Yes.

23        Q.    You said you proceeded to walk.  Where

24    were you going?

25        A.    I was going to Stonebridge Apartments

1  over there by -- there's a friend over there that I

2  knew and Serillo said that he knew exactly where

3  she stayed, but I -- we was going -- I went over

4  there, and I didn't see her car, you know, so we

5  just walked around and talked to other friends that

6  we had talked to a little while earlier, you know,

7  saying a couple few minutes, so we just walked

8  around there.  And before we got to it, that's when

9  the incident --

10        Q.    Let me stop you for a second.  You

11  said -- did you mention that someone was with you?

12        A.    Yes.

13        Q.    Okay.  Who is it that was with you?

14        A.    Serillo.

15        Q.    What's his name again?

16        A.    Serillo.

17        Q.    Sherillo?

18        A.    Serillo.

19        Q.    Serillo?

20        A.    Yeah.

21        Q.    Okay.  Who is he?

22        A.    He's -- I know his mom and sister real

23  well, you know.  He's like twelve, thirteen years

24  old.  And, um, he's like -- he's a young kid, you

25  know.  And, you know, sometimes he be with me.  He

1    moved on the block with my cousin, so sometimes I

2    come over there -- I be at my cousin's house all

3    the time, so he comes down there and he hang out,

4    watch TV, whatever.  We might shoot a little

5    basketball or --

6        Q.    Okay.  So, were you around -- were you

7    near his -- his mother's -- were you at his

8    mother's house when you left to go somewhere else?

9        A.    No.  I was at my cousin's house.  And his

10   mom's house is right --

11       Q.    All right.

12       A.    -- about four houses down the street.

13       Q.    Okay.  That's what I wanted to get out.

14   So his house is right --

15       A.    Yeah.

16       Q.    His house is right there?

17       A.    Yeah.

18       Q.    So he was out in the neighborhood?

19       A.    Yeah, he was out in the neighborhood.

20       Q.    Okay.  Now, what time was it when you

21   were -- when all this happened?

22       A.    It was about 11:00, 11:30, somewhere

23   around that time.  I asked him what he was doing

24   out that late, and he said my mom ain't home.  I

25   said, Well, you can hang with me for a couple

38

1       minutes, then you get on home and go to bed.

2           Q.    Okay.  So you took him with you?

3           A.    Yeah, I took him with me.

4           Q.    All right.  Now, did you all make it to

5       your final destination?

6           A.    Well, actually, I didn't see her car over

7       there, and I didn't see my cousin's car at his

8       house, so I said, We'll just walk around, you

9       know --

10          Q.    And go back --

11          A.    -- go back wherever.

12          Q.    Okay.  Now, did you make it back to the

13      house where y'all -- where y'all came from?

14          A.    No.  We just kept on around the circle,

15      coming on around or whatever.  But I never made it

16      back.

17          Q.    What happened?

18          A.    I was walking -- and I didn't really see

19      anybody, but I was walking, and I -- next thing I

20      know I heard somebody walking behind.  I looked

21      over my shoulder and they was just walking.  By the

22      sights on their faces, I could tell that they were

23      up to something --

24              MR. HARTLEY:  Objection, Your Honor,

25      to what he could tell.

1          THE COURT:  Okay.  Sustained.  Just

2    what happened.  What you saw.  And disregard that

3    last remark.

4          A.    Okay.  Walking at a fast pace and

5    approaching, and I knew that it wasn't right from

6    that situation, so I slowed down --

7          THE COURT:  Let me ask.  Can you

8    slow down just a little bit?  She has to take

9    everything down.

10         THE WITNESS:  I'm talking to fast?

11   Okay.

12         Q.    Okay.  Let me stop you and ask you some

13   more questions.  Okay?

14         A.    Okay.

15         Q.    To kind of walk you through this.  Okay?

16         A.    Okay.

17         Q.    Now, you said someone -- someone called

18   out to you?

19         A.    Uh-huh, someone called out to me.

20         Q.    Okay.  What did they say?

21         A.    They said, Hey, so I turned around --

22   that's when I turned around.  Before I turned

23   around, I told Serillo, I said, something is

24   getting ready to happen.  I said, Don't panic.

25   Whatever you do, Don't panic.  I said, Something is

1   getting ready to happen.

2        Q.    Okay.  So what happened after that?

3        A.    So that's when they were like, Do you

4   know a place where we can enter across the street

5   to go to the apartments?  And, from that point

6   then, I knew that it was already -- you know, ruled

7   out the benefit of the doubt that something is not

8   right, because the apartments across the street, of

9   course you know there's going to be an entrance

10  where you can go into an apartment.  It's not a

11  prison, you know.  So I immediately knew then that

12  someone was up to something.  Common sense, you

13  know.

14       Q.    So what did you do?

15       A.    What I did?  I hesitated, because I know

16  he was going to rob or had a gun or something.  I

17  didn't want --

18                 MR. HARTLEY:  Objection, Your Honor.

19                 THE COURT:  Sustained.

20       A.    I didn't want --

21       Q.    Wait.  When she says --

22                 THE COURT:  Wait.  Wait.  When he

23  objects, don't keep testifying.  I'm sustaining

24  your objection.

25                 MS. PERKINS:  Okay.

1           THE COURT:  And disregard the last

2    comment.

3           Q.   Tell us what you did.

4           A.   What I did?

5           Q.   Uh-huh.

6           A.   I paused.

7           Q.   You paused?

8           A.   I paused.

9           Q.   Okay.  What happened after you paused?

10          A.   After I paused, they walked up on me or

11   whatever.  I tried to ask a question, walking back

12   from them, but I seen that he kept approaching me.

13   So I said, I'm not going to run to provoke

14   anything, so --

15          Q.   So you stopped?

16          A.   So I just completely stopped.

17          Q.   Okay.  Now --

18          A.   Because I had him with me, you know.

19          Q.   -- how many people was it that were --

20   that were approaching you?

21          A.   It was two.

22          Q.   It was two.  And you're sure about that?

23          A.   Yeah.

24          Q.   Okay.  So two people came up.  Did both

25   of them come and approach you?

1  A. Both of them came and approached me.

2  Q. All right.  Now, tell us what happened

3 once you stopped and they came up to you?  And I

4 want you to go slow here and go into detail.  First

5 of all, where were you?  Were you on the sidewalk

6 or in the street?

7  A. I was on the sidewalk, like, right next

8 to the street.  Not to far -- like a couple feet

9 from the street light or whatever.

10  Q. Okay.  So you could see these individuals

11 as they came up to --

12  A. Very clear.

13  Q. Very clear?

14  A. Very clear, ma'am.

15  Q. Okay.  So two people come up to you.

16 Tell us what happens at that point.

17  A. They walked up on me or whatever.  I

18 noticed that -- the clothes he had on, so I paused

19 or whatever.  And --

20  Q. You say he.  Which he are you talking

21 about?

22  A. This was Jamar.

23  Q. Okay.

24  A. Okay.  And then once Jamar separated me,

25 the other guy start smiling or laughing or

1    whatever.  And he went and held the boy and said,

2    Don't move.

3         Q.   All right.  Let me walk you through that

4    for a second.  Because, um, there's a difference up

5    there, you've got to tell the members of the jury

6    stuff.

7         A.   Okay.

8         Q.   I've got to walk you step by step by

9    step.

10        A.   I understand.

11        Q.   And I want you to make sure you explain

12   it to these people, because they have to understand

13   exactly what it is that you're saying.

14        A.   Yeah.

15        Q.   Okay.  Step-by-step.  All right?

16        A.   Okay.

17        Q.   Okay.  So two people came up to you.  You

18   mentioned Jamar's name.  How did you distinguish

19   Jamar from the other person?

20        A.   How did I distinguish?

21        Q.   Yeah.  What was -- what did he do?

22        A.   Basically his clothes.  And then I seen

23   his face clearly, you know, so I seen his face

24   clearly.

25        Q.   Okay.  So when Jamar came up to you, what

1    did he do?

2        A.   He pulled his gun out, cocked it back,

3    and stuck it to me, and told me --

4        Q.   Wait.  When you say stuck it to you,

5    do -- I mean, did he stick it to your foot?

6    Where --

7        A.   He stuck it to my head.

8        Q.   He stuck it to your head?

9        A.   Yeah.  And then when cars started

10   passing, he just stuck it to my chest.

11       Q.   Was he standing in front of you?

12       A.   Standing directly in front of me.  Then

13   he stood to the side of me and put it to my chest

14   and he started --

15       Q.   So he's in front of you like this.  And,

16   at first, he has it to your head?

17       A.   Uh-huh.

18       Q.   And then when a car starts passing, he

19   puts it to -- he puts it to your side?

20       A.   Yeah.  Yeah, he puts it to the side, like

21   this.

22       Q.   Okay.  All right.  What is he saying to

23   you while all of this is happening?

24       A.   And he's saying, Fuck, Nigger, give it

25   up.

1      Q.   Okay.

2      A.   So I said, okay.  I'll give it up.

3      Q.   What was the second person doing?

4      A.   The second person was doing -- looking

5   out, and saying, Man, these cars are coming.  These

6   cars are coming, telling the little dude don't move

7   or whatever, you know what I'm saying.

8      Q.   When you say he was telling him this, was

9   he near the young man?

10     A.   He was right in front of the young man.

11  He had put his hands up, because he said, Are you

12  going to kill us?

13     Q.   The young man said, Are you going to kill

14  us?

15     A.   Yeah.  He said, Are you going to kill us?

16     Q.   What did -- and explain to -- I want you

17  to explain to the members of the jury what the

18  second person was doing.  Was he holding him?

19     A.   At first, he had him by his clothes.  He

20  just held him by his clothes, and then he just

21  stood in front of him like this, and said, Don't

22  move.  He just stood in front of him.

23     Q.   He just stood in front of him?

24     A.   Yeah.

25     Q.   You said like this.  Stand --

1        MS. PERKINS:  Judge, may I have him

2    to stand up to demonstrate, please?

3        THE COURT:  Sure.

4        THE WITNESS:  (Witness complies.)

5    Q.    I have to get you to walk through this,

6    because you're just talking like we know what

7    you're talking about.  So when you say stood in

8    front of you --

9    A.    You're the younger guy.

10   Q.    I'm the young guy.  Tell -- show them

11   what --

12   A.    As he grabbed him like this, and then he

13   stood in front of him like this.  Don't move,

14   whatever.  And then the other -- the other dude put

15   his hands up --

16   Q.    Made sure you talk to them.

17       THE COURT REPORTER:  Well, I've got

18   to hear too, and you're talking low.

19       MS. PERKINS:  Okay.

20   A.    Then the other dude put his hands up and

21   said, Are you going to kill us?

22   Q.    Then what happened?

23   A.    Then Jamar said he was going to kill --

24       THE COURT:  Do you still need him

25   down?

1          MS. PERKINS:  Um, I think he's about

2    to demonstrate something else.

3          Q.    Did something else happen after that

4    point or did he let y'all go?

5          A.    No.  After he robbed me and everything,

6    you know, I started walking away or whatever.

7          Q.    Okay.  You can sit back down.  We're

8    going to walk through that.

9          A.    (Witness complies.)

10          Q.    So Jamar has a gun to your head.  The

11    second guy is standing in front of him, restraining

12    the young guy; is that right?

13          A.    Yes.

14          Q.    Okay.  Now, go on and finish telling us

15    what happened after that.

16          A.    Then after that, the young dude said, are

17    you going to kill us or whatever?  And I guess

18    someone was like, Um, we don't know yet or

19    whatever.  And Jamar is like, Yeah, I ain't going

20    to kill.  I'm just going to put you to some

21    eternity sleep.  I was like Okay.  I said, if you

22    want to rob or whatever, I said, you go ahead if

23    you think --

24          Q.    Slow down.  Slow down.  He said -- Jamar

25    said what to you?

1          A.    Yeah.  I said, Was you going to kill me?

2    And he said, Um, then I'm going to put you to --

3          Q.    Wait.  Wait.  He said --

4          A.    -- put you to --

5          Q.    Wait.  Wait.  I need you, literally, to

6    slow down.

7          A.    Okay.

8          Q.    Slow real, real, real slow.

9          A.    Okay.

10          Q.    Okay.  Now, Jamar said what?

11          A.    Jamar said -- I asked him, Was he going

12    to kill.  I said --

13          Q.    You asked him was he going to kill you?

14          A.    Uh-huh.

15          Q.    All right.  I mean -- or the young boy

16    asked him that?

17          A.    Yeah.

18          Q.    What did Jamar say?

19          A.    He turned to me, he said -- I was, like,

20    Are you going to kill us?  I said, Don't kill him.

21    I just told him, I said, Don't kill him.  Just do

22    me.  Let him go.  You know what I'm saying?

23          Q.    Okay.

24          A.    And, after that, he was, like, um, um --

25    like he was uncertain if he was going to kill me or

49

```
 1    not.  He said that he was going to put me in
 2    eternity sleep.
 3         Q.   He was going to put you in eternity
 4    sleep?
 5         A.   Yeah, eternity sleep.  Eternity, you
 6    know, I guess --
 7         Q.   Okay.  All right.  And then what -- what
 8    did you say?
 9         A.   I was, like, if it makes you feel like a
10    man, go right on ahead.  I said, Just leave the
11    little young kid alone.  I said, Don't bring him in
12    this.  I said, This is enough right here, you know.
13         Q.   Okay.  And what was the second guy doing
14    while this conversation was happening with you and
15    Jamar?  Was he still holding that little boy?
16         A.   Yeah, he was still holding the little
17    boy.  And he was, like, Man, these cars are coming,
18    Man.  Man, all these cars keep coming by.  You got
19    that gun out, Man.
20         Q.   Okay.
21         A.   So that's --
22         Q.   Okay.  Now, I want to talk about that
23    second individual.
24         A.   Okay.
25         Q.   You said, you were near a street light?
```

50

1       A.    Yeah, we were near a street light.

2       Q.    Did you get a good look at that second

3  individual?

4       A.    Got a very good look at him.

5       Q.    All right.  Did you get a good look at

6  his face?

7       A.    Got a good look at his face.

8       Q.    Um, as well as other features --

9       A.    As well as other features.  But,

10  basically, I just remember the face, you know.

11       Q.    Okay.

12       A.    Okay.

13       Q.    Now, was there something significant that

14  you remember about his hair?

15       A.    I remember something significant about

16  his hair.

17       Q.    Okay.  What was that?

18       A.    It was twisted.

19       Q.    Okay.  It was twisted?

20       A.    Yeah.  Can I say something else?

21             MR. HARTLEY:  Objection, Your Honor.

22       Q.    It was twisted?

23       A.    Uh-huh.

24       Q.    Okay.  Was he -- was he light skin?  Was

25  he my -- your complexion or was he darker than us?

```
 1          A.    It was darker than us -- both of us put
 2    together.
 3          Q.    All right.  Now, what -- what did this --
 4    what did he have on?
 5          A.    What did he have on?
 6          Q.    If you can remember.
 7          A.    Yeah.  He had, like, some shorts on or
 8    whatever.  He had, like, a shirt that comes over --
 9          Q.    Make sure you speak in the microphone.
10          A.    He had a shirt that came right past his
11    belt.  And he had something written across it.  I
12    don't know if it was Pele Pele or Girmaud or -- I
13    know he had a shirt on.
14          Q.    Okay.  And Pele Pele and Girmaud are both
15    names of clothing that you --
16          A.    Yeah, clothing.
17          Q.    Okay.  All right.  At some point -- okay.
18    Did you call -- did they leave you or did -- what
19    happened after they --
20          A.    Well, after then, they left me, you know.
21    And --
22          Q.    And what did you do?
23          A.    I said, Don't run.  I asked him to give
24    me my wallet and my I. D.  I said, you can keep my
25    phone with you, you know what I'm saying.  I said,
```

1    Just give me my wallet.  You can keep the money,

2    but just give me my I. D., but he wouldn't drop it.

3    He wouldn't do nothing.  He just kept taking it.

4    And then he pointed the gun at me and said, Shut

5    up.

6         Q.    Okay.  So did you see them leave?

7         A.    So that's what I did, started walking,

8    like, I was leaving.  And then I went back and

9    circled around and watched them get into a red

10   S-10 --

11        Q.    You saw them get into a red S-10?

12        A.    Yeah, crimson color.

13        Q.    Okay.  What did you do after they left?

14        A.    What I did after they left, I seen them

15   pull off, whatever.  Both criminals were inside the

16   truck.  I went to my cousin's house and called the

17   police on the phone and went back to the area where

18   we was at.

19        Q.    So you went and called the police and

20   went back and waited for the police?

21        A.    Yeah.

22        Q.    Okay.  Did the police come?

23        A.    Yeah, the police came.

24        Q.    Did you tell them what happened?

25        A.    I told them exactly what happened.

1    Q.    Now, at some point, the police developed

2    suspects; is that right?

3    A.    Yeah, at some point --

4    Q.    Okay.

5    A.    -- but, at that point, they --

6    Q.    At that point, they didn't know --

7    A.    He just wanted to know my statement.  He

8    didn't want nothing from the little boy.  He just

9    wanted my statement.

10    Q.    Okay.

11    A.    Because he said I was the victim

12    completely, you know.

13    Q.    Okay.  But they developed suspects at

14    some point; is that right?

15    A.    Yeah, at some point, they developed

16    suspects.

17    Q.    Did they bring you back a photo lineup?

18    A.    They brought me back a photo lineup.

19    Q.    Okay.  Did they bring you back a photo

20    lineup, one, of the first person and one of the

21    second person?

22    A.    First person, then the second person,

23    yeah.

24    Q.    Did you identify both of these people in

25    the photo lineup?

1  A.  Straight off, yes, I did.

2  Q.  Okay.  And the first person that you

3  identified was Jamar Brown?

4  A.  Jamar Brown.

5  Q.  Okay.  Do you see the second person that

6  robbed you and that you identified in that photo

7  lineup in the courtroom today?

8  A.  He's in the courtroom today.

9  Q.  Can you, please, identify him for the

10  ladies and gentlemen of the jury?

11  A.  There he is right there.

12  Q.  Can you, please, state what he has on?

13  A.  He has on black shoes, tan -- khaki,

14  light pants and a white shirt.

15           MS. PERKINS:  Okay.  Let the Record

16  reflect that the victim has identified the

17  defendant today.

18  Q.  And this did take place here in

19  Montgomery County; is that right?

20  A.  This did take place in Montgomery.

21           MS. PERKINS:  Nothing further at

22  this time, Judge.

23           THE COURT:  I think this will be a

24  good time to take a break.  I'm going to give you

25  until 1:30.  We'll get you in the jury assembly

1    room at 1:30.  And, again, caution you not to

2    discuss the case.  Okay.  You're excused until

3    1:30.

4                    (Out of the presence of the jury.)

5                    MR. HARTLEY:  Two issues, Judge.

6    Judge, at this moment -- at this point, we would

7    like to ask that the Court allow the court reporter

8    to transcribe Mr. Copeland's testimony from the

9    trial on October the 29th --

10                   THE COURT:  Well, what part?  I

11   mean --

12                   MR. HARTLEY:  It appears -- my

13   recollection of the testimony is he never

14   identified the second person, the thirteen-year-old

15   in that testimony.  And we want to be able to -- if

16   he -- if he -- we're going to question him as to --

17                   THE COURT:  Well, he hadn't -- I

18   don't think --

19                   MS. PERKINS:  He did say the name of

20   the young man at the other trial.

21                   THE COURT:  I don't think he did.

22                   MR. HARTLEY:  I don't think he did.

23   And he was very vague --

24                   MS. PERKINS:  What did --

25                   MR. HARTLEY:  -- and today he

```
 1    said --
 2                    THE COURT:  Wait.  Wait.  Now, don't
 3    all talk at one time.
 4                    MR. HARTLEY:   -- that I thought --
 5                    THE COURT:  What are you saying that
 6    he said today that's in conflict with the prior
 7    testimony?
 8                    MR. HARTLEY:  I believe it is, Your
 9    Honor.  And I didn't hear what he said today.  I
10    think he said the man's name was Torillo or
11    something of that effect.  I didn't quite get it
12    even.
13                    THE COURT:  I didn't either.  I
14    couldn't hear.
15                    MS. PERKINS:  He said, Serillo.
16                    THE WITNESS:  I think you spell
17    it -- you know how --
18                    THE COURT:  Wait just a minute.  Did
19    you identify the young man with you, today, as
20    being Serillo?
21                    THE WITNESS:  Yeah.
22                    MS. PERKINS:  Yes, he did.
23                    THE COURT:  Well, you know -- and
24    it's going to take a lot longer.  His testimony was
25    probably similar to what it is now as far as --
```

1        MR. HARTLEY:  Difficult?

2        THE COURT:  And --

3        MR. HARTLEY:  But we do have that

4    matter coming up at 1:00 or 1:30, so I'm hoping --

5        THE COURT:  Well, she might want to

6    have a short break.  And I can assure you it's

7    going to take a little while.  But you have the

8    right to have it.

9        MR. HARTLEY:  Right.  And I -- and

10   that portion is all we really want is where we

11   talked about the name of the child.  I mean, that

12   wouldn't be -- I would like the whole thing, but if

13   she can only get that --

14       THE COURT:  Okay.  If you would look

15   at that, and then see what's there.

16       MS. PERKINS:  Judge, maybe if she

17   looks at it and sees that he did give the name of

18   the child, then we may not need it.  I don't

19   know -- unless.

20       MR. HARTLEY:  I'll get with her.

21       The second thing is, is we have been -- we're

22   aware of, in the file, a photo lineup.  We've never

23   seen the photo lineup.  We hope they have it

24   available today to see what pictures they used to

25   identify him from.  Have you got that today?

```
 1                    MS. PERKINS:  Uh-huh.

 2                    MR. HARTLEY:  Okay.  We would like

 3     to see that before lunch.

 4                    MS. PERKINS:  I don't know if I can

 5     produce it before lunch.  The case agent has it.  I

 6     mean, I'll have it when I get back.  I don't know

 7     if it will be at your convenience, but we will have

 8     it to produce into --

 9                    THE COURT:  Why don't you try to get

10     the case agent here early?

11                    MS. PERKINS:  Yes, I will.

12                    MR. HARTLEY:  Thank you.

13                    (Lunch recess was taken.)

14                    MS. PERKINS:  Ms. Mary, were they in

15     the same holding cell.

16                    THE BAILIFF:  No.

17                    THE COURT:  Mr. Hartley, what do you

18     need to put on Record?

19                    MR. HARTLEY:  Judge, present are my

20     client, of course, Judge, Kourtney Greenwood and

21     Mr. Brown.  Mr. Brown has already pled guilty to

22     robbing Larry Copeland.  I think that happened

23     roughly ten days ago.  I don't remember the exact

24     date, but Mr. Durant is his attorney.  I -- not

25     having been here, I did not under -- I did not hear
```

1    what he said about the robbery -- or if I did, I

2    may have been in and out of the courtroom or -- I

3    don't have a record of it.

4        However, when I met him in the jail this

5    morning about his possibly of being a witness, he

6    told me that he could testify and it would be

7    beneficial to my client.  Now that he's over here

8    this afternoon, prepared to be a witness, he has

9    expressed his reluctance to testify, because he

10   believes it might be detrimental to his sentencing

11   hearing, which is scheduled for tomorrow morning or

12   Thursday morning?

13              **MR. DURANT:**  Thursday.

14              **MR. HARTLEY:**  Thursday morning.

15   Then, I -- in our general conversations back there,

16   Mr. Brown said that he had already told the

17   District Attorney's office -- he used that

18   language -- that he didn't know Kourtney Greenwood

19   and that Kourtney Greenwood was not involved.  And

20   it sort of came out that he, not only had made that

21   representation to the DA's office, but that he had

22   said something to this effect in his colloquy for a

23   guilty plea.

24              **THE COURT:**  I don't recall.  I guess

25   we'll have to look that up also.

1           MR. HARTLEY:  They might remember.

2  No one seems to have a recollection.  We've already

3  asked.

4           MS. PERKINS:  Judge, may I interject

5  for one second?  I don't know whether or not -- and

6  if Mr. Hartley is wishing to see this, we will have

7  to look it up.  But Mr. Durant and myself, both,

8  remember me asking him, Did he know

9  Kourtney Greenwood --

10           THE COURT:  I don't remember.

11           MS. PERKINS:  -- and he -- I told

12  Mr. Hartley -- and I said it to him in front of

13  him -- that he indicated to myself and to his

14  attorney -- I think it was in front of the Court.

15  I don't know -- that he did not know him, which is

16  why the State is not calling him, because we have a

17  case without him.

18     Now, if Mr. Hartley wants to use him and he

19  does not wish to testify, that's something they

20  have to work out.  If he wants to get that plea and

21  he actually said it on the Record, then, of course,

22  Mr. Hartley can use that, you know, in --

23           THE COURT:  Well, I don't recall.

24  And it would certainly have to be --

25     Meridith, I don't know whether you were

61

1    here -- who took it.  He pled on November 21st.

2         One other matter, Ms. Newman, during lunch,

3    typed up the testimony of the victim.  Now,

4    Mr. Hartley, there was no excuse until waiting

5    while we're in trial to ask for that.  Of course,

6    you're entitled to it.  And I don't want something

7    to come up later on, so I -- she's done it.  But

8    that is inexcusable.  You've had two months to

9    request it.  And you certainly knew he was going to

10   testify.

11              MR. HARTLEY:  I admit that, Judge,

12   and I apologize.  I thought I had detected a

13   different --

14              THE COURT:  Whenever we get the jury

15   back after the case is over, I'm telling them all

16   the reasons for the delay.

17        So, will you go see if you took it?

18              THE COURT REPORTER:  I don't think I

19   did, Judge, but I'll check.

20              MS. PERKINS:  And, just for the

21   Record, before she moves, the issue that

22   Mr. Hartley was raising in that statement, he did

23   mention to me that the young man, Serillo's name,

24   in the transcript, and it is listed in there.

25              THE COURT:  Okay.

1          (Brief recess was taken.)

2          THE COURT:  Let the Record show that

3     at Mr. Hartley's request, the court reporter

4     transcribed the prior testimony of the victim and a

5     copy has been provided to both defense counsel and

6     State counsel.  And so it's available to be used

7     however anyone wants to.

8          And the court reporter who took down the

9     co-defendant's plea is in the process of having it

10    transcribed and a copy will just be marked as Court

11    Exhibit A.

12          MR. HARTLEY:  Thank you, Judge.

13          THE COURT:  Here is a copy of it.

14    And Ms. Perkins stated the State's evidence would

15    show that Mr. Brown, along with co-defendant,

16    Kourtney Green, approached the victim -- go off the

17    record just a minute.

18          (Off the record discussion.)

19          THE COURT:  -- and he admitted that

20    that's what happened.  And, you know, the State's

21    offer of proof was that he was with

22    Kourtney Green -- it said Green.  It should have

23    been --

24          MR. HARTLEY:  Judge, I've been

25    through many, many pleas like this and the Court

1    has to, and I believe that he may have intended

2    to --

3                    THE COURT:  Well, you can certainly

4    call him as a witness.  But that is the transcript.

5                    MR. HARTLEY:  Thank you, Judge.

6                    THE COURT:  And -- okay.  Can we get

7    the jury?

8                    MS. PERKINS:  Judge, before we do

9    that, can I see what his plans are, if he's

10   planning to do that, then I need a --

11        Are you planning to use that?

12                   MR. HARTLEY:  I don't know yet.  I'm

13   going to try --

14                   MS. PERKINS:  Well, if you are, I

15   need a copy of it.

16                   THE COURT:  Well, y'all can each

17   share the copy.  It's a Court Exhibit.  It's not

18   very lengthy.

19                   MR. HARTLEY:  I'm fixing to hand it

20   to you.

21                   MS. PERKINS:  Okay.  If you're not

22   going to use it, it's not --

23                   MR. HARTLEY:  I can't say yes or no.

24                   THE COURT:  When the jury gets to

25   the door, they're coming in no matter who's saying

1    what.  Okay.  Ms. Perkins, what do you want to say?

2                    MS. PERKINS:  Judge, I want to make

3    sure I understand.  I don't want to have to get in

4    the middle of trial and have to stop again to make

5    an objection.  If Mr. Hartley is going to use this

6    testimony to call Mr. Brown to the stand to testify

7    consistent with what's on this page, then the State

8    does not have a problem with that.  But I think

9    Mr. Hartley -- I heard Mr. Hartley, correctly, what

10   he was just saying to me, that I don't think he

11   understood what he was saying right here.  And --

12                    THE COURT:  Well, he can ask him

13   that.

14                    MS. PERKINS:  He can call him to the

15   stand to clear up what he said in a prior

16   statement?

17                    THE COURT:  And it might cause a

18   problem down the road --

19                    MS. PERKINS:  Well --

20                    THE COURT:  Okay.  Are the jury --

21                    MR. DARNIELLE:  (The law clerk

22   nods.)

23                    THE COURT:  Okay.  The jury is here.

24   He's not going to be the next witness.  Let's get

25   the jury in.  I'll get to that in a minute.

1              (In the presence of jury.)

2              THE COURT:  You can be seated.  And

3    when the matter is over, I'll give you some

4    explanation, maybe, for the delay.  And I think the

5    State had finished questioning.

6              MS. PERKINS:  Yes, ma'am.  And we

7    will instruct the witness to go back to the witness

8    stand.

9              THE COURT:  Okay.  And I'll just

10   remind you that you're still under oath.

11              LARRY COPELAND, JR.

12       The witness, having been reminded that he was

13   duly sworn or affirmed to speak the truth, the

14   whole truth, and nothing but the truth, testified

15   as follows:

16                   CROSS-EXAMINATION

17   BY MR. HARTLEY:

18        Q.    Mr. Copeland --

19        A.    Yes.

20        Q.    -- this all took place on the date of

21   April the 10th of 2002; is that right?

22        A.    Correct.

23        Q.    Do you remember what day of the week that

24   was?

25        A.    I don't remember the exact day or

1   whatever, but what the day was -- I know I got

2   robbed.

3        Q.   Okay.  Well, do you remember whether it

4   was, like, a Tuesday night?

5        A.   I think it was a Tuesday night.

6        Q.   Okay.  It certainly wasn't a weekend

7   night, was it?

8        A.   I can't really recall what night.  I just

9   know what I know.  It's been a while.

10       Q.   If I suggest that I found in the record

11  that it took place on a Tuesday, would you agree

12  with that?

13       A.   I really can't remember exactly what day

14  it was.  I can't remember, you know -- I --

15       Q.   Excuse me?

16       A.   It's not like I was trying to keep track

17  in my mind of a day like that.  When something goes

18  wrong like that --

19       Q.   Well, let me ask you this question then.

20  Do you remember on that day that you were robbed,

21  do you remember whether you worked that day or not?

22       A.   Do you remember if I worked that day or

23  not?

24       Q.   Right.

25       A.   No -- I mean, no.  I just got off the ice

1    cream truck, but I didn't go to the job that I was

2    currently working at.

3        Q.    Wait a minute.  I'm not sure I can hear

4    your answer or completely follow it.  Tell me

5    whether you say you were working that day or not.

6        A.    No.  I didn't -- I drive an ice cream

7    truck for my cousin, but I don't -- I wasn't

8    actually employed there.  I wasn't actually

9    employed.

10       Q.    You didn't have a job then, did you?

11       A.    No.

12       Q.    Okay.  You were, in fact, unemployed?

13       A.    Yeah.

14       Q.    Okay.  So, you -- it wouldn't make -- I

15   mean, that doesn't determine whether it was a

16   weekend day or not?

17       A.    No, it doesn't.

18       Q.    All right.  You have testified today and

19   you said that you were with a person at the time

20   this all took place, right?

21       A.    Yes, I was.

22       Q.    And we now have the name of that

23   individual as Serillo?

24       A.    Serillo.

25       Q.    All right.  Let me ask you, if you can

68

1    tell the jury Serillo's last name?

2        A.    No.  I think Serillo's last name --

3        Q.    You don't know who Serillo is other than

4    the first name?

5        A.    I know him.  But I just don't know his

6    last name.  I can't recall his last name.

7        Q.    How long had you known Serillo prior to

8    April the 9th of 2002?

9        A.    I know I've known him at least eight or

10   nine years almost -- eight or nine years.

11       Q.    Eight or nine years?

12       A.    Yes.

13       Q.    And you can't testify, today, what his

14   last name was?

15       A.    I mean, that's not unusual.

16       Q.    It's not unusual.  Okay.  I just want to

17   know if you know or not.

18       A.    Okay.

19       Q.    Then when you went to the police station

20   and were telling the police -- and I believe you

21   said -- testified earlier that you went down there

22   to tell them exactly what happened, right?

23       A.    Yes, I did.

24       Q.    Did you make a -- did you tell the police

25   that you were with another person when you gave

1    your first statement to the police on April the

2    10th, 2002?

3         A.    I was with another person.

4         Q.    And you told the police that, didn't you?

5         A.    Yes.

6         Q.    But you didn't even tell them his name,

7    did you?

8         A.    I didn't think they really wanted to know

9    all that.  The police -- the investigation didn't

10   really want to know all that at all.  They just

11   said, You're the one that got the merchandise

12   tooken from you.  You're the one that was actually

13   the victim -- victim here.  He just, you know,

14   alongside.  He said, I'm not concerned with him.

15   I'm concerned that you -- he took the gun and your

16   life was threatened.  Property was taken from you

17   and --

18                THE COURT:  Wait.  Wait.  Slow down

19   just a minute.  And don't go any further than

20   necessary to answer it.  The State can follow up if

21   they need to.

22        Q.    The point I'm making is, wasn't that

23   person also the victim of the robbery?

24        A.    Okay, yes he was.  But I didn't have no

25   control of who --

70

1    Q.    But wouldn't you have wanted that person

2    to be there -- to be identified in the police files

3    as a witness?

4    A.    I mean -- I mean, the police said he

5    wasn't really a character --

6                MS. PERKINS:    Objection to what the

7    police said.

8                THE COURT:    Sustained.

9    Q.    But you know how -- how Courts can send

10   out subpoenas --

11               MS. PERKINS:    Objection, Judge.    He

12   doesn't know anything about a Court sending out a

13   subpoena.

14               THE COURT:    I'm sustaining the

15   objection.

16               MR. HARTLEY:    Okay.    Then I'll

17   rephrase the question.

18   Q.    Have you ever been subpoenaed?

19   A.    Yes, I have.

20   Q.    Do you know what a subpoena is?

21   A.    It's something for people to call you to

22   come to court.

23   Q.    Okay.    A subpoena could have been sent to

24   Serillo, couldn't it?

25               MS. PERKINS:    Objection, Judge.

1          THE COURT:  Sustained.

2      A.    I didn't want --

3          THE COURT:  Wait.

4      A.    -- to get him involved --

5          THE COURT:  Mr. -- when an objection

6  is made, do not answer.  And, certainly, don't keep

7  talking when I'm talking.

8          THE WITNESS:  Yes, ma'am.

9          THE COURT:  Sustained.

10          MR. HARTLEY:  Okay.

11          THE COURT:  Move on to something

12  else, Mr. Hartley.

13          MR. HARTLEY:  May it just -- I'll

14  ask this question, Judge, and if it's

15  objectionable, I'll withdraw it.

16      Q.    Did you ever give them his address?

17      A.    His address?  I can't really recall.  But

18  I told him that the other guy that was with me

19  stayed right down the street from me.  I have known

20  him for a long period of time -- known his mom for

21  a long period of time, whatever, that I really

22  didn't want to involve him, because he was young.

23  I didn't want to get him too much involved in this.

24      Q.    What -- this person was only about

25  thirteen years old, wasn't he?

1    A.    About twelve, thirteen, yeah.

2    Q.    But, nonetheless, you had him with you

3  going to a girlfriend's house that night at

4  about --

5    A.    Sir --

6    Q.    -- 11:30 p.m. on a week night, didn't

7  you?

8    A.    Yes, it was.  If he was already out on

9  the street, why not let him be with me or whatever.

10 If he's already in the street at that time of

11 night, why can't he go out with me, because I

12 think --

13   Q.    Why do you think --

14        THE COURT REPORTER:  If you'll slow

15 down, please.

16   Q.    Wouldn't it be more prudent to take a

17 young person that age home rather than down the

18 street to your girlfriend's house?

19   A.    Okay.  Okay.  But I can't take him in the

20 house if he's already out like that.  I just speak

21 good things to him and try to converse him not to

22 be in the street so much, you know.

23   Q.    You couldn't take him home?

24   A.    I can't just make him go home like that.

25 He's almost like grown, you know.

1    Q.    Okay.   Thirteen is almost like grown?

2    A.    Okay.   Yeah, I'm not his father.   I'm not

3    his parent.  All I can say is, Hey --

4    Q.    But, at the same time, he's almost grown.

5    But you didn't want to have him involved in this

6    matter, did you?

7    A.    I hate he got involved in this violent

8    crime like that.   I hate I asked him to come --

9              THE COURT REPORTER:   You've got to

10   slow down, please.

11             THE WITNESS:   Okay.

12   Q.    Did you give any description of the

13   person -- the second person that was involved in

14   this in your first statement to the police?

15   A.    I told him what the two had on and how it

16   actually happened.

17   Q.    You didn't give any description of his

18   face or his height or his weight, or anything like

19   that, did you?

20   A.    Uh-huh.   I gave the height, basically.   I

21   knew the other guy -- the first guy was about

22   around my height.   And the second guy was probably

23   a little shorter.

24   Q.    And you're saying that was in your first

25   statement to the police?

1  A.  Yeah, they asked me approximately or

2  whatever.

3  Q.  Did you describe his hair in any way to

4  the police on your first statement?

5  A.  Yeah, I told them that he had like twists

6  in his hair, not completely locks.

7  Q.  Now, you never had any photograph or any

8  way to identify the second person involved until,

9  approximately, eight days later, did you?

10  A.  Whenever they called me -- whenever they

11  called me to the stand -- I mean, to the witness --

12  you know, to the paper or whatever to I. D. it,

13  I -- you know, I made the I. D. of Jamar and the

14  guy sitting out there.

15  Q.  But you -- the only way -- I mean, you

16  identified the person in this photo lineup right

17  here, didn't you?  You identified the person that

18  you claimed to be the defendant in this case and

19  the person who robbed you -- or not robbed you, but

20  was there at the same time -- you identified him on

21  that photo lineup, didn't you?

22  A.  Yes, I did.

23  Q.  But when you were making that

24  identification, you said the only difference is the

25  person who robbed me had twists in his hair?

1          A.    Yes, I did.

2          Q.    So you said that he didn't look like that

3    photograph.  He looked different because he had

4    twists in his hair?

5          A.    Okay.  What I was saying was, I looked at

6    his face.  The face is not going to change.  The

7    hair, cut it, clip it, dye it.  The face is not

8    going to change.  I looked at the eyes, eyebrows,

9    and everything --

10         Q.    Did you --

11         A.    -- and I personally kept my eyes on him

12   because he had that kid there.

13         Q.    This was while the gun was being pointed

14   at you, wasn't it?

15         A.    Uh-huh.

16         Q.    Okay.  Now -- but didn't the police take

17   a statement from you at the same time you made the

18   identification of that photo?

19         A.    Run it by me again.

20         Q.    Run it by you -- okay.  The District

21   Attorney's office has provided me a copy of a

22   statement, that purports to be your statement --

23               MR. HARTLEY:  Counsel, this is April

24   the 18th statement.

25         Q.    It's very short.  But this is -- the

1  questions they were asking you about identifying

2  the subject from the photo lineup.  And you told

3  them, you said -- they questioned you, they said,

4  "The second subject had twists in his hair?"

5      A.    Uh-huh.

6      Q.    And you said, "Uh-huh, he had twists in

7  his hair."

8      A.    Uh-huh.

9      Q.    But now this person doesn't have twists

10 in his hair, does he?

11     A.    Of course not.  But the face is the same.

12            THE COURT:  Now, just answer his

13 questions.

14     A.    Okay.  No, sir.

15     Q.    But that's who you contend is the same

16 person, correct?

17     A.    Yes, it is.

18     Q.    Okay.  Thank you?

19     A.    Thank you.

20     Q.    What, if anything, did this -- did you

21 say that Kourtney Greenwood said to you that night?

22 Did he say anything to you?

23     A.    Well, he basically just -- no, he didn't,

24 not like that, no.

25     Q.    He didn't say anything to you on the

1    night of April the 9th, did he?

2         A.    Jamar did.

3         Q.    The person who actually committed the

4    robbery against you was Jamar Brown?

5         A.    Yeah.

6         Q.    And you're saying this person never said

7    anything to you, did he?

8         A.    No.

9              MR. HARTLEY:   Thank you.   No further

10   questions.

11        A.    Not directly.

12             MR. HARTLEY:   No further questions.

13             MS. PERKINS:   Nothing further of

14   this witness, Judge.

15             THE COURT:   Okay.   You can step

16   down.

17             (Witness excused.)

18             THE COURT:   Your next witness.

19             MS. PERKINS:   State of Alabama calls

20   Detective Buce.

21             THE COURT:   If you'll have a seat

22   and raise your right hand.

23             DETECTIVE N. T. BUCE

24        The witness, having first been duly sworn or

25   affirmed to speak the truth, the whole truth, and

1    nothing but the truth, testified as follows:

2                    **DIRECT EXAMINATION**

3    **BY MS. PERKINS:**

4        Q.    Tell us your name.

5        A.    Detective N. T. Buce.

6        Q.    Detective Buce, where do you work?

7        A.    Montgomery Police Department.

8        Q.    What do you do at the police department?

9        A.    I'm a robbery homicide detective.

10       Q.    Okay.  How long have you been with MPD?

11       A.    Eight years.

12       Q.    Eight years.  Have you been a detective

13   for all of those eight years?

14       A.    No, ma'am.  Just a year.

15       Q.    How long have you been a detective?

16       A.    One year.

17       Q.    What shift do you work?

18       A.    I work the late car shift right now.

19       Q.    Did you work late shift last night?

20       A.    Yes, ma'am.

21       Q.    Is that kind of why you look a little

22   pale right now?

23       A.    Uh-huh.

24       Q.    You've been up here all day as well as

25   the jurors, huh?

1      A.    Correct.

2      Q.    I want to take you back to April 18th of

3 2002. Okay?

4      A.    Okay.

5      Q.    Were you the case agent on a case where

6 the defendant is Kourtney Greenwood?

7      A.    Correct.

8      Q.    Okay. Let's explain to the ladies and

9 gentlemen of the jury exactly what a case agent is,

10 okay, and what you do as a case agent?

11      A.    Case agent compiles all the evidence and

12 is in charge of the investigation.

13      Q.    Okay. Now -- and you learned, during the

14 course of your investigation, that the victim in

15 this case was robbed; is that right?

16      A.    Correct.

17      Q.    And you took a statement from the victim,

18 and he told you in that statement that two people

19 robbed him?

20      A.    Correct.

21      Q.    Okay. At some point, did you develop

22 suspects in that robbery?

23      A.    Yes, ma'am.

24      Q.    Okay. Was one of those suspects an

25 individual named Jamar Brown?

1      A.    Correct.

2      Q.    Okay.  At some point, did you put

3   Jamar Brown in a lineup?

4      A.    Yes, ma'am.

5      Q.    Did you give that lineup to the victim?

6      A.    Yes, ma'am.

7      Q.    Did he positively identify Jamar Brown?

8      A.    Yes, he did.

9      Q.    Okay.  Did you -- at some point, did you

10  develop who the second suspect was?

11     A.    Yes, ma'am.

12     Q.    What was his name?

13     A.    Kourtney Greenwood.

14     Q.    Okay.  Did you put Mr. Greenwood in a

15  photo lineup?

16     A.    Yes, ma'am.

17     Q.    And is this procedure -- why do you do

18  that?

19     A.    We put them in a photographic lineup of

20  five other individuals -- their picture, along with

21  five other individuals, that look similar; height,

22  weight, age, so that we can be sure that we've got

23  the right person.

24     Q.    Okay.  Now --

25              MS. PERKINS:  May I approach the

1    witness, Judge?

2                    THE COURT:    Sure.

3                    MS. PERKINS:    This is that photo

4    lineup.

5                    MR. HARTLEY:    (Attorney nods.)

6        Q.    I want to show you what's been premarked

7    as State's Exhibit 1.    Do you recognize this?

8        A.    Yes, ma'am.

9        Q.    What do you recognize that to be,

10   Detective?

11       A.    That's the photographic lineup that I

12   compiled of -- depicting Mr. Greenwood number 5.

13       Q.    Okay.    So you say Mr. Greenwood is

14   number 5 in this particular one; is that right?

15       A.    That's correct.

16       Q.    All right.    Now, there's some other

17   identifying marks on here, aren't -- is that right?

18       A.    Yes, ma'am.

19       Q.    There's a signature line on there; is

20   that right?

21       A.    Yes, ma'am.

22       Q.    Whose signature is that right there?

23       A.    Mr. Copeland's.

24       Q.    Is that the victim in this case?

25       A.    Yes, ma'am.

1    Q.    Did he sign that in your presence?

2    A.    Correct.

3    Q.    Okay.  And he -- there's a line -- read

4    that line right there for the ladies and gentlemen

5    of the jury.

6    A.    The line states, "I have identified

7    picture number" -- and it's got handwritten -- "5

8    as a suspect on" -- and it's got handwritten the

9    date -- "4/18/02."

10   Q.    Okay.  So Mr. Copeland identified the

11   gentleman in number 5 as the person that robbed him

12   in that case; is that right?

13   A.    Correct.

14   Q.    Can you tell the ladies and gentlemen of

15   the jury who number 5 is in this picture?

16   A.    That's Mr. Greenwood.

17   Q.    Okay.  Now, I see on this picture -- let

18   me ask you this:  Is this picture from April -- did

19   you just take a picture of him at the time -- where

20   did y'all get this picture from?

21   A.    No, ma'am.  We have a computer that we

22   take pictures of everybody that's taken into

23   custody on anything.

24   Q.    Okay.

25   A.    And, also, if they've ever been a witness

1    to anything or have been in contact with

2    detectives --

3        Q.    So any type of contact with your

4    division, whether it's as a witness, as a

5    defendant, or the victim even --

6        A.    Yes.

7        Q.    -- on something else, their picture would

8    go into your system; is that right?

9        A.    Correct.

10        Q.    Okay.  Now, you pulled -- when did you

11    pull this picture to go into this particular photo

12    lineup?  Would it have been on the 18th?

13        A.    I believe the lineup was actually made

14    before -- the day before.

15        Q.    Okay.

16        A.    I think I made it the night before.

17        Q.    Okay.  You made it and then gave it to

18    him through --

19        A.    Set up an appointment for Mr. Copeland to

20    come in and show him the lineup.

21        Q.    Okay.  Now, when was this -- was this

22    picture taken at that time or was it taken before

23    or after?

24        A.    No.  It was taken a while before.  I

25    couldn't tell you exactly when it was taken,

1    because the computer doesn't keep up with the dates

2    that it's made.

3        Q.   Okay.  But this picture would not have

4    been a picture of the defendant on April -- in

5    April of 2002?

6        A.   No, ma'am.

7        Q.   It would have been a picture of him

8    previously; is that right?

9        A.   Correct.  It was the most recent one that

10   we had.

11       Q.   Okay.

12       A.   But it was not made in April.

13       Q.   But it was not at that particular time?

14       A.   No.

15       Q.   But that is him; is that right?

16       A.   Correct.

17       Q.   And this victim identified him; is that

18   right?

19       A.   Yes, ma'am.

20            MS. PERKINS:  Judge, we offer

21   State's 1.

22            MR. HARTLEY:  No objection.

23            THE COURT:  Admitted.

24            (State's Exhibit No. 1 was admitted

25            for identification.)

1    　　　　　　MS. PERKINS:  Nothing further at

2    this time, Judge.

3    　　　　　　　CROSS-EXAMINATION

4    BY MR. HARTLEY:

5    　　　Q.    Detective Bruce -- Buce -- excuse me --

6    　　　A.    It's Buce.

7    　　　Q.    We've established that you were the case

8    agent in this matter, right?

9    　　　A.    That's correct, sir.

10   　　　Q.    And you took two different statements

11   from Larry Copeland, Jr. in the course of your

12   investigation, did you not?

13   　　　A.    Yes, sir.

14   　　　Q.    Do you have copies of those with you?

15   　　　A.    No, sir, I don't have them with me.

16   　　　Q.    Okay.  Would you tell the jury,

17   typically, how you take a witness or a victim in

18   for statement, what the procedures are very

19   briefly?

20   　　　A.    When they -- a victim comes to our

21   division, we take them back to our office.  They --

22   we do a voluntary statement, which they give to us.

23   We do it on audiotape and record the whole thing.

24   　　　Q.    Okay.  And I've been in this business a

25   while, and I -- you didn't use the term, but I've

1    heard it a number of times -- a pre-interview.

2    Don't you get some basic information from a person

3    who is going to give you a statement, so you'll be

4    familiar with what they might say and what the

5    subject is and where the inquiry might go?

6          A.    We do a witness locator form, get their

7    information and go find out what happened before we

8    take the statement.

9          Q.    That's called a pre-interview, isn't it?

10         A.    Correct, sir.

11         Q.    Okay.  And you're gaining sort of the

12   outline or the basic details of what happened, and

13   then you start a recording statement, right?

14         A.    Yes, sir.

15         Q.    That's so that the recording statement

16   will be somewhat logical and coherent, right?

17         A.    So, we'll stay pretty much in order.

18   Because before then, all you have is the report to

19   go by.

20         Q.    Now, do you recall -- and I only have one

21   copy with me, but I believe I can give you my copy

22   and let you look at it.  I'm going to start with

23   the April 10th statement, which appears to be only

24   four pages long, right?

25         A.    Right, sir.

1    Q.    Would you take a look at that?  Just kind

2    of skim over it and see if that refreshes your

3    recollection that would be Mr. Copeland's statement

4    on April the 10th of that date -- of 2002?

5    A.    It looks like it, yes, sir.

6    Q.    Okay.  You took it.  Do you remember that

7    those would be the questions -- is it logically the

8    statement that he gave on that day?

9    A.    Yes, sir.

10    Q.    Okay.  Did you conduct the pre-interview?

11    A.    Yes, sir.

12    Q.    All right.  Now, in Mr. Copeland's

13    statement, he tells you about a second person that

14    he was with on that occasion being his friend or a

15    young person, didn't he?

16    A.    That's correct.

17    Q.    In his statement, did he tell you what

18    this person's name was?

19    A.    No, sir.

20    Q.    Okay.  Now, from reading the statement or

21    from your familiarity with this case, would that

22    person have also been either a victim or a material

23    witness to the offense if you knew who it was and

24    where they lived?

25    A.    Yes, sir, because -- but I believe that

1      the person was a juvenile.

2          Q.   Juveniles can be victims, can't they?

3          A.   Yes, sir, they can.

4          Q.   And juveniles can be witnesses, can't

5      they?

6          A.   Yes, sir.

7          Q.   In fact, many occasions they are, aren't

8      they?

9          A.   Correct.

10         Q.   Okay.  Can you tell us whether or not the

11     Montgomery Police Department or you as the case

12     agent made any inquiry with Larry Copeland as to

13     who this person was that was physically present at

14     the scene on that occasion?

15         A.   No, sir.

16         Q.   Okay.  Why didn't you?

17         A.   I believe I asked him at the time, but I

18     do not remember taking it down.

19         Q.   Okay.  Now, you've been a police officer

20     for how many years?

21         A.   Eight years.

22         Q.   Okay.  A thirteen-year-old person who was

23     at the scene could have been a potential witness,

24     couldn't they?

25         A.   That's correct.

1      Q.   And particularly the way he described

2  what happened, saying this person was part of the

3  whole transaction, right, the thirteen-year-old was

4  right there in the middle of it, wasn't he?

5      A.   Um, that he was pulled to the side, yes,

6  sir.

7      Q.   And, in fact, he contended that they were

8  walking together, traveling together, and had been

9  together for some period of time, right?

10     A.   Correct.

11     Q.   It wasn't just incidental that they

12  happened to be together that -- it wasn't a

13  coincidence that this young person was there?  They

14  were together, weren't they?

15     A.   Yes, sir, I believe they were traveling

16  together.

17     Q.   Have you ever had any information that

18  led to this particular subject -- person or

19  subject's identity or address?

20     A.   I'm -- I don't think so.  I'm not sure,

21  though.

22     Q.   All right.  Now, let me ask you this

23  question.  Do you have any evidence that connects

24  Kourtney Greenwood with this case other than that

25  identification that took place eight days later

1    where he's identified or photographied as being the

2    person that was also involved in this crime?

3         A.    Other than Mr. Franklin's identification?

4         Q.    Who's Mr. -- I'm asking you about

5    Mr. Copeland's --

6         A.    I'm sorry.  Correction.

7         Q.    Okay.  There is no Mr. Franklin?

8         A.    Right.

9         Q.    All right.  Other than Mr. Copeland's

10   identification, is there any evidence that connects

11   Kourtney Greenwood with this case?

12        A.    No, sir.

13             MR. HARTLEY:  Thank you.  No further

14   questions.

15             MS. PERKINS:  Judge, may we

16   approach, please, before I redirect?

17             THE COURT:  Yes.  Mr. Hartley?

18             MR. HARTLEY:  I'm sorry.  I didn't

19   even --

20             (Bench conference was held.)

21             MS. PERKINS:  Judge, I don't know if

22   you'll allow me to.  But when he asked if there's

23   any other evidence, I think he opened the door that

24   he was found with the co-defendant getting into a

25   red car.

```
 1                    THE COURT:  I think we'll just have
 2      to take this and make an offer of it -- make an
 3      offer of proof outside --
 4                    MS. PERKINS:  Okay.  We can do that.
 5                    THE COURT:  Did you need to ask --
 6      your client was showing you -- did you need to ask
 7      something --
 8                    MR. HARTLEY:  No.
 9                    MS. PERKINS:  But I think when he
10      asked is there any other evidence, I think he might
11      have opened the door --
12                    MR. HARTLEY:  I said that connects
13      him with this crime.
14                    MS. PERKINS:  And that does connect
15      him with this crime, because it's the same --
16                    THE COURT:  I'm going to let them --
17      we'll have to do it outside the presence of the
18      jury.
19                         (In the hearing of the jury.)
20                    THE COURT:  So you're going to get
21      another break.  I hope it will be about ten
22      minutes.  So we'll get you in about ten minutes.
23                         (Out of the presence of the jury.)
24                    THE COURT:  Do you want to make an
25      offer of proof or do you want to ask him some
```

1    questions?

2                    MS. PERKINS:  I'll ask him some

3    questions --

4                    THE COURT:  Okay.

5                    MS. PERKINS:  First of all, just

6    straight -- to clear up the Record, exactly what it

7    is that I'm doing, I -- my -- the State's position

8    is that when Mr. Hartley asked Detective Buce, Is

9    there any other evidence linking my client to this

10   particular case, that he opened the door for him to

11   get in, basically, how he was developed as a

12   suspect, which is the exact issue that the State --

13   I mean, that the Court denied my motion in limine

14   to get that in.  But I think he opened the door to

15   it.  I will ask him a couple of questions, just

16   briefly, not into the substance of issues --

17                    THE COURT:  Well, go ahead.

18                    MS. PERKINS:  Okay.

19                    DIRECT EXAMINATION

20   BY MS. PERKINS:

21        Q.   How did you develop this particular

22   defendant as a suspect in this case?

23        A.   The co-defendant, Jamar Brown, when he

24   was identified --

25        Q.   Okay.  Let me -- let me walk you through

```
 1    it.  How -- okay.  You -- you developed the
 2    co-defendant, Jamar Brown, through some evidence
 3    that happened.  Jamar Brown committed another
 4    robbery after this, didn't he?
 5         A.   Correct.
 6         Q.   And, in that other robbery, there was a
 7    red S-10 pickup that Jamar Brown got into in that
 8    case; isn't that right?
 9         A.   That's correct.
10         Q.   That is the same S-10 pickup that this
11    particular victim says he saw both of them get into
12    at that time; is that right?
13         A.   That's correct.
14         Q.   Now, at -- you've learned of these
15    defendants -- now, let me just stop right there.
16    Now, how did you develop this guy as a suspect?
17    You had Jamar Brown.  How did you get
18    Kourtney Greenwood in that loop?
19         A.   I found out that Jamar Brown had a -- an
20    alias name that he went by, McMall.
21         Q.   Okay.  And what does -- what does that
22    have to do with it?
23         A.   There was another robbery that took place
24    in North Union Circle.  The victim, a Mr. Franklin.
25         Q.   And was that robbery similar to this one?
```

94

1      A.    Correct, same red truck was used, McMall

2   and Kourtney Greenwood were put on an IO

3   supplemental report forwarded to me.

4      Q.    Okay.

5           THE COURT:  Now, wait.  What -- they

6   were put on a supplemental report?

7           THE WITNESS:  A supplemental

8   incident offense report like the regular incident

9   offense reports we have, it's another report that

10  adds information to it.

11          THE COURT:  And why did you add his

12  name, Kourtney Greenwood?

13          THE WITNESS:  His name was phoned in

14  by the victim, Mr. Franklin to my Sergeant.  And my

15  Sergeant did the report and forwarded it to me.

16      Q.    And it was the same red truck that was

17  used in that one that is used in these other two;

18  is that right?

19      A.    That's correct.

20      Q.    So when you found Jamar Brown linked in

21  these three different ones committed the same way

22  with the same truck, and in this one over here, you

23  had a co-defendant, you put that co-defendant in a

24  lineup; is that right?

25      A.    That's correct.

1      Q.   And that's how you got him to identify --

2  that's how he ended up identifying that specific

3  person; isn't that right?

4      A.   That's correct.

5              MR. HARTLEY:  May I ask some

6  questions?

7              THE COURT:  Yeah.

8                  CROSS-EXAMINATION

9  BY MR. HARTLEY:

10     Q.   Was Kourtney Greenwood charged in any

11 other offense?

12     A.   Yes, sir.  He was charged in

13 Mr. Franklin's case.

14     Q.   Has he been prosecuted for it?

15     A.   Yes, sir, he was arrested for it.  It

16 went to the grand jury and --

17             MS. PERKINS:  And you're not allowed

18 to tell what happened in grand jury.  But there is

19 not a pending case on it right now.

20     Q.   Okay.  So there is no pending case

21 against Kourtney Greenwood in regard to any of

22 those other investigations?

23             MS. PERKINS:  Not at this point.  He

24 can't say what there will be in the future.

25             THE COURT:  Other than -- you said

1    somebody called in his name?

2                    THE WITNESS:  The victim of the

3    other robbery called in Mr. Greenwood and McMall,

4    which is Jamar Brown's alias name, to my Sergeant.

5                    THE COURT:  And that's how you --

6    and was he arrested?

7                    THE WITNESS:  For that offense, yes,

8    ma'am.  And that --

9                    THE COURT:  And his photograph was

10   used in the lineup?

11                   THE WITNESS:  Correct.  And the

12   circumstances are -- the same type vehicle was

13   used, the red S-10 truck, and it had the same basic

14   occurrence, a person was robbed inside of an

15   apartment complex, you know, with one of them

16   having a gun.

17                   MS. PERKINS:  And because Jamar

18   Brown had already been identified --

19                   THE COURT:  Mr. Hartley, your client

20   wants to tell you something, and I don't want him

21   to say anything.

22                   (Mr. Hartley confers with his

23                   client.)

24                   MR. HARTLEY:  Okay.  Where are we,

25   Judge?

1          MS. PERKINS:  I'm not going to go

2    further than that.  That's it.

3          MR. HARTLEY:  Is that what they

4    intend to offer into this case?

5          THE COURT:  I'm denying your --

6    however -- whatever motion or -- I'm not going to

7    let you go into that, how he was developed.

8       So anything else?

9          MR. HARTLEY:  No.

10          THE COURT:  Let me ask.  Is it --

11    are there going to be more questions for him?

12          MS. PERKINS:  I'm not -- if he's not

13    going to let -- if the Court is denying my motion,

14    I don't have any more.  That's it.

15          THE COURT:  And let me say, for the

16    Record.  I know that the State has previously tried

17    to get in 404B.  And other -- other than the red

18    truck, there's certainly nothing else that would

19    connect this defendant with this robbery.  However,

20    more important, I think that the -- any probate --

21    probative value is outweighed by prejudicial value,

22    and I'm not going to let it in.

23       Now, is the State going to rest?

24          MS. PERKINS:  Yes, ma'am.  At this

25    time, we do have a rebuttal witness depending on --

1    **THE COURT:**  Then, Mr. Hartley, why

2    don't you go ahead and make your motions?

3    **MR. HARTLEY:**  We will, Judge.

4    Judge, we would move to dis -- request the Court to

5    dismiss the charges against Kourtney Greenwood on a

6    judgment of acquittal, based on no prima facia case

7    of Robbery First Degree.

8    We would submit that the evidence does not

9    show that the other person who -- if there was

10   another person there, and whomever it was, didn't

11   do -- it shows nothing more than a mere presence

12   that the other person -- he said that person didn't

13   say anything to him, was just standing around.

14   There's no evidence -- and the only evidence is

15   against Jamar Brown as far as this robbery goes.

16   **THE COURT:**  I've heard the evidence,

17   and I'm denying your motion.

18   **MR. HARTLEY:**  Yes, ma'am.  Okay.

19   How much longer before the jury comes back?

20   **THE COURT:**  Coming right now.

21   **MR. HARTLEY:**  Okay.  Judge, I

22   would --

23   **THE COURT:**  And going back, I don't

24   know if he calls the defendant, what the

25   co-defendant is going to say.

1          MS. PERKINS:  I don't either, Judge.

2          THE COURT:  So until we know what he

3   says, I don't see how we can even go into whether

4   or not --

5          MS. PERKINS:  I agree, Judge.

6          THE COURT:  -- the plea may be

7   relevant in some way.

8       We are ready.

9          MR. HARTLEY:  I got to look for

10   witnesses.

11          MS. PERKINS:  I just wanted to make

12   sure, Judge, that we approached to get a ruling on

13   it before he went into it in the middle of trial.

14          THE COURT:  Just -- we'll do that.

15          MS. PERKINS:  I don't want another

16   mistrial.  Judge, may my witness step down?

17          THE COURT:  Yeah.

18          MS. PERKINS:  Okay.

19          (Witness excused.)

20          (In the presence of the jury.)

21          THE COURT:  At this time, the State

22   has rested.

23       So, Mr. Hartley, are you ready with your --

24          MR. HARTLEY:  We call Ms. Greenwood

25   to the stand.

1          THE COURT:   And if you would raise

2    your right hand?

3                    KIMBERLY GREENWOOD

4         The witness, having first been duly sworn or

5    affirmed to speak the truth, the whole truth, and

6    nothing but the truth, testified as follows:

7                    DIRECT EXAMINATION

8    BY MR. HARTLEY:

9         Q.    State your name, please.

10        A.    Kimberly Greenwood.

11        Q.    And how old are you, Ms. Greenwood?

12        A.    Twenty-one.

13        Q.    And where do you live?

14        A.    1521 Reubin Street.

15        Q.    Okay.  Now, you -- I notice you have the

16   same last name as this young man?

17        A.    (Witness nods.)

18        Q.    Are y'all related?

19        A.    Yes, that's my brother.

20        Q.    Brother.  Okay.  I want to ask you if,

21   going back to April of this year, were you around

22   him very much?

23        A.    When he come around, yes.

24        Q.    Would you see him as much as once or

25   twice a week?

```
 1          A.   More than that.

 2          Q.   More than that?

 3          A.   (Witness nods.)

 4          Q.   All right.  Do you have a recollection of

 5     how his -- what hair style he had in the month of

 6     April of this year?

 7          A.   Low hair cut.  He always kept his hair

 8     low.

 9          Q.   Is it -- would it be like it is now?

10          A.   It would be lower than that.

11          Q.   Lower than that?

12          A.   Yes.

13          Q.   Okay.  Now, do you know what the

14     expression -- and I'll just tell you -- what twists

15     in a man's hair means?

16          A.   When they start growing the dreads.

17          Q.   Was that like short dreads or something?

18          A.   Yes.  They would look -- they start out

19     twists until they lock up.

20          Q.   Okay.  Is that sort of a fad or a

21     hairstyle that some people wear?

22          A.   Mostly Jamaicans.

23          Q.   Excuse me?

24          A.   It's the style like the Jamaicans wear.

25          Q.   All right.  But -- so -- have you ever --
```

1    have you ever known Kourtney to have his hair in

2    twists for any -- on any occasion or at any time?

3        A.    No.

4        Q.    Was his hair long enough to be in a

5    twist?

6        A.    No.

7        Q.    How much do you need to get a twist?

8        A.    As long as you have around -- they've got

9    to be able to be gripped for somebody to twist them

10   up.

11       Q.    Okay.  So is it your testimony that,

12   whether you have or have not ever seen him have

13   twists in his hair?

14       A.    No, he always kept it low.

15       Q.    Would it be like it is now?

16       A.    It would be lower than that.

17       Q.    Well, let me show you this photograph.

18   Would it be like this photograph?  It's the one in

19   the middle there.  I realize there's six of them.

20   I had not shown you.  But see how it is there.

21       A.    Huh-uh.  It would be -- it's low.  It's

22   just a low hair cut with tape.

23       Q.    But no twists?

24       A.    Huh-uh.

25              MR. HARTLEY:  Thank you.  The

District Attorney may ask you some questions.

CROSS-EXAMINATION

BY MS. PERKINS:

Q.    You said you -- you said you saw Kourtney when he comes around?

A.    Yes, ma'am.

Q.    There were some times when he wasn't around you?

A.    Yes.

Q.    Was he ever around you for more than a day or two?

A.    Yes.

Q.    Was he -- he was gone for weeks at a time; isn't that right?

A.    Not from around us, not really.

Q.    But, definitely, say three or four days would go by and you would not see him; isn't that right?

A.    No.

Q.    More than two days then where you wouldn't see him?

A.    Yes.

Q.    Okay.  So two to three days when you wouldn't see him?

A.    Yes.

```
 1        Q.    All right.  And it could have been more

 2   than that at some point.  You just might not

 3   remember; is that right?

 4        A.    I always see him.

 5        Q.    Okay.  But -- but there definitely could

 6   have been two to three days that had gone by where

 7   you didn't see him; is that right?

 8        A.    Yes.

 9        Q.    Now, you would agree that you can

10   actually twist his hair right now, can't you?

11        A.    It would be hard.

12        Q.    But it's possible to twist his hair at

13   the length it is right now, isn't it?

14        A.    Probably so if you comb it out real good.

15        Q.    If you comb it out real good and you pick

16   it out, you can grip the ends and twist it the

17   length it is right now; isn't that right?

18        A.    Probably, I don't --

19        Q.    Excuse me?

20              THE COURT:  You need to answer.

21        Q.    Probably?

22        A.    Probably.  You probably will.

23        Q.    Probably could.

24        A.    If you pick it, twist --

25        Q.    Probably could twist it at the length it
```

1    is right now.  And there are some people that you

2    would agree that might be able to twist it a little

3    bit shorter; isn't that right?

4        A.    Yeah.  Professionals.

5        Q.    They can twist it even at lengths shorter

6    than that, can't they?

7        A.    They probably can.

8        Q.    They can.  Now, when you're twisting your

9    hair -- when you're twisting -- I'm just -- you

10   know, we're just going to talk about twists for a

11   second.  Okay.  Now, some people wear twists when

12   they're going to grow dreadlocks in their hair; is

13   that right?  And some people just wear twists as a

14   style?  It's a style, isn't it?

15       A.    It's -- yeah.

16       Q.    It is -- you may not like it, but it is a

17   style.  Like, a lot of people where twists some

18   times, don't they?

19       A.    Most -- yeah.

20       Q.    Like, you're even beginning to see people

21   on TV wearing twists sometimes, some of the actors,

22   even in some of the television shows; isn't that

23   right?

24       A.    (Witness nods.)

25       Q.    Now, just because you're twisting your

1    hair, doesn't mean you have to lock it, does it?

2        A.    Not -- if you don't want it to.

3        Q.    Right.    When you're locking your hair --

4    and I want to explain for some of the ladies and

5    gentlemen of the jury that may not understand that.

6    When you're locking your hair, that means you twist

7    it and you can't take the twist out unless you cut

8    it; is that right?

9        A.    Yes.

10       Q.    Now, but when you're just twisting it,

11   and you don't lock it, you can wash those twists

12   out of your hair, can't you?

13       A.    Yes.

14       Q.    As a matter of fact, you can wear twists

15   in your hair for one or two days, then wash it out

16   and it's back like that; isn't that right?

17       A.    Yes.

18       Q.    So it's possible that one of those one or

19   two days Kourtney wasn't around you, he could have

20   had twists in his hair; isn't that right?

21       A.    He never kept his hair long enough for

22   it.

23       Q.    Let me ask you this:    It's possible that

24   one of those two days that he was around you -- let

25   me just say this.    You weren't around him at the

1    times when he wasn't around you; isn't that right?

2    A.    No.

3    Q.    You weren't around him, right?

4    A.    (Witness nods.)

5    Q.    So you don't know whether or not he had

6    twists in his hair; is that right?

7    A.    His hair don't grow fast.

8    Q.    His hair doesn't grow fast?

9    A.    No.

10    Q.    Okay.  But you don't know whether or not

11    he had twists in his hair on those days that he

12    wasn't around; isn't that right?

13    A.    Yes.

14    Q.    Now, you said that Kourtney is your

15    brother, right?

16    A.    Yes.

17    Q.    Are y'all close?

18    A.    Not really.

19    Q.    You're not close?

20    A.    No.

21    Q.    You're not close?

22    A.    No.

23    Q.    So would you want to see him go to jail?

24    A.    Huh?

25    Q.    Would you want to see him go to jail?

1         A.    Well, really, he's been there most of the

2    years.

3         Q.    Oh, he's been there before?

4         A.    Huh?

5         Q.    He's been there before?

6         A.    He's been here locked up down here for a

7    while.  He's -- that's my brother and, of course, I

8    don't want to see it, but --

9              MS. PERKINS:  Nothing further,

10   Judge.

11              REDIRECT EXAMINATION

12   BY MR. HARTLEY:

13        Q.    Would you lie under oath --

14        A.    No.

15        Q.    -- about his hair --

16        A.    (Witness nods.)

17        Q.    -- just to keep -- to deceive this jury?

18        A.    No, sir.

19        Q.    And you were around him often in April,

20   weren't you?

21        A.    Yes.

22        Q.    Is it troublesome to put a bunch of

23   twists in your hair?  Is it a slow job, take a

24   while?

25        A.    Yes.

```
 1          Q.    How long, an hour, minutes, or what?

 2          A.    It -- professionals, I don't know how

 3    long it take with that.  But it don't take over a

 4    day --

 5          Q.    A day?

 6          A.    -- as long as they don't keep stopping.

 7    As long as they don't keep stopping, it don't take

 8    long.

 9          Q.    Would it be very practical for somebody

10    to put a bunch of twists in their hair and then

11    just take it out the next day or is that a lot of

12    waisted effort?

13          A.    It would be a waist of time.

14          Q.    Okay.  And you never saw him with any

15    twists in his hair ever?

16          A.    No.

17               MR. HARTLEY:  I thank you,

18    Ms. Greenwood.  That's it.

19               THE COURT:  Anything --

20               MS. PERKINS:  Nothing further of

21    this witness, Judge.

22               THE COURT:  Okay.  You're excused.

23    You can stay or leave.

24               (Witness excused.)

25               THE COURT:  Your next witness?
```

1                  **MR. HARTLEY:** I'll get him, Judge.

2                  **THE COURT:** If you'll come have a

3    seat right up here and raise your right hand?

4                        DEVEN GREENWOOD

5        The witness, having first been duly sworn or

6    affirmed to speak the truth, the whole truth, and

7    nothing but the truth, testified as follows:

8                   **DIRECT EXAMINATION**

9    **BY MR. HARTLEY:**

10       **Q.** All right. We want you to speak loud

11   enough and state your name for the Record, please?

12       **A.** My name is Deven Greenwood.

13       **Q.** All right. And spell your first name for

14   the court reporter.

15       **A.** D-e-v-e-n.

16       **Q.** All right. Ms. Deven Greenwood, how old

17   are you, Ms. Greenwood?

18       **A.** How old are I?

19       **Q.** Yes.

20       **A.** Twenty.

21       **Q.** All right. And how are you -- are you

22   related to Kourtney Greenwood?

23       **A.** Yes, I am.

24       **Q.** What relationship?

25       **A.** I'm his sister.

111

1    Q.    All right.  Do you -- you -- in the past

2    seven or eight months, going back to April of this

3    year, do you have many occasions to see him?

4    A.    Yes.

5    Q.    Would it be fairly -- tell us how often.

6    A.    Well, I seen him quite often.  I used to

7    take him to work.  He used to stay with me some of

8    the time at my house.

9    Q.    Let's -- and we're talking about April

10   now.  April -- the first week of April or ten days

11   of April.

12   A.    Yes, I used to see him.  He come over

13   every day.

14   Q.    Everyday, virtually?

15   A.    Yes.

16   Q.    All right.  Can you tell us about his

17   hairstyle?

18   A.    Short.

19   Q.    What kind of hairstyle did he ever wear?

20   A.    A low fro.

21   Q.    A what?

22   A.    A low fro.

23   Q.    Low fro.  Is that a haircut that would be

24   similar to what he has right now?

25   A.    Yes.

1    Q.    Okay.    Did he ever wear it much longer

2    than that?

3    A.    No.

4    Q.    Okay.    Have you ever seen him with twists

5    in his hair?

6    A.    It ain't never grow out that long to get

7    a twist.

8    Q.    Okay.    This is a photograph that was used

9    for identification of him.    And it was taken

10   sometime prior to April of this year.    Not known

11   exactly how long, but that's what the witness

12   testified to.    Have you ever seen -- I mean, you've

13   seen him with his hair like that before, haven't

14   you?

15   A.    Yes.

16   Q.    Does that represent the way Kourtney

17   sometimes wears his hair?

18   A.    It represents all the time the way he

19   wears his hair.

20   Q.    Are you sure that he never put twists in

21   his hair?

22   A.    He's never put twists in his hair.

23   Q.    And so if somebody identified him saying,

24   The man that I was talking about had twists in his

25   hair.    It couldn't be Kourtney, could it?

1    A.    No.

2                MR. HARTLEY:    Thank you.    No further

3    questions.

4                        CROSS-EXAMINATION

5    BY MS. PERKINS:

6    Q.    You would agree that he could actually

7    twist his hair the length it is now; isn't that

8    right?

9    A.    No.

10   Q.    You wouldn't agree?

11   A.    No, because I do hair and do my little

12   sisters and them hair, and his hair is not that

13   length, unless you want to cut your fingers or hurt

14   your fingers.

15   Q.    But it is possible to twist the hair the

16   length it is right now; is that right?

17   A.    No.

18                MS. PERKINS:    Nothing further --

19   Q.    So if someone said that it would be

20   possible to twist their hair that length, they

21   would be lying?

22   A.    They would need to let it grow out some

23   more and put some honey on it.    Because I tried to

24   get my hair twisted at their length when it was

25   locked.

1       Q.  So, say, if I said I had my hair that

2  length and I twisted my hair when it was that

3  length, that wouldn't be possible?

4       A.  My beautician said it would not even stay

5  together less than an hour.

6       Q.  It wouldn't stay together, but it is

7  possible to do it, isn't that right?

8       A.  I don't know.  I didn't try it.

9             MS. PERKINS:  Nothing further,

10  Judge.

11             MR. HARTLEY:  Nothing further.

12             THE COURT:  Okay.  You can step

13  down.  You're excused.  You can stay or leave.

14             (Witness excused.)

15             THE COURT:  Your next witness?

16             MR. HARTLEY:  Judge, my next witness

17  is Lavan Howard.  I have not seen her in the

18  hallway.  She was here earlier.

19             THE COURT:  Well, I'll get her

20  paged.

21             MR. HARTLEY:  I believe she may be

22  returning.

23             THE COURT:  Do you --

24             MR. HARTLEY:  These witnesses may

25  know about her whereabouts.

1          THE WITNESS:  She's going to pick up
2    her children from school.
3          THE COURT:  I can't hear you.
4          THE WITNESS:  She was going to pick
5    up her children from school.
6          THE COURT:  So she's probably not
7    here.  Could you take anyone else?
8          MR. HARTLEY:  I don't think I have
9    another witness.  If I did, I would, but I don't
10   think -- that was maybe my last witness really.
11         THE COURT:  Okay.  Well, come up
12   here -- do you know when she left and where are her
13   children in school?
14         THE WITNESS:  She hasn't been gone
15   that long.  She left about five or ten minutes ago.
16         THE COURT:  Where does she have to
17   get her children from school?  What school?
18         THE WITNESS:  I don't know.
19         THE DEFENDANT:  I think they go to
20   Peter Crumpton.
21         MR. HARTLEY:  Peter Crumpton.
22         THE COURT:  Well, that's -- is that
23   going to be your last witness?
24         MR. HARTLEY:  Yes, she's going to be
25   my last witness and she has a photograph too, so

1  that's why she's so important.

2            THE COURT:  Wait.  Wait.  Do you

3  know whether she has a car phone or any type of --

4            THE WITNESS:  I think she has a cell

5  phone.

6            THE COURT:  Would you go talk to her

7  and see if you can -- so we can see where --

8            MR. HARTLEY:  I may have it in my

9  file, Judge.

10           (Mr. Hartley looking and talking.)

11           MR. HARTLEY:  I have some numbers I

12  think I can call.

13           THE COURT:  Okay.  Well, I'm going

14  to give y'all another break, so you don't have to

15  just sit there.  We'll certainly let you know

16  something at 3:30.  Whatever we know, we'll know.

17           (Out of presence of the jury.)

18           MR. HARTLEY:  I'll waive the

19  presence of my client.  Just -- we anticipate that

20  the State --

21           THE COURT:  Wait just a minute.

22           MR. HARTLEY:  If the Court allows

23  this type testimony, it would make it an

24  impossibility for the defense to effectively

25  cross-examine this person.  In other words, the

1    Court has already sort of noted that his testimony

2    would be so limited that it would be just like one

3    or two questions and an answer.   Any

4    cross-examination would be -- would make it

5    incumbent upon the counsel -- defense counsel to

6    try to test the validity of his statement.

7    Therefore, you go right into the facts that he was

8    testifying about a robbery.

9              THE COURT:  Well, I mean, if you

10   want to do that, I think --

11             MR. HARTLEY:  No.

12             THE COURT:  -- but they cannot get

13   into that.  But they can certainly have a rebuttal

14   witness to testify about hair.

15             MS. PERKINS:  And that's solely --

16   the questions that I'll give an offer of proof

17   strictly -- and I'm going to strictly -- have

18   informed him that he is not to say anything.  I am

19   strictly going to ask him, Have you seen this guy

20   before?  When did you see him?  What was the date?

21   Where were you when you saw him?  Who was he with?

22   And what was his hair like?  That's it.

23             MR. HARTLEY:  All right, Judge, then

24   outside the presence of the jury, I want to be able

25   to ask him a couple of questions so that the

1    appellate record, if it has to go up on appeal,
2    would reflect that counsel cannot cross-examination
3    somebody who -- a person whose only association
4    with this man is in an unindicted criminal charge.
5         In other words, we can't really go into any
6    cross-examination without opening the door of
7    another charge.
8                   MS. PERKINS:  But you have a right
9    to open the door --
10                  MR. HARTLEY:  Oh, I know --
11                  MS. PERKINS:  -- you can do that if
12   you want --
13                  MR. HARTLEY:  You're right.  It puts
14   me in that position.
15                  THE COURT:  Mr. Hartley, she can
16   call -- you've gone into the hair.  You've brought
17   it up, and she certainly has a right to have a
18   rebuttal witness on that limited.  Rebuttal
19   witnesses are limited any way.
20                  MR. HARTLEY:  Your Honor, if he
21   makes such a good identification, why wasn't
22   Kourtney Greenwood indicted for that offense?
23                  MS. PERKINS:  Judge, we're not
24   talking about that offense.
25                  THE COURT:  We are not talking --

119

```
 1                    MS. PERKINS:  We're just saying that

 2   he's somebody that has seen him before without --

 3   with twists in his hair.

 4                    MR. HARTLEY:  We object to this

 5   testimony, Judge.

 6                    (In the presence of the jury.)

 7                    THE COURT:  Okay.  Mr. Hartley, are

 8   you ready with your witness?

 9                    MR. HARTLEY:  Yes, Judge.

10   Ms. Howard, come on.

11                    THE COURT:  If you'll have a seat

12   right over there and raise your right hand.

13                         LAVAN HOWARD

14       The witness, having first been duly sworn or

15   affirmed to speak the truth, the whole truth, and

16   nothing but the truth, testified as follows:

17                    THE COURT:  Okay.  Put your hand

18   down and slip up to the microphone.

19                    DIRECT EXAMINATION

20   BY MR. HARTLEY:

21       Q.   State your name for the Record, please.

22       A.   Lavan Howard.

23       Q.   All right.  Ms. Howard, how old are you?

24       A.   Twenty-six.

25       Q.   And where do you live?
```

120

1          A.    3207 Meadow Lane.

2          Q.    All right.  Ms. Howard, are you

3    acquainted with Kourtney Greenwood?

4          A.    Yes.

5          Q.    And what is your relationship with him?

6          A.    I have kids by him.

7          Q.    Have kids?

8          A.    Uh-huh.

9          Q.    Okay.  Did y'all remain friends or

10   boyfriend and girlfriend for a long period of time?

11         A.    Yes.

12         Q.    Okay.  Now, you're no longer seeing him,

13   are you?

14         A.    No, sir.

15         Q.    You have another boyfriend, don't you?

16         A.    Yes.

17         Q.    All right.  Now, did you see him

18   frequently in the months of April -- well, let's

19   say -- April, May, and June of this year?

20         A.    Yes.

21         Q.    Did you see him often enough to be able

22   to testify about how he kept his hair?

23         A.    Yes, sir.

24         Q.    And how many times would you have seen

25   him in April?

121

```
 1         A.    Almost daily, because he came -- he came
 2    by daily.
 3         Q.    Okay.
 4         A.    And he stayed a few nights.
 5         Q.    Are you -- okay.  I asked you could --
 6    can you testify about how he has worn his hair
 7    since you've known him?
 8         A.    Yes.
 9         Q.    And would you represent to the jury
10    something about his hairstyle?
11         A.    Well, me and Kourtney had been dating
12    for, like, five and a half years.  We lived
13    together.  And he's always wore an afro.
14         Q.    If I use the term twist as a -- for a
15    hairstyle.  Are you familiar with people that wear
16    twists?
17         A.    Yes, sir.
18         Q.    Have you ever had an occasion to see him
19    wear twists in his hair?
20         A.    I have never seen Mr. Greenwood wear
21    twists in his hair.
22         Q.    Is there a reason for that that you know
23    of?
24         A.    Yes.
25         Q.    What's that?
```

1      A.    He never really wore -- wanted his hair

2    cut real low, because him and my son, their ears

3    stick out at the top.  And he's always wore his

4    afro to keep his ears from sticking out at the top.

5      Q.    Is that to soften the effect of his ears

6    or something?

7      A.    I guess so.

8      Q.    He didn't like his ears?

9      A.    He just don't like the way his ears stick

10   out.

11     Q.    I'm going to show you what I've shown to

12   counsel.  And I'm going to show you some pictures,

13   and I want to ask you to identify those.  And tell

14   me if you were present when those pictures were

15   taken.

16     A.    Yes, sir, I took them.

17     Q.    Okay.  And what do they purport to be?

18     A.    This is Kourtney Greenwood with his son

19   right here standing in the bedroom of the door.

20   And this is April, around the 17th, when our son

21   turned three, and we had a big birthday for him.

22   And this is Kourtney and his son and his nephew.

23     Q.    That's April the 17th, I think it is?

24     A.    Yes, sir.

25     Q.    All right.  And how can -- how can you be

1    absolutely certain that that picture was taken on

2    April 17th?

3        A.    Because it's my son's birthday.

4        Q.    Okay.  When y'all celebrated it this

5    year?

6        A.    Uh-huh.

7        Q.    All right.  And does this show your

8    husband -- well, not husband.  He's not your

9    husband.  But father of your child, right?

10       A.    Uh-huh.

11       Q.    Does it show his hair?

12       A.    Yes.

13       Q.    And is it in a relative low afro?

14       A.    Yes, sir.

15       Q.    All right.  In the week or two before

16   that, had he ever gone to the trouble of putting

17   twists in his hair?

18       A.    No, sir.

19       Q.    Has he ever done it?

20       A.    No, sir.

21       Q.    Are you stating that under oath this is

22   true in front of this jury?

23       A.    Yes, sir.

24       Q.    Would you lie because he's the father of

25   your children?

1          A.    No, sir.

2          Q.    If other witnesses said he never put

3    twists in his hair, like, his sisters, would they

4    be able to testify to that?

5                     MS. PERKINS:  Objection, Judge.

6                     THE COURT:  Sustained.

7                     MR. HARTLEY:  Okay.  Strike that.

8    We offer -- well, we have not marked them, but we

9    offer those photos as Defense 1 and 2.

10                    MS. PERKINS:  I don't have any

11   objection.

12                    THE COURT:  Admitted.

13                    (Defendant's Exhibits No. 1 and 2

14                    were admitted into evidence.)

15                    MS. PERKINS:  No questions for this

16   witness.

17                    THE COURT:  Okay.  You can step down

18   and you're excused.  You can stay or leave.

19                    THE COURT REPORTER:  I need the

20   pictures, please.

21                    (Witness hands them over.)

22                    THE COURT REPORTER:  Thank you.

23                    THE COURT:  Do you have any other --

24                    MR. HARTLEY:  Wait one moment.  Can

25   I have -- can I recall this witness?

1          THE COURT:  Sure.  And just remember

2    you're still under oath.

3                    LAVAN HOWARD

4         The witness, having been reminded that she was

5    duly sworn or affirmed to speak the truth, the

6    whole truth, and nothing but the truth, testified

7    as follows:

8              DIRECT EXAMINATION (continued)

9    BY MR. HARTLEY:

10        Q.    Ms. Howard, I did forget, and I wanted to

11   ask one more line of questions.  You remember the

12   birthday party of it being on the 17th?

13        A.    Uh-huh.

14        Q.    Okay.  A week before that, do you

15   remember if that was during the week or on the

16   weekend?

17        A.    I think it is on a Saturday.

18        Q.    On a what?

19        A.    A Saturday.

20        Q.    Do you remember on -- during the week

21   nights of that time period what he was doing

22   typically most week nights?

23        A.    Yes, sir.

24        Q.    What was it?

25        A.    He used to baby-sit for me while I go to

126

1    work and school and stay at night.

2         Q.   Okay.  Now, where were you going to work

3    and school?

4         A.   At Scooters Hot Wings.  I had two jobs.

5         Q.   And --

6         A.   And it -- my Scooters Hot Wings job was

7    at nighttime.  It used to be from, like, 4:30 to

8    9:30 or 10:00.  And I didn't have no babysitter for

9    the three kids, and so he would have to baby-sit.

10        Q.   Do you remember about -- on around April

11   the 10th as to whether or not he was baby-sitting

12   for you or not during that time?

13        A.   He did.

14        Q.   And when you came home, did he stay home

15   or did he go somewhere?

16        A.   Huh-uh, he stayed there.

17        Q.   Okay.  Do you remember on Tuesday, April

18   the 10th, whether or not he baby-sat for you?

19        A.   He baby-sit.  I worked on Tuesday,

20   Thursday, and Saturdays.

21        Q.   During that time period, you were working

22   those days?

23        A.   Uh-huh.

24        Q.   And can you state affirmatively that he

25   baby-sat for you on Tuesday during the first week

127

1    of April?

2         A.    Yes, sir.

3         Q.    Okay.  And that would have been into the

4    hours at least till ten or eleven o'clock at night?

5         A.    Yes, sir.

6         Q.    And he would stay there or would he

7    leave?

8         A.    Stay.

9              MR. HARTLEY:  Thank you.  No further

10   questions.

11                    CROSS-EXAMINATION

12   BY MS. PERKINS:

13        Q.    Now, this offense happened on April 18th.

14   Was he baby-sitting for you on April 18th?

15        A.    My sister went -- my sister went in

16   labor.  My son had his birthday party on the 17th.

17   That evening -- that night, my sister went in

18   labor.  I left Mr. Greenwood there with his niece,

19   his nephews, and our kids.  And I stayed -- I spent

20   the night at the hospital --

21        Q.    Okay.  So you weren't there?

22        A.    -- so he was there.

23        Q.    Were you there the whole night with him?

24        A.    No, I wasn't there, but --

25        Q.    Let me go back for a second.  Kourtney

1     has been charged with this offense since July of

2     2002; is that right?  Are you aware that he --

3     didn't you know that he was charged with this

4     offense before now?

5         A.   What you mean did I know he was

6     charged --

7         Q.   Did you know that he had been charged

8     with a robbery before now?

9         A.   Yeah.

10         Q.   Have you ever given -- gone to the police

11    office and given a statement -- an alibi is

12    important, isn't it?

13         A.   Yes.

14         Q.   And if you were saying that he was at

15    home that night, that would be some important

16    information, wouldn't it?

17         A.   And I never went to the police station or

18    the detective station to give no alibi witness or

19    nothing like that, because I -- I never was asked

20    to.  If I would have been asked to or, like now, if

21    I would have been subpoenaed to come to court or

22    subpoenaed to go talk to someone, then, yes, ma'am,

23    I would have.  But, no, ma'am, I didn't.

24         Q.   You didn't --

25         A.   When they locked Kourtney up, they locked

1    Kourtney up.

2        Q.   Did you know why Kourtney was locked up?

3        A.   When he called home, he said something

4    about they was trying to charge him with some

5    robbery.

6        Q.   All right.  And -- and if he was at home

7    baby-sitting your children, then that would mean

8    that he didn't commit this robbery, right?

9        A.   Correct.

10       Q.   And he's the father of your children,

11   right?

12       A.   That's right.

13       Q.   And you wouldn't want to see the father

14   of your children locked up for something he didn't

15   do, right?

16       A.   Sure wouldn't.

17       Q.   So that would be some important

18   information to give the police at that point; isn't

19   that right?

20       A.   It probably would have been --

21       Q.   I'm just asking --

22       A.   But --

23            MR. HARTLEY:  Your Honor --

24            THE COURT:  Wait.

25       A.   I was --

130

1              THE COURT:  Wait.  She can't take it

2     down when everybody talks at the same time.  Let

3     her finish asking the question.  But let her finish

4     the answer.  And if you have an objection,

5     Mr. Hartley, do it when she asked the question.

6     Would you repeat it?

7          Q.   My question is simply this:  Would that

8     be important information?  That's a yes or no

9     question.  Is that information -- would that

10    information be important that he was at home with

11    your kids?

12         A.   Yes, it's important.

13         Q.   Right.  And since that information is

14    important, that would be some information -- and

15    this is simply a yes or no question -- that would

16    be some important information for the police to

17    have when you found out he was charged, wouldn't

18    it?  Yes or no?

19         A.   Yeah.

20         Q.   It would have been important.  But you

21    didn't tell them, did you, yes or no?

22         A.   No, I didn't tell them.  And I have a

23    reason for not telling the police, because a

24    detective or police and no one else ever came to me

25    asking me the whereabouts of my kids's father that

1    night up until I talked to Mr. John Hartley.

2        Q.    The first time that we're hearing about

3    this is today; isn't it?

4        A.    The first time you're hearing about what?

5        Q.    About -- about that he was at home is

6    today; isn't that right?

7        A.    I'm quite sure he done spoke up for

8    himself.

9        Q.    Um, let me move on.  Let's talk about

10    that night.  Okay.  You weren't there, were you?

11        A.    Which night?

12        Q.    The night that this offense happened, the

13    night that your cousin was in labor.

14        A.    When my sister went into labor?

15        Q.    Yes, ma'am.

16        A.    No, he was there with his kids.

17        Q.    Let me --

18        A.    I rushed off to the hospital.

19        Q.    Okay.  Let me ask my question, and then

20    you can answer.

21                    THE COURT:  Do you need some water?

22                    THE JUROR:  I'm fine.  Thank you.

23        Q.    Okay.  Let me ask you some questions, and

24    I just simply want you to answer my questions.  And

25    then Mr. Hartley can come and clear something up

1    for you, if need be.  Okay?

2        A.    Uh-huh.

3        Q.    Now, you said it was your sister --

4        A.    It is.

5        Q.    Did I get it right?

6        A.    Uh-huh.

7        Q.    Okay.  Your sister went off into labor;

8    is that right?

9        A.    Yes.

10       Q.    Now, when your sister -- what time was

11   this when this happened?

12       A.    Ma'am, I don't know.  This was in April.

13   I'm not for sure what time it was.

14       Q.    Was it noontime?

15       A.    No.  It was nighttime.

16       Q.    Was it midnight --

17       A.    When I left -- when I left Mr. Greenwood

18   there with his kids, it was nighttime.

19       Q.    Okay.

20       A.    It was late nighttime.

21              THE COURT:  Wait just a minute.

22   Could you --

23              MS. PERKINS:  I'll get it.  (Hands

24   juror some water.)

25              PROSPECTIVE JUROR:  Sorry.  Thank

1    you.

2         Q.   Now, when you left Mr. Greenwood there

3    with his kids, you said it was nighttime, right?

4         A.   Nighttime.

5         Q.   And you left; isn't that right?

6         A.   Uh-huh.

7         Q.   And you went to the hospital, right?

8         A.   Yes.

9         Q.   What time -- how long did you stay at the

10   hospital?

11        A.   Until the next morning.

12        Q.   Until the next morning?

13        A.   Uh-huh.

14        Q.   Okay.  So if you left that night to go to

15   the hospital, and you didn't come back until the

16   next morning, that means that you weren't at the

17   house that whole night, were you?

18        A.   Huh-uh.

19        Q.   Okay.

20             THE COURT:   Now, you need to answer

21   yes or no for the Record.

22        A.   No.

23        Q.   So if you weren't at the house that whole

24   night, you can't say whether or not

25   Kourtney Greenwood was at the house the whole

1   night, can you?

2      A.   Well, I can say when I was at the

3   hospital, I did call Kourtney Greenwood several

4   times to check upon my kids and make sure that they

5   was all right.  And I can say that.

6      Q.   And this statement -- and this is also

7   information that you've never told the police

8   before this --

9      A.   The police never came to me wanting to

10  know information, ma'am, about Kourtney Greenwood

11  or his arrest.

12     Q.   But if you knew he was innocent, why

13  didn't you go to them?

14     A.   Why should I go to them?  He can speak up

15  for himself.

16     Q.   That's a good question.

17          MS. PERKINS:  Nothing further of

18  this witness.

19          REDIRECT EXAMINATION

20  BY MR HARTLEY:

21     Q.   Are you very sure that the night that

22  you're talking about when he was -- when you were

23  at the hospital was a Tuesday?

24     A.   That's when -- she's talking about that

25  Saturday after the birthday party.  That Tuesday, I

1  was at work. And when I got off of work,

2  Mr. Greenwood was still at home with his kids where

3  I left him at.

4     Q.  Okay. Do you remember that he was

5  charged with this matter April -- I mean, do you

6  know that he was charged with an event that took

7  place on Tuesday night?

8     A.  Kourtney called home when they had

9  arrested him or whatever. He called home -- he

10  called my house, and he was, like, I'm in jail. Me

11  and Kourtney was going through some changes and

12  I -- I had washed my hands of him. And I wasn't

13  really -- being honest, I wasn't concerned.

14     Q.  Okay. Okay. But look back on it. Did

15  you say that he kept your children on Tuesday

16  nights --

17     A.  Yes, he kept my kids on Tuesdays,

18  Thursdays, and Saturday.

19     Q.  And if this offense took place on April

20  the 9th -- and I'm just saying -- and if that was

21  one of those Tuesdays that he was baby-sitting for

22  you, right?

23     A.  Yes, sir.

24     Q.  Okay. I'm not saying it was or wasn't.

25  But you're saying it was a Tuesday and it fell in

136

1    April, he was baby-sitting for you?

2        A.    Yes, sir.

3        Q.    Okay.  And the place -- the DA asked you

4    if this is important information or important

5    testimony.  This is the place to give important

6    information and testimony, isn't it?

7        A.    Yes, sir.

8        Q.    Because this is where his guilt or

9    innocence is decided, right?

10       A.    Yes, sir.

11       Q.    So it's just as good to tell it here as

12   it is to tell it to the police down there, isn't

13   it?

14       A.    Yes.

15               MR. HARTLEY:   Thank you.

16                  RECROSS-EXAMINATION

17   BY MS. PERKINS:

18       Q.    On April 9th, you were working?

19       A.    Yes.

20       Q.    You weren't at home, were you?

21       A.    No.

22       Q.    Okay.  So you don't know whether Kourtney

23   was there the whole time on April 9th or not, do

24   you?

25       A.    I mean, I call home when I'm not home.  I

1    call home and I check on Kourtney and my kids. And

2    if Kourtney had left, he must have left the kids

3    there my themself. And that's something he would

4    not do, because he's been baby-sitting kids every

5    since they was kids.

6          Q.    You weren't at the house, were you?

7          A.    No, ma'am.

8          Q.    So you don't know whether or not he was

9    there, do you, yes or no?

10         A.    No, ma'am.

11               MS. PERKINS:  Nothing further,

12   Judge.

13               MR. HARTLEY:  Nothing further.

14               THE COURT:  Okay.  You can step

15   down.  You can stay or leave.

16               (Witness excused.)

17               THE COURT:  Do you have any other

18   witnesses?

19               MR. HARTLEY:  No, Your Honor.  I

20   don't think I'm going to attempt to call that other

21   witness.

22               THE COURT:  Okay.  And so at this

23   time --

24               MR. HARTLEY:  Wait one moment.  Let

25   me see what he wants.

```
 1                    (Brief second was taken.)

 2              MR. HARTLEY:  Okay.  My client wants

 3     to testify.

 4              THE COURT:  Okay.  And would you

 5     raise your right hand?

 6                    KOURTNEY GREENWOOD

 7        The witness, having first been duly sworn or

 8     affirmed to speak the truth, the whole truth, and

 9     nothing but the truth, testified as follows:

10                    DIRECT EXAMINATION

11     BY MR. HARTLEY:

12        Q.    State your name.

13        A.    My name is Kourtney Greenwood.

14        Q.    And your age.

15        A.    Twenty-two.

16        Q.    All right.  Kourtney, let me ask you

17     about what you were generally doing back in April

18     of this year.  Where were you living and where were

19     you staying?

20        A.    I was staying at 248 West South Boulevard

21     with my cousin.

22        Q.    Okay.  What about your relation with

23     Lavan Howard at that time?

24        A.    We saw each other every day.  But, like

25     she said, we were going through bad terms.  But,
```

1  you know, by us still having dealings because of

2  the kids, we communicated every day.

3     Q.    Did you have occasion where you would

4  baby-sit for her?

5     A.    Every Tuesday, Thursday, and Saturday.

6     Q.    Was that a regular thing or just for one

7  week or two that you did this?

8     A.    Every Tuesday, Thursday, and Saturday.

9  That was her second job.  On those three nights of

10  the week, I always baby-sit, because she didn't

11  have no babysitter.  And that was my kids, so I

12  always was there.

13     Q.    How many kids do you have by her?

14     A.    Two.

15     Q.    Okay.  Are they -- are they in the

16  picture?

17     A.    Yes, sir.

18     Q.    Okay.  Identify your children in those

19  pictures for me, because there appear to be maybe

20  another child or somebody in there.

21     A.    A little nephew and my niece.  That's my

22  little boy right here.

23     Q.    Hold it for the jury -- I know they can't

24  see, it's not real close, but they'll look at it

25  later.  Kind of just aim it towards them and point

140

1    to which one is your child.

2        A.    This is my little boy right here.  My

3    little girl, she's not around right now.  She's

4    probably off to the side somewhere.  But I'm

5    holding my little boy.

6        Q.    And is that a picture, as was testified

7    earlier, is that a picture of a birthday party?

8        A.    Yes, sir.

9        Q.    Okay.  And what about the other picture,

10   who are you holding in the other picture?

11       A.    That's my little boy again.

12       Q.    Okay.  Is that picture taken at an

13   earlier time?

14       A.    Yeah, that morning.

15       Q.    Now, on April the 9th, did you go out to

16   the area of Moorecroft apartments and have anything

17   to do with this man?

18       A.    No, sir.

19       Q.    Did you have anything to do with

20   Jamar Brown?

21       A.    I don't even know of a Jamar Brown, sir,

22   or Mr. Copeland.

23       Q.    Okay.  Now, what about your hair, how

24   have you habitually worn your hair?

25       A.    I always wore a miniature size fro --

1    afro.  It's just the way I always -- it's just my

2    little style, I guess.

3        Q.   Has it ever been a desire of yours to put

4    these twist things in your hair?

5        A.   No, sir.

6        Q.   Have you ever worn your hair, basically,

7    you know, long enough to do that?

8        A.   No, sir.

9        Q.   Does it -- is it a style that you would

10   like to have on you for appearance purposes?

11       A.   No, sir.

12       Q.   Are you -- what do you call it -- partial

13   to the way your hair is done now?

14       A.   State that again.

15       Q.   Okay.  Do you like the way your hair is

16   now?

17       A.   Yeah, I like it like this, because I

18   always -- I can just pick it out or just comb it

19   and be through with it, you know.  I ain't ever had

20   no desire to wear it any other type way besides

21   wave.  That was a couple of years ago.  I used to

22   wear waves in my hair.

23       Q.   But no twists?

24       A.   No twists.

25       Q.   Okay.  All right.  And do you tell this

1    jury today that you never were involved with

2    Jamar Brown when he -- if Jamar Brown took some

3    money or something from this man?

4        A.    I don't even know Jamar Brown or know

5    Mr. Copeland.  Personally, I don't know neither one

6    of them.  I don't know what was going on.  I just

7    know I was at a female friend's house of mine, and

8    I was just arrested and been locked up ever since,

9    you know.  And things just -- I didn't know what

10   was going on, so I didn't sign nothing.  I didn't

11   do anything when the police arrested me.  All they

12   said was I was charged with robbery.  And it

13   shocked me half to death, you know, so I just

14   didn't say anything or do anything up until now

15   when -- that's why I want to speak today.  And I

16   have a little more that I want to add to my

17   statement.

18              THE COURT:  Wait.  You just need to

19   answer his questions.

20        Q.    Well, where were you on April the 9th?

21        A.    I was at home April the 9th.

22        Q.    On what street?

23        A.    I was at Daniel Drive -- 503 Daniel Drive

24   at that time.

25        Q.    Is that Lavan Howard's address at that

1    time?

2        A.    Yes, sir.

3            MR. HARTLEY:    That's all.    You're

4    going to be asked some more questions from the

5    District Attorney.

6                    CROSS-EXAMINATION

7    BY MS. PERKINS:

8        Q.    Kourtney, you've robbed somebody before,

9    haven't you?

10        A.    Yes, ma'am.    I've been convicted of a

11    robbery case before about nine years ago.

12        Q.    In '94?

13        A.    Yes, ma'am.

14        Q.    You've been convicted of a possession of

15    marijuana; is that right?

16        A.    Yes, ma'am.

17        Q.    You said you don't know -- you said you

18    don't know -- you don't know Jamar Brown?

19        A.    No, ma'am.

20        Q.    Never been around him before?

21        A.    No, ma'am.

22        Q.    So back on March 30th of 2002, you

23    weren't around Jamar Brown?

24        A.    No, ma'am.

25        Q.    And you didn't have twists in your hair

1    at that time?

2        A.   No, ma'am.

3        Q.

4               MS. PERKINS:  Judge, may I approach

5    briefly for a second?

6            THE COURT:  Yes.

7            MS. PERKINS:  Mr. Hartley?

8        (Bench conference was held.)

9        Q.   Was anybody else at home with you on the

10   night of the offense --

11        A.   April the 9th?

12       Q.   -- besides your kids.  Yeah.

13       A.   No.  I always baby-sit alone.  I always

14   got me a six-pack of beer and I stayed at the house

15   and watched movies and baby-sitted them.

16       Q.   So you always get a six-pack of beer and

17   stay at home and watch movies with your kids?

18       A.   Yes, ma'am.

19       Q.   And you do that every night that you

20   baby-sit them?

21       A.   Every Tuesday, Thursday, and Saturday.

22       Q.   So there's nobody to corroborate your

23   testimony that you were at home with your kids on

24   that night really except for you; is that right?

25       A.   No one besides Lavan Howard.

1      Q.    Who wasn't there, was she?

2      A.    No.  She was at work at the time.  But I

3  wouldn't leave those kids there by their self.

4      Q.    But there's nobody else to testify about

5  that except for you; is that right?

6      A.    Yes, ma'am.

7           MS. PERKINS:  Nothing further,

8  Judge.

9           MR. HARTLEY:  Nothing further, Your

10 Honor.

11           THE WITNESS:  I would like --

12           MR. HARTLEY:  You can step down.

13           THE COURT:  Why don't you go up and

14 see --

15           (Brief second was taken.)

16           REDIRECT EXAMINATION

17 BY MR. HARTLEY:

18     Q.    Is there something that you -- that is

19 important about a date of April 18th?

20     A.    Yes.  I heard the District Attorney say

21 that April the 18th, this incident took place.

22 This incident did not take place on April the 18th.

23 The warrant -- in my discovery, the warrant and who

24 ever else went, that's when I supposedly became a

25 suspect on April the 18th, you know, that's when my

```
 1    photo, I guess, was pointed out by somebody I don't
 2    even know.  But this incident happened on April the
 3    9th, you know.  That's -- I just wanted to make
 4    that clear, because I don't know how things were
 5    going all about April the 18th, and I was
 6    charged --
 7                    THE COURT:  Now, wait --
 8         Q.    Is that clear?  That was a good answer.
 9                    MR. HARTLEY:  That's all I wanted to
10    ask you.  Thank you for giving us that.  Now, you
11    can step down.
12                    (Witness excused.)
13                    THE COURT:  Do you have any other
14    witnesses, Mr. Hartley?
15                    MR. HARTLEY:  No, Your Honor.
16                    THE COURT:  Do you have -- at this
17    time, do you rest?
18                    MR. HARTLEY:  Yes, Judge.
19                    MS. PERKINS:  I do have one rebuttal
20    witness, Judge.
21                    THE COURT:  Okay.
22                    MS. PERKINS:  The State calls
23    Harold Franklin.
24                    THE COURT:  If you'll come right
25    over there and raise your right hand.
```

1                    HAROLD FRANKLIN

2       The witness, having first been duly sworn or

3   affirmed to speak the truth, the whole truth, and

4   nothing but the truth, testified as follows:

5                    **DIRECT EXAMINATION**

6   **BY MS. PERKINS:**

7       Q.   Tell us your --

8               **THE COURT:**  You might slip up to

9   that microphone.

10              **MS. PERKINS:**  I'll scoot it up to

11  you.  Talk right in there, okay, good and loud.

12      Q.   Tell us your name, please.

13      A.   Harold Franklin.

14      Q.   Mr. Franklin, where are you from -- from

15  Montgomery?

16      A.   Yes.

17      Q.   Okay.  This is going to go quickly.  Do

18  you know this defendant right here?

19      A.   Yes.

20      Q.   What's his name?

21      A.   Kourtney Greenwood.

22      Q.   Back in March of 2002, did you see him at

23  that time?

24      A.   Yes.

25      Q.   Where were you when you saw him -- let's

1    go to March 30th of 2002.  Okay?

2           A.   All right.

3           Q.   Do you remember that day?

4           A.   Yes.

5           Q.   Where were you when you saw him?

6           A.   In Trenholm Court in front of my

7    apartment.

8           Q.   Were you outside or in your car or

9    where --

10          A.   I was outside in my car --

11          Q.   Okay.

12          A.   -- chilling and listening to the music.

13          Q.   Was he with somebody at that time?

14          A.   Yeah.

15          Q.   Who was he with?

16          A.   Jamar Brown.

17          Q.   Do you know Jamar Brown?

18          A.   Not right off.

19          Q.   But you know of him?

20          A.   Yes.

21          Q.   Okay.  And he was with Jamar Brown at

22    that point when you saw him?

23          A.   Yes.

24          Q.   Did you see his hair at that point?

25          A.   Yes.

1       Q.   You did see his hair?

2       A.   Yes.

3       Q.   How was his hair looking?

4       A.   It was twisted.

5       Q.   It was twisted?

6       A.   Yes, it was twisted.

7       Q.   Was it fully twisted?

8       A.   Yes.

9              MS. PERKINS:  Nothing further,

10  Judge.

11             CROSS-EXAMINATION

12  BY MR. HARTLEY:

13       Q.   Mr. Franklin, you say you know this man?

14       A.   I don't know him.  I don't know him, but

15  I just, you know, seen him.

16       Q.   So you don't really know him?

17       A.   Huh-uh.

18       Q.   You don't really know him; do you?

19       A.   I know -- I know I know his name.

20       Q.   You know his name?

21       A.   Yeah.

22       Q.   So you don't know him?  You've never had

23  a conversation with him, have you?

24       A.   Huh-uh.

25              MS. PERKINS:  Objection, Judge.  May

1    I approach?

2                    THE COURT:  No.  Overruled.  Go

3    ahead.

4                    MR. HARTLEY:  Okay.

5                    MS. PERKINS:  Judge, I think --

6         Q.   What was the date that you said you saw

7    him with -- and he was with Jamar Brown or

8    whomever, what date was that?

9         A.   March 30th.

10        Q.   Okay.  Prior to March 30th, did you know

11   who he was?

12        A.   Yes.

13        Q.   You had spoken to him before?

14        A.   No.

15        Q.   Okay.  So you didn't know who he was?

16        A.   I don't know him personally.

17        Q.   That's what I mean.  You don't know him.

18   So the answer you gave when you said I know him was

19   really not true, was it?

20        A.   Well --

21        Q.   You don't know him like I know --

22                    THE COURT:  Let him get through with

23   his answer.

24                    MR. HARTLEY:  All right.

25        A.   I'm saying, I know of him.  But I don't