COURT OF CRIMINAL APPEALS NO. _02-0634_

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

FROM

CIRCUIT COURT OF _Montgomery_ COUNTY, ALABAMA

CIRCUIT COURT NO. _CC-02-909_

CIRCUIT JUDGE _Truman Hobbs_

Type of Conviction / Order Appealed From: _Robbery I_

Sentence Imposed: _Life_

Defendant Indigent: ☒ YES ☐ NO

_Kourtney Souern Greenwood, alias_

_Kourtney Greenwood_

NAME OF APPELLANT

_Marco Kirkland_  _261-6200_
(Appellant's Attorney)              (Telephone No.)
_529 S. Perry St._
(Address)
_Montgomery    AL    36104_
(City)            (State)       (Zip Code)

V.

## STATE OF ALABAMA

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

NAME OF APPELLEE

_____

_____

FILED

FEB 11 2003

CLERK
ALA COURT CRIMINAL APPEALS

(For Court of Criminal Appeals Use Only)

STATE'S
EXHIBIT
P
PENGAD 800-631-6989

1    know him personally.

2        Q.    Okay.  How do you -- I mean -- so you've

3    never talked to him?

4        A.    No.

5        Q.    Okay.  Have you seen him since that March

6    date in any situation, have you seen him since

7    then?

8        A.    I might have.

9        Q.    You -- but certainly you have seen him in

10   a social occasion or a conversation or anything

11   else, right?

12       A.    You know how you glance at folks and then

13   you don't really pay attention --

14               MR. HARTLEY:  Okay.  No further

15   questions.  No further questions.  Oh, wait.  Wait.

16       Q.    Have you ever been convicted of any

17   felonies?

18       A.    Yes.

19       Q.    Huh?

20       A.    Yes.

21       Q.    How many?

22       A.    One.

23       Q.    What was it?

24       A.    A robbery first developed down to a theft

25   of property.

1    Q.   Okay.  Is that the only felony conviction
2    you've got?
3    A.   Yes.
4    Q.   What other arrests have you had for
5    felony or crimes involving moral turpitude?
6              MS. PERKINS:  Objection, Judge.
7              THE COURT:  Okay.  I think you need
8    to rephrase that remark.
9              MR. HARTLEY:  Okay.
10   Q.   Okay.  Do you have any other crimes that
11   you've been convicted of involving moral turpitude?
12             MS. PERKINS:  Objection.
13             THE COURT:  Do you know what moral
14   turpitude is?
15             THE WITNESS:  No, ma'am.
16             THE COURT:  Okay.
17   Q.   All right.  Is it your testimony that
18   your only felony is a robbery that was reduced to a
19   lesser offense?
20   A.   Yes.
21   Q.   And what was the lesser offense?
22   A.   Theft of property.
23   Q.   Theft of property.  Okay.  Did you serve
24   any time for it?
25   A.   Boot camp.

```
 1          Q.    Excuse me?

 2          A.    Yes.

 3          Q.    How much?

 4          A.    Boot camp.

 5                MS. PERKINS:  Objection, Judge.

 6                THE COURT:  Sustained.

 7                REDIRECT EXAMINATION

 8   BY MS. PERKINS:

 9          Q.    On March 30th, 2002, what -- well, let me

10   go back.  You said you do know of Kourtney; is that

11   right?

12          A.    Yes.

13          Q.    And on that date, you saw him, didn't

14   you?

15          A.    Yes.

16          Q.    And you saw him with Jamar Brown; is that

17   right?

18          A.    Yes.

19          Q.    And he did have twists in his hair; is

20   that right?

21          A.    Yes.

22                MS. PERKINS:  Nothing further of

23   this witness, Judge.

24                THE COURT:  Then -- do you have

25   anything?
```

1          MR. HARTLEY:  No further questions.

2          THE COURT:  Okay.  You're excused.

3    You can step.

4          (Witness excused.)

5          THE COURT:  Do you have any other

6    witnesses?

7          MR. HARTLEY:  (Attorney nods.)

8          THE COURT:  Does the State have any

9    other witnesses?

10         MS. PERKINS:  Nothing further,

11   Judge.

12         THE COURT:  So the State, at this

13   time, rest?

14         MS. PERKINS:  Yes.

15         THE COURT:  And you renew your

16   motions?

17         MR. HARTLEY:  Renew our motion.

18         THE COURT:  Okay.  Both sides, at

19   this time, have rested, and the attorneys will

20   address you again and make closing arguments.  Does

21   anyone want to take a five-minute break?

22         (Juror raises hand.)

23         THE COURT:  Do you need to take --

24   let's take about five minutes.

25         THE JUROR:  Really just a glass of

```
 1   water would be fine.
 2                   THE COURT:  Okay.  We can get you
 3   water.  But you -- if you want -- why don't we just
 4   take a break if you --
 5                   PROSPECTIVE JUROR:  Well, I hate
 6   to --
 7                   THE COURT:  That's okay.
 8                   THE JUROR:  Really, it's okay.  Just
 9   a glass of water would be fine.
10                   THE COURT:  Okay.
11                   THE JUROR:  And I apologize.
12                   THE COURT:  That's okay.  I've been
13   having the same thing.  Just not quite where you
14   are yet.
15      Are we ready to proceed?
16                   MS. PERKINS:  Did he make his
17   motions on the record?
18                   THE COURT:  Yeah, he renewed his
19   motion.
20                   MS. PERKINS:  Okay.
21      Members of the jury, can you actually believe
22   we're at the end of this case?  I -- let me correct
23   one thing from the beginning.  This offense did
24   happen on April the 9th.  It did happen on
25   April 9th.  April 18th was the date that he was
```

1  developed as a suspect and that was on that

2  picture. That was my mistake. And I want to clear

3  that up. So, Mr. Greenwood was exactly right about

4  what he said when he was sitting here on that

5  particular offense. That's why I came back and

6  asked him on April 9th. Because on that date,

7  Ms. George (sic.) said that she was working, and

8  that's why I asked her that she was working that

9  night. And she still wasn't there on that night

10  too. So the same line of questioning went to that

11  particular night.

12      So, on April 9th, let's talk about what

13  actually happened on April 9th of 2002. What

14  happened? What really happened out there? What do

15  we know? Okay. We do know that Mr. Copeland was

16  walking down the street on Raintree over by

17  Virginia Loop Road. We do know that two black

18  males approached him. One put a gun to his head.

19  The other held the young man that was near him. We

20  do know that they took property from him. That,

21  members of the jury, according to the law in the

22  State of Alabama, equals a robbery.

23      A robbery -- and you're going to hear the law.

24  She's going to tell you -- the Judge is going to

25  tell you a lot about what that law is. A robbery

1    is when you have a theft, taking the property --

2    taking the property without you giving the

3    authorization to take it.  Okay.  A robbery is a

4    theft.  But in the course of committing the theft,

5    in this case, of his wallet -- his wallet, his

6    money, and his identification.  In the course of

7    committing that theft, I use force against you.

8    Okay.  And, in this case, that force is putting

9    that gun to his head.  I think we would all agree

10    that that's force.  If somebody puts a gun to your

11    head, you're pretty much going to give them what

12    they want.  Okay.

13        And, in the course of committing the theft,

14    you use force with intent to basically get this

15    person to comply with what you want them to do --

16    to get them to do what you're trying to get them to

17    do.  That's what separates a theft from a robbery.

18    And some people use burglary and exchange them for

19    robbery, but that's not what we're here on.

20    Robbery, according to the law -- not what you saw

21    on Law and Order -- but according to the law right

22    here in the State of Alabama is in the course of

23    committing the theft the use of force.  We know,

24    members of the jury, that that happened.

25        The question is, is this particular defendant

1    one of the ones who was out there participating?

2    That's what the issue in this case comes down to.

3    Okay.  We know that the robbery took place.  We

4    know his property was taken.  We know it was two

5    people out there that did it.  Was he one of the

6    ones out there that did it?  Was he?

7         Now, let's talk about Mr. Copeland for a

8    second.  Mr. Copeland got a good look at the two

9    people out there who did this.  One of those

10   persons is Jamar Brown.  He's the one that had the

11   gun.  The second of those persons, he has

12   identified back then and he identified today to be

13   this defendant.  Okay.

14        Now, there has been a lot of issue in this

15   case about twists -- about twists.  And I don't

16   know how many of you have seen twists on people's

17   hair, how many of you know what a twists is.  Okay.

18   Or how long somebody has to be -- there's a lot of

19   dispute about that.  These are the pictures that

20   the defendant submitted into evidence.  Pretty kids

21   too.  But you're going to all get a chance to look

22   at it.  There's not an exhibit sticker, but I think

23   there's --

24                    THE COURT REPORTER:  It's on the

25   back.

1         **MS. PERKINS:** It is on the back.
2  Okay. And you're going to get a chance to look at
3  those. And, as you look at these cute little kids,
4  I want to make sure that you look at the
5  defendant's hair, because that's really the
6  probative -- that's what these pictures were
7  entered into evidence to talk about. Okay. They
8  were here to talk about his hair.
9         Now, I used to have my hair down -- actually,
10  had an afro like this. It -- this year too, as a
11  matter of fact. And I was thinking, I wish that I
12  still had my hair --
13         **MR. HARTLEY:** Judge, I object to
14  what her personal opinion about her hair was.
15         **THE COURT:** I'm going to sustain.
16  You don't need to go into your hair.
17         **MS. PERKINS:** Well, what I'll do
18  then, is show -- because -- because we need to
19  know, as ladies -- as members of the jury, what
20  length someone's hair can be for you to be able to
21  twist it. Okay. That's an issue here. That's the
22  issue in the case. Everybody is saying he had his
23  hair this length and he didn't wear a twist. The
24  defendant is saying -- I mean, the victim is saying
25  he had twists. And we have another witness in here

1  saying that he had twists at the time.  So what

2  length can your hair be to twist it?  Now, I -- I

3  was saying this earlier, and I did this -- and I

4  want to scoot this out of the way -- to prove a

5  point.  And I tried to do it on this side so that

6  you could see using the victim's hair.  Now, this

7  hair is really, really, really low, what you would

8  consider low.  And I believe this -- and I'm

9  definitely no expert in twisting hair -- but I'm

10 doing this to show you what length you can twist

11 somebody's hair.  And I want you to see that even

12 at -- and this is how you twist hair.  It's a

13 demonstration of what it is.  And I did these three

14 to show you.  And even at the length his hair is

15 right now, if I went around his head doing each one

16 of those little things, it would be able to be

17 twists.  And that's important, members of the jury,

18 because this is what one considered to be -- sorry

19 for doing your head -- but this is what one

20 considered to be a low haircut, definitely.

21 Definitely, a lot lower than what you see on these

22 pictures.  And I don't know if you all can see it

23 from -- good from over here, but if you turn --

24 turn around just a little bit, so they can see.

25 You see how those little -- they end up being --

and what you do when you're growing dreadlocks, you
keep on twisting and twisting and they grow out
longer.  But, at this length, you can twist them
up -- twist your hair up, have that style, wash
them out and have another hairstyle.  If his hair
can be twisted at this length, surely, members of
the jury, his hair could be twisted at this length.
And you're going to look on these pictures and see
the difference in between how thick his hair is on
these pictures and how -- how low his hair is on
those pictures.  And I think we had to see that to
get a good look at that.  Because, without somebody
in here with twists or with hair long enough to be
twisted, we know it's real easy for people to get
confused about that unless you know people with
twists or know how that works.  So this is an
extreme example.  His hair is really low.  If you
can twist his hair, surely you can twist this.

Members of the jury, Larry -- Larry Copeland
saw this defendant out there that night with twists
in his hair.  He saw him come up to him with
Jamar Brown, and Jamar Brown put a gun to his head
and took his property.  He saw this defendant hold
that young boy that was walking with him.  He went
and he called the police.  They developed him as a

1    suspect.  He identified him in a photo lineup.  All

2    of the defense witnesses have been willing to

3    identify his hair that he didn't wear twists.  He

4    didn't wear twists.  We already know that even with

5    the length of his hair at the length that they say

6    it is, it could have been twisted, because I've

7    just showed you that.  I just twisted way -- hair

8    way shorter than that.  These are his family

9    members, members of the jury.  You get to judge the

10   credibility of witnesses and what bias they have

11   and what interest in this case.  They are his

12   family members.

13        The only person that came in here with

14   something besides those twists was the mother of

15   his children.  And she was not there during that

16   night to say that he was there.  She cannot put him

17   there.  She can only say what he does generally.

18   She cannot say what he did on the night in

19   question, because she was not there.  So he doesn't

20   have an alibi, because he can't -- she can't put

21   him there.  Nobody says that but him.  And does he

22   have motive to say, Yeah, I was there?  Yes, he

23   does.  He has motive to lie.  Where does the truth

24   lie?  Where does the truth lie?  If you really weed

25   through everything, the only thing he's saying, I

1    wasn't there.  I was at home by myself with a

2    six-pack of beer, baby-sitting my kids, and that --

3    and he's saying I had twists, but I didn't have

4    twists.

5        And we had somebody that come in, we have to

6    get in touch with that knows him, totally

7    unrelated -- they said, yeah I know him, but I saw

8    him before and he had twists.  And I saw him with

9    Jamar Brown.  Someone who doesn't -- is not a

10   relative, is not a family member.  And, yeah, he

11   does have a prior felony.  He's out on the street.

12   He has one just like Kourtney Greenwood does.  I've

13   seen them around.  I've seen him in the

14   neighborhood.  And I've seen his hair, and I saw

15   him on that particular day and he had twists in his

16   hair.  What interest does he have?  That's what

17   this case comes down to, members of the jury.  Was

18   he there?  And the evidence shows, members of the

19   jury, that he was there.

20       Why did this victim pick him out randomly?  If

21   he wasn't there, where would he just make his name

22   up from?  He was there.  He is the one that

23   assisted in the commission of this crime.

24               MR. HARTLEY:  Your Honor, District

25   Attorneys, counsel.

1    Members of the jury, I want to thank you for

2 being our jury today.  I have to admit that there

3 have been some stumbles along the way as far as

4 getting this case to flow as smoothly as we like

5 them to.  Some of it was my fault.  Some are

6 witnesses fault.  Some things like that.  I really

7 want to apologize, because I like to keep a case

8 moving.  And this has been one that did not move as

9 I hope they always would be.  So I apologize to

10 that for you.  And I apologize if, in any way

11 you've been inconvenienced because of that, take it

12 out on me or complain to the Bar Association about

13 me or whatever, but don't take it out on my client.

14 I don't think that you would, but it's just been

15 sort of a hit and miss type thing getting this case

16 up here into the jury stance.

17    Let me talk about a number of topics that I

18 think are important before you, before you take

19 this case to the jury -- I mean, to the jury room.

20 I think that you're going to be faced with a very

21 tough decision about guilt or innocence, because

22 the stakes are high.  This is an important case.

23    Later, right after I -- Ms. Perkins finishes

24 her second portion of her closing statement, you'll

25 get the charges of the law.  And Judge Greenhaw

will give you a set of legal standards and
principles that apply to this case. She'll define
robbery again. She'll define what an accomplice is
for you. She'll give you some legal language to
test the burden of proof, which is beyond a
reasonable doubt. And she'll tell you what a
reasonable doubt is. And she'll tell you about
Mr. Greenwood's being -- having a presumption of
innocence. All those things you will need to
listen to very, very closely. Because, if -- that
would be like the -- sort of your guidebook to
consider the evidence within those parameters.

I submit to you that when you do that, you
will have good reason for finding him not guilty.
And I want to try to hit every point that I can
think of in regard to some serious weaknesses in
the State's case and what I submit to you are some
good points in the defense case.

Mr. Greenwood wrote me a note and it said that
he thinks this case stands -- this case stands for
this proposition, that possibly an innocent man can
be sent to prison because of the possibility that
he could have had twists in his hair. I think, in
a way, he's correct on that. But I think there's a
whole lot more to it that what that -- is contained

1     in that statement.  This case really -- I mean,
2     maybe there is a question about whether he could
3     have had twists in his hair or not.  I guess I
4     could have had twists in my hair.  But look at what
5     contradicts that evidence.  I submit to you that
6     these photographs contradict the victim's claim
7     that the person who was involved had twists in his
8     hair, not because they show necessarily that his
9     hair is too short to have twists, but because these
10    photographs clearly show that he, on more than one
11    occasions, is there are photographic evidence to
12    show what his hairstyle was.  It's almost like the
13    State is trying to make a case, say, Hey, he put
14    these twists in his hair so that somebody wouldn't
15    recognize him.  Well, Hey, if he wanted to do that,
16    why wouldn't he wear something over his face or put
17    something, like a -- sunglasses -- I mean no
18    sunglasses, not at night -- but something.  If
19    you're going to go to that trouble, why wouldn't
20    you put something around his head to shade his
21    face?  Why would you just twist your hair to
22    mislead somebody?  That's a fallacious argument,
23    because I think anyone in this courtroom would
24    admit that if he had twists, they had to be little
25    bitty short twists like this -- little bitty short

1    twists.

2        And remember what Mr. Copeland's testimony

3    was? This guy named Jamar Brown approached him and

4    came up to him and stuck a gun in his face and was

5    demanding that he, you know, submit to a robbery.

6    What, if you looked over here in the dark, would

7    you -- and you're far away from me and him, would

8    the first thing that you would notice and the only

9    thing that you would notice would be possibly

10    twists in somebody's hair? Would that be what you

11    would notice about somebody while a gun is sticking

12    in your face? Your focus would be so acutely

13    focused -- your attention would be so acutely

14    focused on that gun, you couldn't tell if it was

15    lighting outside at that time. But be that as it

16    may, that's what he said.

17        Okay. All right. Let's see if he's -- if you

18    give him that ability, then let's figure something

19    else out. Then that means that he's a pretty

20    observant person who is capable in the crux of a

21    very tragic moment -- or what do you call it --

22    traumatic moment, he's able to absorb details and

23    remember facts. That's what -- that's what that

24    would be a conclusion about him. All right. One

25    of the things that we can present to you this

1    afternoon is that there is a lack of evidence in

2    the case.  Okay.  I'm going to tell you where the

3    lack of evidence is.  Here's a man who claims he

4    can identify somebody under those circumstances,

5    but can't even tell you the last name or the --

6    where a person lives, who he's known for eight or

7    nine years and was with him on that night.  Now,

8    how can you be so smart in one situation and so

9    incapable of giving information about a key

10   material witness?  Not only a witness, a victim.  A

11   thirteen-year-old boy.

12        Hundreds of thirteen year olds have testified

13   in courtrooms.  They are considered competent.

14   There's not even a question as to their competency,

15   unless they were mentally retarded or something.

16   They would be competent witnesses.  He's certainly

17   an eyewitness to this case.  He was right there in

18   the middle of it.  Remember, this man who could

19   make the perfect identification, couldn't tell you

20   Serillo's last name.

21        What was he doing with this kid out there that

22   night?  Maybe the reason is he was doing something

23   he shouldn't have been doing.  He was up to

24   something.  He didn't want -- he didn't want that

25   kid to be able to come in and be questioned about

1     what in the heck they were doing.  What do you do
2     with a thirteen-year-old kid at 11:30 at night on
3     Tuesday night, a weeknight, who's not your job, no
4     blood relationship to you?  And he said he was
5     going to a -- he said he was going to a
6     girlfriend's house is where he was headed.  There's
7     something wrong.  There's something wrong to that.
8         He -- and what -- and what it is, that's one
9     of the witnesses that we need here.  I mean, why
10    wouldn't this person be here to back up his
11    identification.  That person was closer to whoever
12    it is than he was.  So they've got a big lack of
13    evidence.  So this is a man who can positively
14    identify somebody eight days later out of a group
15    of six.  Where is your photo lineup?  You know, one
16    out of six odds, you know, that ain't bad odds.  I
17    mean, you can pick somebody out of here.  What the
18    heck, they're all very similar.  That's what a
19    photo lineup is supposed to do, just pick somebody
20    out.  This will be available to you, I believe.  We
21    have admitted it, I believe.
22        Okay.  That's the lack of evidence.  This
23    thing took place at night.  Identification of
24    people at night is more difficult than the daytime.
25    We don't know what the lighting was out there.  I

1    think he said it was near a street light.  I don't

2    care what the deal was.  11 o'clock at night is one

3    thing and daytime is another thing.  It's hard to

4    identify at night.

5        Now, another thing I want to address for a

6    moment or two is his demeanor.  One of the things

7    that you gauge as jurors is credibility.  You are a

8    test -- sort of a polygraph, I guess you might call

9    it, a selective polygraph.  And you are supposed to

10   use your common -- commonsense knowledge -- or

11   whatever you want to call it -- your general

12   knowledge of how people behave, how people act, and

13   how people are presenting themselves when they are

14   testifying.  I suggest to you that Mr. Copeland was

15   a little nervous, most disjointed witness that he

16   could possibly be.

17       I was making a note, and I was going to tell

18   you that this is the whatever case or the you know

19   case.  You know, we were out there, you know,

20   whatever, you know, you know.  He must have used

21   whatever about a hundred times in his testimony.

22   And it -- It's kind of hard to even follow him.

23       Now, I'm going to bring up three more -- three

24   witnesses to contrast that to.  We had

25   Deven Greenwood, sister and Lavan Howard.  They

1    were consistent in their testimony about his hair.

2    Now, some of you might say, Well, you know, she --

3    it's his blood kin.  You know, they'll come in here

4    and they'll testify to anything.  Well, ask

5    yourself:  Did they look like they were lying?

6    Were they nervous when they were testifying?  Did

7    they -- did they -- were they inconsistent with,

8    you know, with what each other said?  Or were they

9    giving you what appeared to be an honest statement

10   of what they knew about their brother's hair --

11   well, not brother, of course, not from

12   Lavan Howard.  But the two girls were his

13   brother -- his sister.  And she was his, you know,

14   like a husband -- like a wife for a period of time.

15   I ask you to -- to give -- give weight to what you

16   think their credibility is.

17        I also would say that you should take his --

18   the way he testified and his demeanor and his

19   posture in this case -- or his poise in this case

20   as a witness.  I think he testified to you with the

21   sincerity that you would expect to come from

22   someone.

23        Now, what -- what -- how strong is the State's

24   case?  They've got a witness who has got a little

25   bit of a suspect story about who his

1    thirteen-year-old friend was, who's out there doing

2    something that we ain't -- we're not sure.  They

3    were wandering around out there that night going to

4    see somebody, who was allegedly the victim of a

5    robbery and the person that robbed him, apparently,

6    is Jamar Brown.  The State argues that the second

7    person was participating in the robbery.  I didn't

8    hear that much in the participating.  But that's

9    not the thrust of our case.  If you think that

10   there was a second person out there and that person

11   was participating, okay.  I'm submitting to you

12   that the State hasn't proved that he was out there.

13   But, the person that stuck the gun to his face, I

14   ask you to remember was Jamar Brown.  That person

15   has been identified.  I believe he, in fact, has

16   pled guilty to this offense.

17       When you add the witnesses of the State's

18   case, which I submit to you, I have outlined for

19   you -- and, of course, you can make your own

20   assessment.  I may have overlooked something.  I

21   think important testimony was Lavan Howard was

22   confident or sure that on Tuesday nights in April

23   she was going to work and going to her second job

24   and that she routinely had him at home

25   baby-sitting.  I submit to you these photographs

1    are at least consistent with a man who has a

2    relationship with his children, who is affectionate

3    with his children, who would be the type that would

4    assume that responsibility and baby-sit on

5    occasions as needed.

6         The State tried to bring in one -- one of

7    their rebuttal witness, a man, himself, whose

8    testimony didn't come across all that sterling and

9    is a convicted robber himself.  I submit to you

10   that that testimony travels rather weak.  I don't

11   know how he would be able to tell, after such a

12   long period of time, he's got twists in his hair.

13   I don't know how that would be -- that would be

14   hard to remember that.  What would be important

15   about that?  But he said it.

16        I will ask you -- I will leave you with this

17   question.  And I think that Mr. Greenwood did make

18   an important point when he said, could somebody

19   have had twists in his hair?  I don't think that's

20   the real issue.  I think it -- what -- what's the

21   strength of this man's testimony?  And how could he

22   not have told the police who the other victim was

23   who would have been the witness that could make or

24   break this case?  When he left that out, I think he

25   gunned his own case down.  Long hair, short hair,

```
 1     afro, corn rolls -- or whatever those --
 2     dreadlocks, or whatever, that's all, to me, less
 3     important than the fact that he didn't identify
 4     this kid with enough specificity that a police
 5     officer -- and believe me, they can find people.
 6     They've got investigators to go out and find
 7     somebody.  All you've got to do is say I've got a
 8     witness that lives at such and such address.  They
 9     can -- they've got police cars roaming this city
10     looking for witnesses all the time.
11          Now, anybody -- you might get back there and
12     say, Well, you know, it's the police officer's
13     fault -- Mr. Bruce -- Buce.  He should have done
14     something.  Well, if he did, he should have done it
15     is right, and maybe we would have some testimony
16     from that person.  But, he took -- you know, they
17     could have done it.  But he could have given the
18     information or Buce could have sought the
19     information.  Either way, it is a weakness or a
20     lack of evidence on the State's side.
21          In summary, I'll say to you this, that the
22     evidence, as it stands today, does not prove him
23     guilty of anything beyond a reasonable doubt.  It
24     leaves us room for substantial doubt.  We submit to
25     you that a proper assessment of the juror -- of the
```

1    evidence in this case will justify a reasonable

2    doubt.  But to -- hand in hand with that goes his

3    presumption of innocence.  It doesn't matter that

4    he's been convicted of something before.  It

5    doesn't matter -- he took the stand and admitted to

6    his prior transgression.  But he's still presumed

7    innocent.  And I ask you to take that presumption

8    back there and give it its due weight.  Then stack

9    up the evidence and stack up what the defense said

10   in regard to how he always kept his hair and never

11   had those twists or whatever, and ask yourself, am

12   I convinced beyond a reasonable doubt of his guilt.

13   I submit to you that I -- that that's not a

14   reasonable -- or not -- or not the reasonable

15   finding of this trial.  A reasonable finding is

16   there's a doubt.  The State didn't pass that --

17   that standard of proof.  That standard is so high,

18   and it sometimes said that if a -- if a District

19   Attorney proves that it was possible that somebody

20   is guilty, that's not beyond a reasonable doubt.

21   If they prove that it's probable that they're

22   guilty, it's not beyond a reasonable doubt.  It is

23   a standard above possible -- beyond possible and

24   beyond probable.  It's got to exclude all

25   reasonable doubt.  That is a high standard, and we

1    just ask you to listen to the Judge when she

2    delineates it to you in her jury charge.  And then,

3    under that standard, we ask you to find

4    Mr. Greenwood not guilty.  Thank you.

5                    MS. PERKINS:  Counsel.

6          Mr. Hartley was just talking about reasonable

7    doubt.  I think a good question -- if I was sitting

8    there, I would be asking what is reasonable doubt.

9    You know, what does that mean?  And reasonable

10   doubt is a doubt -- it's an actual doubt.  Okay.

11   It's not a suspicion or guess or a possibility of a

12   doubt.  It's an actual doubt.  It's a doubt that

13   arises from the evidence or the lack of evidence,

14   like Mr. Hartley said.  But it's an actual doubt.

15   It's not something that you're just sitting here

16   saying, Um, I wonder about that, but, you know,

17   there's nothing that you can point to, you know,

18   from the evidence that's reasonable, where you can

19   actually get that particular doubt.  I want you to

20   be clear about what that is, and I hope I've

21   cleared that up for you.  It's not a surmise.  It's

22   not a guess.  It's not a speculation, well, such

23   and such and such maybe.  Your doubt has to be

24   reasonable and it has to arise from the evidence or

25   the lack of evidence.

1          Okay.  Now, there's one thing, as I was

2     sitting there, I wanted everybody to keep in mind.

3     You know, this guy's testimony and about this

4     guy's.  This is a victim of a robbery.  This is

5     a -- this man -- this is a guy that was walking

6     down the street and had a gun put to his head and

7     had property taken from him.  He's a person.  When

8     this happened to him on April the 9th of 2002, it

9     was near a street light.  That's what his testimony

10    said.  And he got a good look at the two people

11    that was standing there in front of him.  One of

12    those persons was Jamar Brown, who put a gun to his

13    head.  And the other one was Kourtney Greenwood

14    that held the little boy.

15         And I want to go back and talk about the law

16    for the second.  Okay.  If he didn't put the gun to

17    his head, why is he charged with this offense?

18    That's a good question.  There's a law in the State

19    of Alabama.  And, again, that's why I asked you,

20    would you be willing to follow this law, not what

21    you think would be the law and not what you saw on

22    Law and Order last night -- or you're going to see

23    tomorrow night.  I think tomorrow is Wednesday --

24    tomorrow night.  Okay.

25         The law, aiding and abetting says, if you

1    assist somebody in the participation of a crime,

2    then you're just as guilty as the person who did

3    it.   Okay.   So if I'm driving a car and you go in

4    there and rob the gas station -- and I'm the get

5    away car driver -- you run out, and I get in the

6    car and I drive off, yeah, they're going to charge

7    with me breaking in that place and taking the

8    stuff, just like they charged you, even though I

9    didn't go in there and do it.   So whoever the

10   person is that was standing there holding that

11   little boy is just as guilty as Jamar Brown even

12   though he didn't put a gun to his head, because he

13   was assisting him.

14        Now, who is the person that was standing there

15   with Jamar Brown when Jamar Brown put the gun to

16   his head?   Members of the jury, it was

17   Kourtney Greenwood.   What evidence has there been

18   that he was not there?   An alibi by his baby's mom

19   who comes in today.   If you know -- and think about

20   it, members of the jury -- if she knew that the

21   father of her children was charged with something

22   and she knew -- she knew he was charged back then.

23   She said he called home and said he was charged.

24   If someone calls and says such and such was charged

25   with a crime and you knew they didn't do it and you

1    had evidence --

2                MR. HARTLEY:  Judge, I object.  I

3    think this is improper argument.  I don't think it

4    creates a burden on him or anybody to create a

5    defense.

6                THE COURT:  I'm going to sustain it

7    in that line.  But you can rephrase that.

8                MS. PERKINS:  Okay.  If she knew --

9    if she knew, this woman that took this witness

10    stand -- and I questioned her about it and I asked

11    her, Wouldn't that be important information, if

12    you -- if she knew he was innocent, the father of

13    her children that she doesn't want to see go to

14    jail -- if she knew that he wasn't there, that he

15    was somewhere else at the time, you don't think she

16    would have gone and told the police that?  She came

17    in here and testified today.  If she knew that back

18    then -- well, they didn't come to me.  How are they

19    supposed to know?  You've got evidence that this

20    man is innocent.  You know that he's charged with a

21    crime, why don't you go down there and tell them?

22    Why didn't you call the DA office?  Why didn't you

23    do something?  But she didn't, members of the jury.

24    First time you hear about that is in here today.

25    That's it.  She had information on this guy's

```
 1    innocence she could have told the police, yeah,
 2    detective, it would have been true.  But, no, we
 3    get it after the facts, where there can't be no
 4    investigation about that.  We can't investigate
 5    that.  No, we're already here.  Because if I had
 6    would have come back and told you then, you could
 7    have gone and checked out all this stuff.  But,
 8    now, I can't check nothing out, because this is the
 9    moment of truth, so I'll come in and tell it now.
10    Convenient.  That's the kicker, because that's his
11    alibi.  I wasn't there.  I was at home with a
12    six-pack of beer and my kids watching a movie.  The
13    only preservation of that alibi is the baby's
14    mother saying, I was at work.  She wasn't there.
15    But she comes in with that testimony to corroborate
16    his testimony today when nothing can be done to
17    check it out.  When she could have done it back
18    then, she knew he was charged and it could have
19    been investigated and find it true, we never would
20    have got to this point.  That's convenient.
21         And, members of the jury, he does not have an
22    alibi, because that is not credible.  That is not
23    credible.  Why -- how else do we know that he
24    wasn't there?  Well, because Mr. Greenwood said
25    that the person that was there had twists.  And he
```

1    never wears his hair like this.  It's always in a

2    short little afro.  Okay.  We already know that a

3    short afro can be twists, you know.  Nodding your

4    head like that, send an innocent man to jail with

5    twists -- because of twists.  He's not going no

6    where because of no twists.  Twists is not an

7    issue.  The issue is, Were you standing there when

8    a gun was put to this man's head?

9        We've already decided that the alibi is not

10   credible.  Could he have had twists?  Who are the

11   people that said he didn't have twists?  Sister.

12   Sister.  Well, who is the person that came in,

13   person from the community, not the sister, not the

14   cousin, not nothing, just somebody we could get

15   when they came up that we knew that knew him and

16   said, Okay.  You know this guy.  Have you seen him?

17   Have you seen him with twists before?  Yeah, I saw

18   him with twists.  Have you seen him with

19   Jamar Brown before?  Yeah, I've seen him with

20   Jamar Brown.  He don't have no connection.  He's

21   not a cousin, family member, or nothing.  He comes

22   up here -- I put him on for that limited purpose,

23   because that was the issue.  And the time is far

24   spent.  The issue is everybody is up here saying

25   that this guy doesn't have twists and that he said

1    he don't know Jamar Brown.  Have you seen him with
2    Jamar Brown?  Yes I have.  Have you seen him with
3    twists?  Yes I have.  Who is more credible?  Does
4    he have a felony?  Yes, he does.

5        Does he have a felony?  Yes, he does.  That
6    makes it more credible to me, because he's out
7    there where he is and sees him around.  He hangs
8    around.  He didn't say, I know him.  I'm not his
9    boy.  I'm not his best friend.  I don't hang out
10   with him.  He's not somebody that I, you know, go
11   shoot basketball with or whatever, but I know of
12   him.  I know of him.  And it's reasonable to know
13   of somebody.  If I know of you of my community,
14   even though I haven't talked to you, I'm qualified
15   to testify about what I've seen you like.  You all
16   are qualified to testify about what you've seen my
17   hair like once you've left here, because you've
18   seen me.  Did her hair look like that?  Yeah, I saw
19   it.  And just because you don't know me or you
20   haven't hung out with me, does that mean that your
21   testimony is any less credible about what you saw
22   my hair look like?  You saw me.  And his testimony
23   is more credible, because he don't have a reason to
24   sit up here and lie about it.  He ain't no family
25   member.  He ain't got no connection.  He's just

1       innocent.

2            Now, let's talk about Serillo.  And I want to

3       say this -- and I don't know if this is a culture

4       thing -- but it's legitimate to bring up, because

5       Mr. Hartley has made it an issue.  It is very

6       reasonable in African/American communities for you

7       to know people by their nicknames and know them in

8       the streets and not know their last name from your

9       neighborhood.  I just know this little kid that's

10      out in the street.  I saw him out there when I was

11      walking down the street.  I was, like, Hey, little

12      kid, come with me.  Didn't know his last name.  I

13      think there is a lack of evidence as far as why the

14      police didn't investigate that.  I don't have no

15      problem admitting, I can't make up evidence that's

16      not there.  It is so not there.  It is just totally

17      not there.  But is that reasonable doubt enough to

18      acquit this man for what he did when we have

19      everything else lined up and his defense doesn't

20      buy.

21           And you know what, if you consider that it is,

22      then do what you got to do.  Let him go.  Even

23      though he was there when this man put this gun to

24      his head and the law holds him guilty.  He said he

25      didn't want that little boy to get involved,

1   because he hated he had told him to come with him

2   and got him involved with this any way.  He told

3   the police his name.  Didn't follow up on him,

4   because he -- he hated that he put him in that

5   situation anyway.  He saw them both.  He identified

6   them both.  His looked at them both.  His alibi

7   doesn't wash up, because it's not quivocal.  It

8   comes in here when it can't be investigated.  And

9   he could have had twists in his hair.  And have

10  somebody say that he did have twists in his hair

11  about that point.  So that destroys the credibility

12  of their witnesses.

13      That's what this case comes down to, members

14  of the jury.  And you really do have a serious

15  decision to make.  You have to weigh the evidence.

16  And you have to weigh what happened out there.  We

17  know that it was a robbery.  We know, by law, that

18  whoever the person that was out there with

19  Jamar Brown when Jamar Brown put this gun to his

20  head, we know that whoever was out there is guilty

21  just the same as Jamar Brown.  The question for you

22  all to consider is, Is this the man that was out

23  there with Jamar Brown?  The victim says he got a

24  good look at him.  He identified him, and he

25  identified Jamar Brown.  Identified him then,

1    identified him in a photo lineup, and he identified

2    him today.  What says that he's not there?  His

3    alibi, which we know is not credible.  And

4    number two, the fact that the person he identified

5    had twists and his family says he doesn't have

6    twists.  That's the only two things that are not

7    there.  His alibi is not credible.  We know that he

8    could have had twists and we have a good

9    identification.

10        He was there, members of the jury.  And he

11    needs to be found guilty -- just as guilty as the

12    person that put that gun to his head.  We know that

13    you will render the only fair and just verdict in

14    this case, which is a verdict of guilt.

15            THE COURT:  Let me ask.  It's right

16    at five o'clock, I'd rather you be fresh -- but if

17    you want to stay, let's --

18            (Jurors nod.)

19            THE COURT:  Okay.  I see -- it will

20    be a good time to take a break.  What time do y'all

21    want to come back in the morning?  In the morning,

22    I'll charge you, and my part won't take as long as

23    theirs.  But what time, 8:30 or 9:00?  You're in

24    charge now.  9:00 or --

25            PROSPECTIVE JUROR:  8:30.

1     THE COURT: 8:30. Good. We'll --

2     PROSPECTIVE JUROR: 7:30.

3     THE COURT: Now, y'all need to start

4 agreeing, so -- but 8:30 in the morning. And we'll

5 get you in the jury assembly room. And, again,

6 I'll caution you not to discuss the case. And if

7 anybody at home asks you about it, just say the

8 Judge said I can't talk about it. So we'll see you

9 in morning.

10     (Out of the presence of the jury.)

11     THE COURT: Mr. Hartley --

12     MR. HARTLEY: I'm sorry. I was

13 getting distracted, Judge.

14     THE COURT: I think he wants to say

15 something, but I don't want him to say it

16 without --

17     MR. HARTLEY: I think it was kind of

18 like the jury argument, Judge, I believe is what

19 it's leading to.

20     THE DEFENDANT: (Defendant nods.)

21     MR. HARTLEY: Oh, okay.

22     THE DEFENDANT: I just wanted to say

23 a couple of things to you, Ms. Greenhaw, and

24 whoever else is in here. If I had any part of

25 doing this or knew anything about it, I would have

1    been told -- okay, Ms. Greenhaw, I know what you're

2    fixing to do -- but I don't know Mr. Brown.  And I

3    don't know Mr. Copeland --

4                    THE COURT:  Well, you know --

5                    THE DEFENDANT:  I don't know

6    Mr. Franklin.

7                    THE COURT:  -- you've testified to

8    that, and it's going to be up to the jury.  You

9    know, that's what it comes down to.  And none of us

10   have any control over that.

11                   THE DEFENDANT:  I just don't want to

12   be in no situation like that that I don't know

13   nothing about.

14                   THE COURT:  Okay.

15                   MR. HARTLEY:  Judge, what time did

16   they decide to come back?

17                   THE COURT:  8:30.

18                   (Break for the day.)

19                   (In the presence of the jury.)

20                   THE COURT:  Good morning.

21                   (Jurors respond.)

22                   THE COURT:  Now, we need to lock

23   that back door.  I don't want everyone coming in

24   and out.  Everyone that's in here, you've got to

25   stay in here.  You cannot leave while I'm charging

1   the jury.  And you need to be seated.

2              THE DEFENDANT:  Ms. Greenhaw, can I

3   say something, please?

4              THE COURT:  No.  You need to say it

5   to your attorney.  Now, I'm getting ready to charge

6   the jury.

7        It's now my duty to explain to you the law

8   that will guide you in your deliberations.  We all

9   appreciate how carefully you've been listening.

10  And I know you'll continue to do so.  I'm going to

11  go slow, because unfortunately in the State of

12  Alabama, you're not permitted to have a copy of my

13  charge to take with you to deliberation room.  Now,

14  I disagree with the law in that respect, but I must

15  follow it and so must you.

16       Now, this case is brought to you by an

17  indictment which charges Kourtney Greenwood with

18  Robbery in the First Degree.  I want you to

19  understand, from the beginning, that the indictment

20  here has no bearing whatsoever on the guilt or

21  innocence of any person.  It is not evidence in the

22  case.  It's merely the paperwork or legal process

23  by which the case is presented for trial.

24       Now, as to this charge, the defendant has pled

25  not guilty.  A plea of not guilty places the burden

```
 1    on the State of Alabama to prove by the evidence

 2    the guilt of defendant beyond a reasonable doubt.

 3    So before a conviction can be had, each of you must

 4    be satisfied beyond a reasonable doubt of his

 5    guilt.  Otherwise, he's entitled to an acquittal.

 6         Furthermore, the defendant is presumed to be

 7    innocent.  And that presumption attends him until

 8    his guilt is established from the evidence beyond a

 9    reasonable doubt.  This presumption of innocence is

10    evidence in the case and is to be considered by you

11    along with all the other evidence.  It's a fact

12    which is to be considered by you and goes with the

13    defendant to your verdict unless the evidence

14    convinces you beyond a reasonable doubt of the

15    prudent --

16                    THE DEFENDANT:  Ms. Perkins.

17    Ms. Perkins, why don't you go on and tell them

18    what --

19                    THE COURT:  Now, wait just --

20                    THE DEFENDANT:  -- what Jamar Brown

21    told you yesterday?  That dude told you he didn't

22    know me.

23                    THE COURT:  Okay.  I'm going to have

24    the jury go out.  If you'll take --

25                    THE DEFENDANT:  He told you he
```

1    didn't know me.

2              THE COURT:  -- them into the jury

3    deliberation room?

4              THE DEFENDANT:  He told you he

5    didn't know me, Ms. Perkins.  Why don't you tell

6    the jury that, Ms. Perkins.  Don't lie.  This is my

7    life on the line.

8              THE COURT:  Mr. --

9              THE DEFENDANT:  An innocent man can

10   go to prison for nothing.

11             THE COURT:  Mr. Greenwood --

12             THE DEFENDANT:  Tell them, Ms.

13   Perkins.  An innocent man can go to prison for

14   nothing, Ms. Perkins.  Please tell the jury that.

15   Please tell the jury that, Ms. Perkins.  That man

16   told y'all he didn't know me yesterday.

17             THE COURT:  Mr. Greenwood -- and I

18   don't want to say it in front of the jury -- he

19   needs to stay out here.

20             THE BAILIFF:  Okay.

21             THE COURT:  Is the door closed?

22             THE COURT REPORTER:  Not yet, Judge.

23             (Out of the presence of the jury.)

24             THE COURT:  Mr. Greenwood, you have

25   the right to stay in the courtroom if you conduct

1    yourself in a proper manner.  If you do not, you

2    will not be allowed to stay in the courtroom.  Now,

3    I can cite you, at this time, for being in direct

4    criminal contempt of court.  However, in light of

5    your other sentence -- a life sentence, I don't

6    think that that's worth my time.  So I want to know

7    now whether you're going to stay in here and remain

8    silent.  If not, we'll make arrangements so you can

9    hear my charge.

10            MS. PERKINS:  Judge, the State is

11    going to ask for a mistrial.  I mean, that's

12    information that the jury was not supposed to hear.

13            THE COURT:  I didn't hear what all

14    he said.

15            MS. PERKINS:  He said, Why don't you

16    tell him what Mr. Jamar Brown said?  Don't hold --

17            THE DEFENDANT:  He told y'all -- he

18    told y'all yesterday he didn't know me --

19            THE COURT:  Mr. Greenwood --

20            THE DEFENDANT:  Ms. Perkins.

21            THE COURT:  What did he say, Ms. --

22            THE DEFENDANT:  I need a lawyer,

23    Mama.  Get me a lawyer.  Don't let them do me like

24    this, please.

25            THE COURT:  Okay.  I'm citing him

1   for -- we'll make arrangements for -- to have some

2   way for him to hear it.

3        Tell the jury there's going to be a slight

4   delay and they can take about an hour break.  We're

5   going to have to make some adjustments.  Take him

6   back there.

7                    THE DEFENDANT:  Why y'all going to

8   let them do me like this?  Make sure they know

9   what's going on, Mama.  Make sure --

10                    THE COURT:  Take them out the back

11  way.

12                    THE DEFENDANT:  -- they know what's

13  going on.  That dude told her -- ask her.

14                    (Out of the presence of the

15                    defendant.)

16                    THE COURT:  I'm going to find out if

17  Mr. Merrill -- we don't have a monitor, do we?

18                    (Out of the presence of jury.)

19                    THE COURT:  Mr. Greenwood, the Court

20  had indicated before -- and I will state again.

21  You will not be able to stay in the courtroom when

22  I'm charging the jury.  I also want to correct

23  myself.  I had indicated I would not hold you in

24  contempt because you had a life sentence.  You do

25  not have a life sentence.  That was someone last

1    week.  So the Court will warn you again that you

2    would be subject to contempt.  You're going to be

3    taken back to the jury deliberation room.  You will

4    be able to hear everything that goes on in there.

5    There will be deputies with you.  If you have any

6    outbursts that can be heard in here, then you will

7    be gagged.

8         So, at this time -- and it will take probably

9    about five minutes to get the jury together.  But,

10   whenever, you can take him back there.

11                   THE BAILIFF:  Yes, ma'am.

12                   (In the presence of the jury.)

13                   THE COURT:  I'm sorry about the

14   delay.  But now I'm going to continue charging you.

15        And I had previously charged you that the

16   indictment is not evidence and that the State has

17   the burden of proof and that the defendant is

18   presumed to be innocent.  And that is a fact which

19   is to be considered by you and goes with your --

20   with the defendant to your verdict unless the

21   evidence convinces you beyond a reasonable doubt of

22   each and every element of the offense here.

23        Now, you've heard the term reasonable doubt

24   mentioned.  It's a relative term.  And it's not

25   always easy to define.  But, basically, a

```
 1    reasonable doubt, it's a fair doubt based upon
 2    reason and common sense arising from the evidence.
 3    In short, it's a doubt for which you can assign a
 4    reason that comes from the evidence.  Now, a
 5    reasonable doubt may arise not only from the
 6    evidence produced, but also from a lack of evidence
 7    or any part of the evidence.
 8         Now, the law tells us this about the term
 9    reasonable doubt.  It's not just a mere possible
10    doubt.  In other words, it is not a mere guess,
11    surmise, or capricious doubt.  The doubt which
12    would justify an acquittal, it must be an actual
13    doubt.  The reasonable doubt which entitles an
14    accused to an acquittal, it's not fanciful --
15    fanciful, vague, conjectural, or speculative.  But,
16    again, it's a reasonable doubt arising from the
17    evidence and remaining after a careful
18    consideration of the testimony such as men and
19    women such as you would consider under all the
20    circumstances.
21         Now, the State is not required to convince you
22    of defendant's guilt beyond all doubt or to a
23    mathematical certainty.  Again, it's beyond a
24    reasonable doubt.  I told you earlier that you're
25    the sole judges of the evidence, and I'm going to
```

1    remind you or explain to you again what is and what
2    is not evidence.  First, the indictment, as I said,
3    it is not evidence.  In addition, the arguments,
4    statements, or assertions or demonstrations of the
5    attorneys, that is not evidence.  Rulings made by
6    the Court during the course of the trial, that is
7    not evidence.  Evidence is simply the testimony of
8    witnesses under oath from the witness stand, any
9    exhibits or documents that were actually admitted
10   and any presumptions of law that I've given you,
11   such as the presumption of innocence.

12        Just as you're the judges of the evidence,
13   you're also the sole and exclusive judges of the
14   credibility of witnesses and the weight that should
15   be given their testimony.  In passing on the
16   credibility of a witness, you have the right to
17   consider any bias, interest, or prejudice that may
18   have been exhibited to you while that person was
19   testifying.  You also can consider the demeanor of
20   the witness on the stand.  That is, how did they
21   appear to you while they were testifying?  You also
22   can consider the basis for their testimony.  That
23   is, how did they know the facts to which they
24   testified?  Did they have an opportunity to see,
25   hear, just how did they know or learn those facts?

1    Now, the defendant in this case has testified

2    in his own behalf, and he has a perfect right to do

3    so.  And you cannot capriciously disregard his

4    testimony any more than that of any other witness.

5    The law is that you must take his testimony in the

6    case and consider it along with all the other

7    testimony.  But while you are evaluating his

8    testimony, you may also take into consideration his

9    interest in the outcome of the case.

10    In addition in evaluating the testimony of any

11    witness, you can consider whether or not that

12    person has prior convictions.  However, with regard

13    to the defendant, you may only consider them in

14    assessing his credibility in this case.  You cannot

15    assume that just because he has been convicted of a

16    prior offense that he may have committed this

17    offense.  That's not permissible as you may only

18    consider a prior conviction in evaluating

19    credibility.

20    Now, the defendant here also asserted the

21    defense of alibi.  That is to say that he was at

22    another place when this offense was committed.  The

23    burden of proof does not shift to the defendant

24    when he undertakes to advance an alibi defense.

25    Rather you're to consider the evidence of his alibi

1    with all the other evidence.  And if you have

2    reasonable doubt as to the guilt of the defendant,

3    then you would find him not guilty.

4         There's also been an issue raised regarding

5    identification.  The reliability of eyewitness

6    identification is an issue and deserves your

7    attention when evaluating the credibility of the

8    witness testifying to the identification.  And

9    you're to consider it as you would the testimony of

10   any other witness.  In addition to that, you're to

11   consider whether or not the witness had an adequate

12   opportunity at the time of the offense to observe

13   the person or hear the person.  Also, you can

14   consider the circumstances under which the victim

15   or the eyewitness observed the person.  The -- such

16   things as the length of time, the visibility,

17   distance, lighting.  You can consider those type of

18   conditions.  If you have a reasonable doubt as to

19   the identity of the defendant as to the person who

20   committed the offense, then you would find the

21   defendant not guilty.

22        Now, in Alabama there is a law which is called

23   aiding and abetting.  And the law in Alabama is

24   that a person is legally accountable for the

25   behavior of another person constituting an offense

```
 1      if with intent to promote or assist the commission
 2      of the crime, he aids or abets such other person in
 3      committing the crime.  And there's no distinction
 4      between principles and accessories in the
 5      commission of the offense.  And an accessory is
 6      just as liable for that offense as the principal.
 7      Aid and abet comprehends all assistance rendered by
 8      acts or words of encouragement, support or
 9      presence, actual or constructive to render
10      assistance should it become necessary.  However,
11      mere presence, without giving aid or encouragement
12      at or before the commission of the offense, does
13      not constitute aiding and abetting.
14          With regard to this particular offense, as you
15      know, the defendant is charged with robbery in the
16      first degree.  Under the law of Alabama, a person
17      commits the offense of robbery in the first degree,
18      if he, in the course of committing a theft uses or
19      threatens the imminent use of force against the
20      person of the owner of the property or any person
21      present, with the intent to overcome that person's
22      physical resistance, and, in doing so, is armed
23      with a deadly weapon.  So in order to convict, the
24      State must prove beyond a reasonable doubt that the
25      defendant, Kourtney Greenwood, committed or
```

1    attempted to commit or aided and abetted in the --

2    in the attempt to take any type of property from

3    the victim.  That in the course of committing or

4    attempting to commit or in aiding and abetting the

5    theft, the defendant used force against the person

6    with intent to overcome his physical resistance or

7    physical power to resist or threaten imminent use

8    of force against the person with intent to compel

9    acquiescence to the taking of the property and that

10   the defendant was armed with a deadly weapon or

11   aided and abetting while one was armed with a

12   deadly weapon.  And here it would be a gun.

13        A person commits the crime of theft of

14   property if he knowingly obtains or asserts

15   unauthorized control over the property of another

16   with intent to deprive the owner of his property.

17   A deadly weapon is any firearm or anything

18   manifestly designed or adapted for the purpose of

19   inflicting death or serious physical injury.  And a

20   person acts intentionally with respect to a conduct

21   when his purpose is to cause that result or to

22   engage in that conduct.  And a person acts

23   knowingly with respect to conduct when he is aware

24   that his conduct is of that nature or that the

25   circumstance exists.  And a deadly weapon can

1    include such items as a pistol.

2         If you find from the evidence that the State

3    has proved beyond a reasonable doubt each of the

4    elements of the offense of robbery in the first

5    degree, then you would find the defendant guilty as

6    charged.  On the other hand, if you find that the

7    State has failed to prove one or more of the

8    elements of robbery in the first degree, then you

9    would find the defendant not guilty.

10        In a moment, you'll be beginning your

11   deliberations.  And, in passing on the evidence,

12   you have the right to use your knowledge of people

13   and their affairs.  This is the tool that is given

14   you, in which some of us simply call your common

15   sense.  In arriving at your verdict, you must not

16   permit sympathy, prejudice, or emotion to influence

17   you.  Furthermore, you must not base your verdict

18   upon any preconceived idea of what would be a

19   popular or unpopular verdict.  In other words, your

20   verdict must strictly be based on the evidence

21   presented in the courtroom and the law that

22   applies.

23        Also, before you reach a verdict, all twelve

24   of you must reach or agree on the same verdict.  In

25   other words, there can be no split verdict.  It

1    must be unanimous.

2        In a moment when you go back to the jury

3    deliberation room, one of the first things you need

4    to do is to select one person to act as your

5    spokesperson or your foreperson. Now, that person

6    will have no greater weight in your deliberations

7    than anyone else, but will simply act as your

8    spokesperson. You need to discuss the case. And

9    if you have any questions -- and there's paper and

10   pencil back there -- have the foreperson write out

11   the question, sign. And if it's a question of law,

12   I will answer it. However, if it's a question of

13   fact, I cannot assist you, as you're the sole and

14   exclusive judges of the facts. Once you have

15   reached a verdict, have the foreperson sign the

16   verdict form, and you'll be brought back into the

17   courtroom and it will be read in the courtroom.

18        The verdict form is very simple, and there's a

19   place for you to check. And it's we, the jury,

20   find the defendant guilty of robbery in the first

21   degree as charged in the indictment. Or we, the

22   jury, find the defendant not guilty.

23        There's one last thing I must do. And I --

24   after you've been here for two days and waited a

25   lengthy time -- but we found from past experience

1    when a case goes this long, and particularly into

2    another day, it's always wise to have an alternate.

3    And it's extremely important, because if the number

4    reaches less than twelve, I would have to declare a

5    mistrial and we would have to start all over.  So

6    I'm sure you understand the importance of it.  And

7    it is not unusual for something to come up during

8    the course of the trial.  In fact, it happens more

9    frequently than you can imagine, that a juror

10   cannot continue serving as a juror.  But, at this

11   time, I'm going to -- the alternate is

12   Eloise Wilkerson.  And when the rest of you are

13   taken, in a moment, back to the jury deliberation

14   room, I'm going to have you stay in here.

15        Now, the attorneys are real good about letting

16   me know if I've misstated something or need to

17   charge you further.

18        What says the State?

19             MS. PERKINS:  State's satisfied,

20   Judge.

21             MR. HARTLEY:  Satisfied, Judge.

22             THE COURT:  Okay.  In just a moment,

23   you'll be taken back to the deliberation room.

24   Now, you're in charge of your time now.  You can

25   take breaks if you want to.  If you want to go down

1    and get a Coke, you can do so.  You also have your

2    own thermostat back there, so you're in charge --

3    it's either too hot or too cold in the courtroom.

4         And, in just a moment, we'll get the exhibits

5    and they'll go back with you as well as the jury

6    verdict form.  It will be just -- and there are

7    also restrooms back there.  And it will be just a

8    moment.

9         MS. PERKINS:  Judge --

10        THE COURT:  And let me say one last

11   thing.  I know you're aware that Mr. Greenwood is

12   not in the courtroom.  But you cannot infer

13   anything prejudicial whatsoever by his not being

14   present in the courtroom.  Okay.  So, if you'll --

15        MS. PERKINS:  Judge, my coat is back

16   there.  Can I get it before they go back there?

17        THE COURT:  Yeah.

18        MS. PERKINS:  (Ms. Perkins

19   complies.)

20        THE COURT:  Okay.  If all of you

21   will --

22             (Alternate juror comes to the

23             bench.)

24        THE ALTERNATE:  I'm sorry.

25        THE COURT:  Okay.

1           (Out of the presence of the jury.)

2                THE COURT:  I just wanted to tell

3   you how much we appreciate you serving.  I know

4   it's been a long two days.  The good news is you

5   are excused for the rest of the day.

6                THE ALTERNATE:  Thank you.

7                THE COURT:  But you would need to

8   call code-a-phone tonight, and they'll let you know

9   what to do about tomorrow or the rest of the week.

10  And it's up to you whether you want to talk to

11  anybody about the case.

12               THE ALTERNATE:  Thank you very much.

13               THE COURT:  Now, we need to bring

14  Mr. Greenwood back out and take up a few final

15  details.

16               THE BAILIFF:  You need him back out?

17               THE COURT:  Yes.

18               (In the presence of the defendant.)

19               THE COURT:  You were back in the

20  deliberation room the whole time?

21               THE BAILIFF:  Yes, ma'am.

22               THE COURT:  Mr. Greenwood, of

23  course, you were back in the deliberation room and

24  we had a monitor back there.  And I need to know,

25  were you able to hear the Judge's jury charge?

1          THE DEFENDANT:  (Defendant nods.)

2          THE COURT:  You need to --

3          THE DEFENDANT:  Yes.

4          THE COURT:  Okay.  And I think there

5    were deputies -- two deputies back there, and y'all

6    could hear it as well?

7          THE BAILIFF:  Yes, ma'am.

8          THE COURT:  I had -- the State had

9    hurriedly asked for a mistrial at one time.  And,

10   let me just say this, I'm not going to let --

11         MS. PERKINS:  We withdraw that

12   motion.

13         THE COURT:  Okay.  Well, I was going

14   to say, I don't think the conduct -- I'm not going

15   to let error be invited into the record.  But you

16   withdraw?

17         MS. PERKINS:  Yes, Judge.

18         THE COURT:  Now, Mr. Greenwood, I

19   got your letter or your note.  And, of course,

20   you're still referring to Jamar Brown, and

21   although, we went over some things yesterday, I

22   want to be sure it's in the Record.  And

23   Mr. Brown's attorney, Mr. Durant, was here

24   yesterday and is here as well.  And is there

25   anything anyone wants to say regarding Mr. Brown?

1          MR. HARTLEY:  I will start, Judge,

2     by saying that, first of all, prior -- some time

3     ago Mr. Brown had pled guilty in this matter.

4     Yesterday morning, I talked to Mr. Durant before I

5     went and spoke to Jamar Brown.  I asked Mr. Durant

6     if it was okay if I went and talked to him, because

7     I had some information that said that he might

8     testify in a way that would be beneficial for

9     Kourtney Greenwood.  I went to the jail yesterday

10    morning and sat with Mr. Brown, explained to him my

11    role in the case.  I understood that he had already

12    pled guilty.  I don't think I had attended his

13    guilty plea, so I asked him what he would be saying

14    pertaining to Kourtney Greenwood's participation in

15    the -- or lack of participation in the offense.

16         I'll just summarize that he represented that

17    he would be a witness for the defense.  I then

18    proceeded to the part of the jail where

19    Mr. Greenwood was and told him.  I said, I cleared

20    it with Mr. Durant.  I talked to Mr. Brown, and I

21    think he's going to be a defense witness.  I --

22          THE DEFENDANT:  State what --

23          MR. HARTLEY:  Well -- coming to your

24    defense, stating that Kourtney Greenwood was not at

25    the scene and that he was not acquainted with him.

1          So, I advised the Judge's office that we were

2     going to need him for a witness.  A little later in

3     the day, I believe -- I'm trying to remember who

4     told me -- but a deputy or some court personnel

5     told me that Mr. Brown was not -- had said

6     something about not testifying.  At that point,

7     because I really did want his testimony, we had a

8     meeting in the holding cell there that consisted of

9     myself, Mr. Durant, Mr. Brown, Vernetta Perkins,

10    and the District Attorney, Richard White.  I think

11    that was who all was there; is that right?

12              MS. PERKINS:  (Attorney nods.)

13              MR. HARTLEY:  Mr. Brown's

14    reservation seemed to be that he thought his

15    testimony, if it was favorable for the defense,

16    might adversely affect his sentence in the case,

17    because he has not been -- he has not been

18    sentenced yet -- in every way we thought was

19    ethically and correct -- legally correct, we tried

20    to admonish Mr. Brown to testify.  We appealed to

21    his attorney.  We appealed to the DA's office to

22    speak to him.  All of that to no avail.  And I

23    really regret that, because I really -- really did

24    want Mr. Brown's testimony.

25              THE COURT:  And let me say in this

```
 1    regard.  We've had the transcript of Mr. Brown's
 2    plea -- and that's Court Exhibit A, and it's in the
 3    Record.  And when the State was putting on its
 4    offer of proof, Mr. Greenwood, it was stated that
 5    he was with Mr. Brown on that occasion.
 6              MR. HARTLEY:  Of course, Judge, we
 7    think that that is what the Record says.  We think
 8    that it is typical -- that was an offer from the
 9    State, and he just said yes to --
10              THE COURT:  I'm just simply saying
11    that that's part of the Record.
12              MR. HARTLEY:  However, yesterday, he
13    said he had told the State and told his attorney,
14    and -- and made several references, he said that he
15    had told them that Kourtney Greenwood was not there
16    and he didn't know Kourtney Greenwood.  He made
17    that representation and led us to believe that it
18    was on the Record.  But he did say that that's what
19    his position was, but he refused to testify as such
20    in the trial.
21              THE COURT:  Well, that was not on
22    the Record, that --
23              MR. HARTLEY:  Right.  But it --
24              THE COURT:  -- representation.
25              MR. HARTLEY:  -- but he said that he
```

1    represented that to the DA's office.

2                    MS. PERKINS:  Judge, may I --

3                    THE COURT:  Yes.

4                    MS. PERKINS:  I have said on the

5    record more than one time that Mr. Brown did tell

6    myself and Mr. Durant again yesterday in front of

7    Mr. Hartley.  And I think we brought both of them

8    out here.  He did say -- and I have said it on the

9    Record more than one time -- that he did tell me he

10   did not know Kourtney Greenwood on the Record.  At

11   the same time, when I did do the offer of proof, he

12   did say, Yes -- yes, this is what the facts show.

13   Don't know what he meant -- was not in his head --

14   but, as we normally do the offer of proof, he

15   accepted that in order to get his plea -- that

16   version of the facts in order to get his plea of

17   guilty.  He did represent to me that he did not

18   know -- did not know Mr. Greenwood.  I was back

19   there.  Mr. Durant was back there.  Mr. Hartley and

20   Mr. White.  I told Mr. Brown, as well, in presence

21   of his attorneys and everybody else, that what the

22   State wanted him to do was testify truthfully, then

23   get on the witness stand, tell the truth and then

24   there would be no problem.  If he gets on the

25   witness stand and lies, then that would be a

1    problem for me.

2        I told him that the State of Alabama does not

3    do sentencing.  The Court does sentencing.  And all

4    of that was communicated to him.  Once we all had

5    the conversation with him, he said that he did not

6    want to testify.  And that's what he decided.  Was

7    that because we had a witness here saying that they

8    did know him.  I don't know why that was.  But he

9    decided that he did not want to testify.  And

10   that's a decision that was made.  That's where we

11   stand.

12            MR. DURANT:  And, Judge, may I add

13   that after everyone had left, all of the attorneys,

14   I spoke to Mr. Brown by myself.  And I indicated to

15   him that he was the one to make the decision,

16   whether he was going to testify or not.  That all

17   we wanted him to do was --

18            MS. PERKINS:  -- tell the truth.

19            MR. DURANT:  -- to tell the truth.

20   And, at that time, he indicated to me that he did

21   not want to testify.  And I -- I subscribe to what

22   everyone has said, he has -- he has, from the

23   outset, said he did not know Mr. Greenwood.

24            THE COURT:  Okay.  I just wanted all

25   of this to be on Record.

1                    MR. HARTLEY:  And could I ask

2   Mr. Durant one question?

3                    THE COURT:  Yes.

4                    MR. HARTLEY:  Did he express a

5   reservation because he thought it would affect his

6   sentence?

7                    MR. DURANT:  Yes, he did.

8                    MS. PERKINS:  But wasn't he

9   communicated to -- and I want to clear this up for

10   the Record, because I don't want there to be any

11   confusion if there is an appeal or something.  He

12   was told over and over by the Court, by myself, by

13   Mr. Durant, and by you that none of us have any

14   effect on sentencing.  There was no threats made to

15   him or promises on either way concerning his

16   sentence.  As a matter of fact, he was told that

17   the State of Alabama, out of my mouth in the

18   presence of both of you all, that the District

19   Attorney's office does not sentence.  The Court

20   does that.  And all the State of Alabama wanted him

21   to do was testify truthfully.

22                    MR. DURANT:  And I told him the same

23   thing when we were alone.

24                    THE COURT:  Okay.  Well, that's all

25   for now.

1          THE DEFENDANT:  Ms. Greenhaw, I

2     was -- when all this saying was going on, I was in

3     the little holding cell right there, listening and

4     looking at everything.  And I know what -- exactly

5     what they said.  And he looked -- Mr. Brown looked

6     exactly at Ms. Perkins, and she leaned back and

7     looked at him, and said that -- he knew -- he said,

8     I go to sentencing this week.  I ain't fixing to go

9     in there in front of those folks like that, because

10    I go for sentencing.  I know what y'all goin' try

11    to do.  You know, what I'm saying.  I know what's

12    going -- I ain't going in there like this.  I ain't

13    going in there like this.

14        I'm standing right there in the holding cell

15    looking --

16          THE COURT:  Okay.  Well, I think

17    everyone is -- there's not that much disagreement

18    about what occurred.  Okay.  That's all right now.

19                    (Jurors deliberating.)

20                    (In the presence of the defendant.)

21          THE DEFENDANT:  (Defendant raising

22    his hand.)

23          THE COURT:  Mr. Greenwood, wait just

24    a moment.  The jury has a verdict.  You can stay in

25    the courtroom if you do not say anything.  But if

1    you're going to say something, I need to know now,

2    because then you cannot stay in the courtroom.

3    THE DEFENDANT:  I ain't going to say

4    nothing to nobody.  I just want to talk to you.

5    THE COURT:  Well, I don't want

6    anything said to the jury.  Do you understand that?

7    THE DEFENDANT:  I ain't going to say

8    nothing to them.

9    THE COURT:  Okay.  Then -- and I

10    don't want any outbursts from anyone else in the

11    courtroom.

12    (In the presence of the jury.)

13    THE COURT:  I understand that you've

14    reached a verdict and you want the Court to read

15    the verdict?

16    THE FOREPERSON:  Yes, ma'am.

17    THE COURT:  Who has --

18    THE BAILIFF:  (Hands it over.)

19    THE COURT:  It is the verdict of the

20    jury, we, the jury, find the defendant guilty of

21    robbery in the first degree as charged in the

22    indictment.

23    Do you want the jury poled?

24    MR. HARTLEY:  Yes, Judge.

25    THE COURT:  I'm going to ask each of

1    you this same question, and I'll start with you.

2    Is this your verdict?

3                    THE JUROR:  Yes, ma'am.

4                    THE JUROR:  Yes.

5                    THE JUROR:  Yes, ma'am.

6                    THE JUROR:  Yes.

7                    THE JUROR:  Yes.

8                    THE JUROR:  Yes.

9                    THE JUROR:  Yes.

10                   THE JUROR:  Yes.

11                   THE JUROR:  Yes.

12                   THE JUROR:  Yes.

13                   THE JUROR:  Yes.

14                   THE JUROR:  Yes.

15                   THE COURT:  And let the Record

16   reflect that all the jurors indicated -- said it

17   was their verdict.  And, in accordance with the

18   verdict, the Court will adjudicate the defendant

19   guilty as charged.

20        I want to tell you how much we appreciate your

21   serving.  I know it's been a long two days.  And

22   I'm hoping that you won't have to come back, but

23   you still need to call code-a-phone tonight, but I

24   think we might can work it out where you don't have

25   to be back.  We appreciate you serving.  And,

1    although I told you earlier I'd explain some

2    delays, I really don't think you care about knowing

3    about them now.  They're just, unfortunately, some

4    delays that could not be avoided.  And we

5    appreciate your patience and --

6         Do you want to take them out the back?

7                   THE BAILIFF:  Yes, ma'am.

8                   PROSPECTIVE JUROR:  Does this mean

9    we don't have to come back this afternoon?

10                  THE COURT:  No.  You do not --

11   you're excused the rest of the day.  You've done

12   your civic duty, and you might have for the whole

13   week.

14        In fact, call Bob and see if they can be

15   excused.  I don't know where we are with jury

16   trials.

17        Because, if you are, it's small compensation,

18   but you can go down and get your juror fees.

19        I do want to say one thing for your

20   information that, although Mr. Greenwood wasn't in

21   here during the Court's closing, arrangements were

22   made so that he could hear everything that was

23   going on.

24                  MS. STRICKLAND:  Right now, they

25   need to call code-a-phone tonight.

```
 1                    THE COURT:  Call code-a-phone.

 2                    MS. STRICKLAND:  Maybe you'll get

 3        lucky.

 4                    THE COURT:  Okay.  And -- they can

 5        go out the front now, I think.

 6                    THE BAILIFF:  You want them to go

 7        out the front?

 8                    THE COURT:  Yeah, I think it's okay.

 9            Everyone needs to stay in the courtroom until

10        the jurors leave.

11                    (Out of the presence of the jury.)

12                    THE COURT:  We'll just set

13        sentencing for the 30th -- I don't see that on this

14        calendar, but it's a court date, isn't it?

15                    MS. STRICKLAND:  Yes, ma'am.

16                    THE COURT:  And if you'll --

17                    MS. PERKINS:  Is that -- that's

18        December 30th of this --

19                    THE COURT:  Is somebody asking a

20        question?

21                    MS. PERKINS:  Me.

22                    THE COURT:  Okay.  I'm setting

23        sentence for December 30th at 8:30.

24                    MS. PERKINS:  8:30, Judge?

25                    THE COURT:  Yes.
```

1                    (Court was adjourned.)

2

3

4

5

6          *  *  *  *  *  *  *  *  *  *  *

7              END OF PROCEEDINGS

8          *  *  *  *  *  *  *  *  *  *  *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      REPORTER'S CERTIFICATE

2

3    STATE OF ALABAMA

4    TALLAPOOSA COUNTY

5

6        I, Meridith Newman, Court Reporter and

7    Commissioner for the State of Alabama at Large,

8    hereby certify that on Tuesday, December 10, 2002,

9    I reported the TESTIMONY AND PROCEEDINGS in the

10   matter of the foregoing cause, and that the

11   foregoing pages contain a true and accurate

12   transcription of said proceedings.

13       I further certify that I am neither of kin nor

14   of counsel to any of the parties to said cause, nor

15   in any manner interested in the results thereof.

16       This 6th day of February, 2000.

17

18

19

20        Meridith Newman, Court Reporter
          Commissioner for the State of
21        Alabama at Large

22        MY COMMISSION EXPIRES:   12/30/2005

23

24

25